# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

|  |  |
|---|---|
| TENNESSEE STATE CONFERENCE OF THE NAACP, LEAGUE OF WOMEN VOTERS OF TENNESSEE, SHELBY COUNTY VOTERS ALLIANCE, FREE HEARTS, VICKIE TERRY, NOEL HUTCHINSON, PASTOR IVORY JACKSON, BISHOP MARVIN F. THOMAS, SR., TAJUAN STOUT MITCHELL, and GLORIA SWEET-LOVE,<br><br>             Plaintiffs,<br>v.<br><br>TRE HARGETT, in his official capacity as Secretary of State of the State of Tennessee, MARK GOINS, in his official capacity as Coordinator of Elections for the State of Tennessee; the STATE ELECTION COMMISSION, and DONNA BARRETT, JUDY BLACKBURN, JIMMY ELDRIDGE, MIKE MCDONALD, SECONDRA MEADOWS, VANECIA BELSER KIMBROW, and KENT YOUNCE, in their official capacities as members of the State Election Commission,<br><br>             Defendants. | Civil Action No. _____<br><br>**Requesting a three-judge panel pursuant to 28 U.SC. § 2284** |

## COMPLAINT

Plaintiffs NAACP Tennessee State Conference, League of Women Voters of Tennessee, Shelby County Voters Alliance, Free Hearts, Vickie Terry Noel Hutchinson, Pastor Ivory Jackson, Bishop Marvin F. Thomas, Sr., TaJuan Stout Mitchell and Gloria Sweet-Love (collectively, "Plaintiffs") bring this action against Tre Hargett, in his official capacity as Secretary of State of the State of Tennessee; Mark Goins, in his official capacity as Coordinator of Elections for the State of Tennessee; the State Election Commission; and Donna Barrett, Judy Blackburn, Jimmy

Eldridge, Mike McDonald, Secondra Meadows, Vanecia Belser Kimbrow, and Kent Younce, in their official capacities as members of the State Election Commission (collectively, "Defendants"), and allege as follows:

## INTRODUCTION

1. On May 5, 2026, the Tennessee Assembly convened an extraordinary session that included introduction of a map ("House Bill 7003" or "HB 7003") that eliminated the only majority Black district in the state of Tennessee, Congressional District 9 ("District 9" or "CD-9"), among other legislation. Fewer than 48 hours later, the Legislature adopted that map, despite objections made by lawmakers during rapid-fire committee hearings and floor debates making clear that the map was intentionally targeting the state's sole majority Black Congressional district and would deny Black voters any opportunity to elect candidates of their choice.

2. The proclamation did not result from any action by the Census Bureau. It did not reflect any mandate from a court. The Governor cited no dramatic shift in population since the 2020 Census that rendered the current maps unrepresentative. The sole predicate for redistricting was the Supreme Court decision in *Louisiana v. Callais* that made it more difficult to prevail on claims of racial discrimination under Section 2 of the Voting Rights Act against any newly drawn district.

3. U.S. Congressional District 9 has been the sole majority Black district in the state of Tennessee for over 50 years and has always included Memphis in its entirety and almost all of Shelby County.

4. Memphis, located in Shelby County, Tennessee, is the largest majority Black city in the United States. Likewise, Shelby County has the highest Black population of any county in the State of Tennessee, at nearly 55%.

2

5.      The Tennessee Legislature instituted an opaque and rushed process that lacked transparency and precluded opportunities for deliberation, to prevent meaningful debate, and to silence any voices of dissent. Furthermore, legislators passed HB 7003 without any meaningful consideration given to testimony provided by lawmakers and members of the public, and without opportunity for presentation or consideration of any alternative plans that may have addressed the discriminatory intent animating the plans.

6.      Civil rights groups, including several Plaintiffs in this action, opposed the redistricting and urged the Legislature to keep those communities whole.  The Legislature ignored them, dismantling cohesive neighborhoods and communities of interest across three geographically disperse and non-compact legislative Districts, eliminating the opportunity for Black citizens and other people of color to elect a candidate of their choice.

7.      The new Congressional map ("House Bill 7003" or "HB 7003") splits U.S. Congressional District 9, into three separate districts and assigns segments of the geographically compact city of Memphis to new districts that extend hundreds of miles across the state into rural counties in Middle and West Tennessee. This reconfiguration deliberately "cracks" Black voters and dilutes their voting strength. In doing so, the Legislature subordinated traditional redistricting principles, such as geographic compactness, preserving communities of interest, and respect for political subdivisions for racially-motivated objectives. Because of this new map, Black voters in Congressional District 9 no longer have an opportunity to elect their candidates of choice.

8.      The Tennessee Legislature was fully aware that these proposed changes to District 9 would deny the votes of, and adversely impact, Black voters.

9. Again and again, Black representatives told the Legislature about the adverse impact the plan would have on Black voters, about the dissolution of communities of interest, and about the intentional elimination of a district that provides Black voters the opportunity to elect a candidate of their choice. In response, the all-white legislators backing the bill changed nothing.

10. The Tennessee Legislature's late-decade redistricting of the Congressional map was adopted with discriminatory intent, disenfranchises Black voters in Congressional District 9, and makes unlawful use of race in violation of the Fourteenth and Fifteenth Amendment rights of Black voters and other voters of color. The Legislature adopted these new maps knowing of, and fully intending, their discriminatory consequences. Courts have identified factors that evidence intent to discriminate in drawing electoral districts. One factor is the subordination of traditional redistricting principles. Here, the Legislature ran roughshod over longstanding principles that it had previously treated as central to its redistricting efforts, including geographic compactness, preservation of communities of interest, and respect for political subdivisions. The rejection of these principles signals the abandonment of normal legislative objectives, and the pursuit instead of racially-motivated goals. A further signal of racial motivation is that the new map met those goals. It now denies Black voters in Congressional District 9 the opportunity, that they previously enjoyed, to elect their candidates of choice.

11. Further, the map's elimination of the only majority Black district in Tennessee strongly suggests racial intent. Legislatures are presumed to intend the natural and foreseeable consequences of their acts, especially when they are advised beforehand that those consequences will certainly occur.

12. In evaluating whether a legislative measure reflects discriminatory intent, courts have assessed the process by which Legislature adopted a new map, to evaluate whether

4

it departed from normal procedures and excluded participation—especially by people of color—and stifled debate. The process here departed drastically from business as usual.

13. Redistricting in the past has extended over weeks, with long, diversified hearings and substantial debate. The process here was extraordinarily truncated, taking only a couple of days from start to finish.

14. Tennessee's House and Senate committees quickly adopted this map with little debate or deliberation. On May 5, a Congressional map was introduced and considered in Committees. On May 6, that map was put to a vote in subcommittees and passed. On May 6, those same maps were introduced on the House and Senate floor, voted on, and passed again, in rapid-fire fashion. The entire process took approximately 48 hours.

15. The Tennessee Legislature's committees instituted an opaque and rushed process that departed from the normal order of business, lacked the customary transparency, and was designed to preclude deliberation, curtail debate, and silence dissent.

16. The Legislature entirely disregarded the minimal testimony they heard from lawmakers and members of the public opposed to the bill. Repeatedly, witnesses described to the legislators the harms the plan would produce. In no respect did these warnings produce any change in the map. None.

17. Neither the witnesses—nor, for that matter, the lawmakers themselves—had any opportunity to consider alternative plans not infected by discriminatory intent and that did not disadvantage Black citizens.

18. False statements by legislators regarding the redistricting plan also evidence discriminatory intent. Here, the Governor and legislators claimed that the new plan sought partisan advantage, the creation of a new Republican seat at the expense of the

5

Democratic incumbent. A sponsor of the legislation, however, asserted that the drafters had consulted no data other than the 2020 Census. The Census, however, does not provide information on partisan splits in voting. It does not discuss partisan results at all. By contrast, the Census provides detailed data on the racial composition of the old and proposed districts

19. In assessing whether redistricting reflected an intent to discriminate, moreover, courts consider the recent history of racial incidents and statements by the Legislature. Here, a litany of such events affects the analysis, including expelling two Black Representatives in 2023 for conduct on the floor of the House, while not expelling a White woman who engaged in the same conduct, and displaying the bust of the founder of the KKK in the State Capitol until 2021.

20. The pat claim that the Legislature was merely seeking partisan advantage rings hollow. Aside from the false statement about the source of data on which the Legislature relied, the Legislature could have achieved similar partisan results without so drastically carving up a majority Black city, separating communities of interest, and isolating Black urban residents in districts anchored by white rural communities with whom they do not share socio-economic needs or interests.

21. In light of the foregoing and below, Plaintiffs seek declaratory and injunctive relief that prohibits Defendants from conducting, holding, supervising, or certifying any election under the redistricting plans passed during the extraordinary session of the Tennessee General Assembly.

22. Plaintiffs respectfully request that the Court order Defendants to remedy the impermissible intentional vote dilution of Congressional District 9.

**JURISDICTION AND VENUE**

23. Jurisdiction is appropriate under 28 U.S.C. § 1331. Plaintiffs' claims arise "under the Constitution, laws, or treaties of the United States," including the Fourteenth and Fifteenth

6

Amendments to the United States Constitution, 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983, and 42 U.S.C. § 1988.

24. Jurisdiction is also appropriate under 28 U.S.C. § 1343 because Plaintiffs seek to "redress deprivation" of a "privilege or immunity secured by the Constitution of the United States" and seek "equitable relief . . . under [an] Act of Congress providing for the protection of civil rights, including the right to vote."

25. Venue in this Court is appropriate under 28 U.S.C. § 1391(b) because Plaintiffs' members' voting rights are being infringed upon in this District and in this County.

## REQUEST FOR THREE-JUDGE PANEL

26. Because this action challenges the constitutionality of the apportionment of the state's Congressional delegation, Plaintiff respectfully requests the convening of a three-judge panel pursuant to 28 U.S.C. § 2284.

## PARTIES

### A. Plaintiffs

27. Plaintiff **NAACP TENNESSEE STATE CONFERENCE** ("NAACP Tennessee") is a subsidiary organization of the National Association for the Advancement of Colored People, Inc. ("NAACP"), a national non-profit, non-partisan organization founded in 1909, which has more than 2,200 units across the nation and is powered by more than two million activists.

28. The NAACP works to ensure the political, educational, social, and economic equality of all persons and to eliminate racial hatred and racial discrimination, including by removing all barriers of racial discrimination through democratic processes.

7

29. NAACP Tennessee is a nonpartisan, multi-racial, non-profit membership-based organization headquartered in Jackson, Tennessee, and is the state's unit of the largest and most preeminent civil rights organization in the country.

30. NAACP Tennessee was founded in 1946 to serve as the Tennessee arm of the NAACP. Its mission is to eliminate race-based discrimination through securing political, educational, social, and economic equality rights and ensuring the health and well-being of all persons.

31. NAACP Tennessee has three regional divisions—Eastern, Middle, and Western Tennessee—as well as 70 local branch units and 16 college chapters and youth councils. NAACP Tennessee and most of its local branch units are primarily volunteer-run, and all officers are volunteers. In total, NAACP Tennessee has 5,699 members across the state. NAACP Tennessee's membership is predominantly Black, but the organization also has members from the Hispanic community, other communities of color, and white members. Many Black members are residents and registered voters in long-standing Congressional District 9 and long-time residents of Memphis and Shelby Counties.

32. Two central goals of NAACP Tennessee are to eliminate racial discrimination in the democratic process and to enforce federal laws and constitutional provisions securing voting rights. Towards those ends, NAACP Tennessee has filed lawsuits to protect the right to vote, regularly engages in efforts to register and educate Black voters, and encourages Black Tennesseans to engage in the political process by turning out the vote on Election Day.

33. NAACP Tennessee has a history of fighting for fair redistricting maps, as well as advocating for responsive government, specifically in Memphis and Shelby Counties.

8

34. During the extraordinary session of the General Assembly, NAACP Tennessee gave public testimony before Senate and House committees, submitted written testimony, and held its own Voters' Rights Town Hall on May 4, 2026, in Memphis. Based on the feedback received at the Town Hall, NAACP Tennessee presented testimony that made clear its members' objections to a late-redistricting process that was prohibited under a decades-old law; objections to a hastily scheduled process that was scheduled to coincide with local elections and denied opportunity for meaningful public participation; and objections to a process that was focused on elimination of the state's only majority Black district. The testimony also underscored the importance of keeping communities of interest together and not denying Black voters a voice by dismantling Congressional District 9.

35. NAACP Tennessee organized a protest against the enacted plans and spoke with Legislators about the proposed map. The NAACP Tennessee transported members from Memphis, Haywood County, Hardiman County, Crockett County, Madison County, and Carroll County to participate in the protest.

36. NAACP Tennessee brings this case on behalf of its members, including Black members, Hispanic members, and other members of color who are registered voters and reside in former District 9, and all three Districts created from dismantled District 9. These members have been subject to unconstitutional racial discrimination.

37. Under the new Congressional plan, it will be far difficult for Black voters and Hispanic voters to elect the candidates of their choice. This will have a chilling effect on many minority voters. Unfortunately, because of this new Congressional plan, many Black voters believe that their vote does not count.

38. Under such conditions, it is more challenging to encourage many Black voters and Hispanic voters to participate in the electoral process. Thus, Tennessee NAACP must devote more resources to voter registration, voter education, and get-out-the-vote efforts.

39. The **LEAGUE OF WOMEN VOTERS OF TENNESSEE** ("LWVTN") is a non-partisan, non-profit, grassroots, membership-based organization. LWVTN seeks to promote civic engagement through informed and active participation in government. It accomplishes this mission in part by helping Tennessee citizens register to vote, educating voters about the issues that impact them, and encouraging voters to be active participants in democracy through engaging with elected officials and their policy decisions. Additionally, LWVTN focuses on racial equity in voting and believes it is important that voters have a reasonable opportunity to elect their candidates of choice.

40. LWVTN is a part of the League of Women Voters of the United States and has over 1,000 members statewide, spread out amongst various local Leagues across Tennessee, including communities of color in each of the challenged Districts in Shelby. LWVTN has nine local leagues in Tennessee.

41. LWVTN brings this case on behalf of its members, which include registered Black, Hispanic, and other voters of color who reside in each of the challenged Districts that have been created from Congressional District 9, whose voting power has been unconstitutionally reduced given the configuration of the Districts in these counties.

42. As a result of the new Congressional plan, it is more difficult for the LWVTN to conduct their civil engagement activities. The new Congressional plan has caused confusion and chaos. As a result of the change, many voters and candidates do not know their new assigned districts.

10

43. The Tennessee Comptroller's address lookup website includes a disclaimer urging users to "verify all information with your local county election commission." Under such circumstances, it is challenging for LWVTN to provide voters with accurate information regarding assigned districts. This impedes LWVTN's work and mission.

44. Due to the new Congressional plan, LWVTN must divert more resources to communications. LWVTN must diversify how it communicates to voters about the new Congressional plan.

45. Before the new Congressional plan, the League of Women Voters Memphis' outreach was limited to Shelby County. Now, the League of Women Voters must distribute information from Memphis to the outskirts of Nashville. That area includes several rural areas that do not have local newspapers, thereby creating a huge communications and outreach challenge for LWVTN. LWVTN does not have the necessary resources to reach that entire area.

46. Under the new Congressional plan, it is difficult for Black voters and Hispanic voters to elect the candidates of their choice. Under such conditions, it is more challenging to persuade many Black voters and Hispanic voters to participate in the electoral process. Thus, LWVTN will have to divert more resources to voter registration, voter education, and get-out-the-vote efforts.

47. Plaintiff **SHELBY COUNTY VOTER ALLIANCE** ("SCVA") is a non-partisan organization that unites non-partisan 501(c)(3) organizations in Shelby County that are ensuring access to the polls, registering voters, increasing voter turnout, and fighting for racial equity at the ballot box. SCVA was founded in Memphis, Tennessee in 2019. SCVA's mission is to build power by working with Shelby County organizations to dramatically increase voter access, engagement, and turnout using data driven strategies and civic education.

11

48.     During the Extraordinary Session when the redistricting plans were passed, SCVA leaders publicly spoke about the importance of fair and equitable redistricting plans, with specific respect to Middle Tennessee.  Further, SCVA organized a protest against the enacted plans, and spoke with Legislators about the proposed map.

49.     SCVA has diverted and continues to divert resources away from its voter registration and other election protection activities, in order to advocate against the late-decade redistricting process.

50.     Had the Tennessee Legislature not dismantled CD-9, SCVA would not have needed to divert resources in the past or continue to do so in the future to combat the dilutive effects of the redistricting plans through, among other things, coalition-building and voter education in the challenged District.

51.     Prior to the enactment of the new Congressional plan, SCVA's civic engagement work was limited to Shelby County. Now, SCVA will have to do civic engagement work in all the counties that share Shelby County's Congressional districts.

52.     Plaintiff **FREE HEARTS** is an organization led by formerly incarcerated women that provides support, education, and advocacy in organizing families impacted by incarceration, with the ultimate goals of reuniting families and keeping families together. It was founded in Nashville, Tennessee. It has leadership across 18 counties in Tennessee, including Shelby County. Free Hearts' work includes voter education, voting rights restoration, and voter participation.

53.     The Free Hearts brings this case on behalf of its members, including Black members, and other members of color who are registered voters and reside in former District 9 and all three of the purported Districts that have been created from dismantled District 9.

12

54. The Free Hearts' members whose voting power has been reduced given the configuration of the districts in those counties.

55. Under the new Congressional plan, it is difficult for Black voters and Hispanic voters to elect the candidates of their choice. Under such conditions, it is more challenging to persuade many Black voters and Hispanic voters to participate in the electoral process. This is especially true for ex-offenders who must overcome significant legal and procedural hurdles to restore their voting rights. Thus, Free Hearts will have to devote more resources to voter registration, voter education, and get-out-the-vote efforts.

56. Plaintiff **NOEL HUTCHINSON** is a Black lawfully registered Tennessee voter residing in Memphis, Tennessee, in former Congressional District 9, now Congressional District 5. Mr. Hutchinson is over the age of eighteen and a United States citizen eligible to vote. Mr. Hutchinson is and will continue to be irreparably harmed by living and voting in unconstitutional districts where the Legislature used race to place her and others within districts.

57. Plaintiff **VICKIE TERRY** is a Black lawfully registered Tennessee voter residing in Memphis, Tennessee, in former Congressional District 9, now Congressional District 8. Ms. Terry is over the age of eighteen and a United States citizen eligible to vote. Ms. Terry is and will continue to be irreparably harmed by living and voting in unconstitutional districts where the Legislature used race to place her and others within districts. Ms. Terry is a member of NAACP Tennessee and the Executive Director of the NAACP Memphis Branch.

58. Plaintiff **PASTOR IVORY JACKSON** is a Black lawfully registered Tennessee voter residing in Memphis, Tennessee, in former Congressional District 9, now Congressional District 8.

59.     Pastor Jackson is over the age of eighteen and a United States citizen eligible to vote. Pastor Jackson is and will continue to be irreparably harmed by living and voting in unconstitutional districts where the Legislature used race to place him and others within districts. Pastor Jackson is the Pastor of Faith Temple Ministries Church of God in Christ.

60.     Plaintiff **BISHOP MARVIN F. THOMAS, SR.** is a Black lawfully registered Tennessee voter residing in Memphis, Tennessee, in former Congressional District 9, now Congressional District 5. Bishop Thomas is over the age of eighteen and a United States citizen eligible to vote. Bishop Thomas is and will continue to be irreparably harmed by living and voting in unconstitutional districts where the Legislature used race to place him and others within districts. Bishop Thomas is the 62nd bishop of the Christian Methodist Episcopal Church. He is a member of the NAACP National Board of Directors and a lifetime member of NAACP.

61.     Plaintiff **TAJUAN STOUT MITCHELL** is a Black lawfully registered Tennessee voter residing in Memphis, Tennessee, in former Congressional District 9, now Congressional District 9. Ms. Stout Mitchell is over the age of eighteen and a United States citizen eligible to vote. Ms. Stout Mitchell is and will continue to be irreparably harmed by living and voting in unconstitutional districts where the Legislature used race to place her and others within districts. Ms. Stout Mitchell is a member of NAACP Tennessee.

62.     Plaintiff **GLORIA SWEET-LOVE** resides in Brownsville, Tennessee. Sweet-Love is a United States citizen and a registered voter and votes regularly. She is President of NAACP Tennessee, where she also serves on the Organization's executive board. Sweet-Love is a member of the NAACP National Board of Directors. Under the new plan, she now finds herself assigned to Congressional District 8.

14

*Defendants*

63.     Defendant **TRE HARGETT**, as Secretary of State, is Tennessee's Chief Election Officer, who is responsible for appointing the Coordinator of Elections, currently Defendant Mark Goins, who serves "at the pleasure of the secretary of state" and may make regulations as necessary to carry out the election code with "the concurrence of the secretary of state." Tenn. Code § 2-11-201(a), (c).

64.     Defendant **MARK GOINS** is the Coordinator of Elections, who is tasked with "generally supervising all elections" and [a]uthoritatively interpret[ing] the election laws for all persons administering them." Tenn. Code § 2-11-201(a)(1), (4).

65.     Defendant **STATE ELECTION COMMISSION**, and its seven individual members in their official capacities, **DONNA BARRETT**, **JUDY BLACKBURN**, **JIMMY ELDRIDGE**, **MIKE MCDONALD**, **SECONDRA MEADOWS**, **VANECIA BELSER KIMBROW**, and **KENT YOUNCE**, are tasked with appointing and supervising five election commissioners for each county in Tennessee, who in turn are tasked with overseeing elections and implementing relevant election laws and regulations in those counties. See Tenn. Code § 2-12-103(a).

## FACTUAL ALLEGATIONS

A.     *Statewide Demographics and 2022 Congressional Redistricting*

66.     Black residents accounted for 6.1% of the total population growth in Tennessee between 2010 and 2020. Those who identified as any-part Black made up nearly 14.3% of that growth. Those who identified as Hispanic accounted for approximately 33.5% of that growth.

15

67. The 2020 Census also showed that voters of color make up approximately 26.5% of the voting age population ("VAP") of Tennessee, with 15.1% Black VAP ("BVAP") and 5.7% Hispanic VAP ("HVAP").

68. According to the 2020 Census, white, non-Hispanic people make up 73.5% of the voting age population ("WVAP").

69. Governor William B. Lee signed the prior Congressional map, Senate Bill 781 into law on February 6, 2022. CD 9 was anchored in Memphis and included only parts of Shelby and Tipton counties.



*2022 Congressional District 9*

**B.      48 Hour Legislative Process**

70. On May 1, 2026, the Governor called an extraordinary session via a proclamation dated May 1, 2026 (the "Proclamation"). The Proclamation calls the Legislature, in relevant part, to consider and act upon legislation relative to "the composition of Tennessee's

16

congressional District" and "making statutory changes that are necessary to effectuate changes to the composition of Tennessee's congressional District and to facilitate 2026 congressional elections."

71. On May 5, 2026, at or about 2:00 p.m., Central Time, the General Assembly convened an extraordinary session at the Capitol in Nashville, pursuant to the Proclamation. Representatives Cameron Sexton, Jason Zachary, Warner Todd, and Johnny Garrett introduced HB 7003 and the bill passed first consideration on the same date.

72. Legislators in three separate committees voted and passed HB 7003 on May 6. The Congressional Redistricting Committee discussed the bill for less than 45 minutes and passed it out of committee.

73. When asked on multiple occasions by Rep. Jesse Chism, a Black legislator from Memphis, about both the city of Memphis and Shelby County being predominantly African American jurisdictions, bill sponsor Rep. Sexton refused to admit the demographic makeup of each jurisdiction.

74. Furthermore, Rep. Sexton admitted that the map was drawn to add a third district in Shelby County in a colloquy with Rep. Bo Mitchell regarding whether the sponsors attempted to avoid dividing Shelby County in the reconfiguration of the congressional districts.

75. Legislators failed to make any substantive changes to HB 7003 based on debate raising concerns of the map's dilutive effect on Black and other voters of color in CD-9 before referring the bill to the Finance, Ways, and Means Committee on the same day.

76. The Finance, Ways, and Means Committee passed the map in approximately one hour.

77.     HB 7003 then proceeded to the Calendar and Rules Committee, which voted to put the bill on the regular calendar for May 7.

78.     The plan was not made accessible to the public. Members of the public were not provided any specific demographics or street-level data, only an image of the proposed plans. This procedure was abnormal compared to prior redistricting.

79.     The first time that members of the public had access to view the Senate and Congressional plan was on Wednesday, May 6, 2026.

80.     On May 6, 2026, the House Congressional Redistricting Committee adopted the House Redistricting Guidelines.

81.     There were only three witnesses allowed to present public comment.

82.     During that period, various members of the public, including Dr. Sekou Franklin, Congressman Steve Cohen, and Attorney Walter Bailey testified about the importance of transparency and collaboration in the redistricting process, including the ability of community members to comment on proposed maps prior to their approval. Multiple speakers, including Dr. Sekou Franklin, the Political Action Chair of the NAACP Tennessee, described the proposed plan as an unprecedented attack on voting rights that would dismantle a cohesive majority-Black district and strip Black voters of meaningful political power. Dr. Sekou Franklin also discussed the historical context of racial discrimination in Tennessee, and underscored that the actions of the Legislature were unlawful and unconstitutional

83.     On May 6, 2026, the Judiciary Committee convened to hear from members of the public. Despite widespread public interest, the Committee set aside less than an hour for this hearing and allowed only 3 individuals to speak on behalf of their communities, meaning that each

18

of them was afforded less than three minutes to express their goals and concerns regarding the redistricting process.  Only a few of the individuals allowed to speak were persons of color.

84.     At subsequent meetings, the Committee ignored the concerns that had been expressed by its Black constituents and pressed forward with the redistricting plan that dismantled Congression District 9.

85.     In the Senate, only limited public comment was permitted during committee meetings.  Several commenters, including Dr. Sekou Franklin of the Tennessee NAACP, stressed the need for a transparent process as well as the importance of keeping Memphis and Shelby County whole to ensure that Black residents and other people of color continued to be heard.

86.     On May 6, 2026, the House Committee reconvened for the presentations and approval of Tennessee's Congressional Plan.

87.      At this same meeting, the proposed Congressional map was publicly revealed.  The proposed Congressional plan had never been disclosed to the public.  The plan split communities of interest.  For instance, the Committee Plan split Shelby County (and thus the city of Memphis) amongst three existing Congressional Districts.  As a result, large segments of the Memphis community found themselves separated from those white residents of Memphis in the 5th Congressional District with whom they share public services and social ties.  Instead, they were shunted into the largely rural, white, non-Hispanic Districts, neither of which have any historical ties to Memphis's affected communities of color, and which have divergent social and policy interest.

*May 7 Tennessee House Floor Debate*

88.     On May 7, 2026, the full Tennessee House approved the plan and forwarded the plan to the Senate.

19

*May 7 Tennessee Senate Floor Debate*

89.     On May 7, 2026, the full Tennessee Senate approved the plan.

*Enactment of HB 7003*

90.     On May 7, 2026, Governor Lee signed the Act into law.

91.     The full House approved the Congressional Plan in a 70-26 vote. All Black representatives in the House voted against the Plan. On May 7, 2026, Governor William B. Lee signed SB 781 into law.

**C.      Analysis of CD-9**

92.     Shelby County is located in the southwest corner of the State and borders two states—Arkansas to its west and Mississippi to its south.  The Mississippi River flows along the entire western edge of Shelby County.  Memphis, in particular, shares many cultural attributes with the Mississippi Delta region and is considered part of the Mississippi Delta.

> [A] distinct geographical area of the state traditionally featuring an agricultural economy concerned with flood control of the Mississippi River. The geography of the Delta has been colorfully and somewhat accurately described as beginning in the lobby of the Peabody Hotel at Memphis, Tennessee, and ending at Catfish Row in Vicksburg, Mississippi. Since early times, concentrations of blacks have resided in the Delta area.

*Jordan v. Winter*, 541 F. Supp. 1135, 1139 n.1 (N.D. Miss. 1982) (internal quotations omitted).

93.     The newly drawn CD-9 is also far less compact than it was under the old plans, which had kept Shelby County and Memphis mostly whole.  Under the new plan, CD-9 now sprawls further east, with slender tentacles snaking out in either direction to pull in portions of more rural white counties, including parts of Fayette, Maury, Williamson, and Rutherford counties. The district also includes the entirety of Hardeman, McNairy, Hardin, Wayne, Lawrence, Giles, Lincoln, Moore, Bedford, and Marshall counties.

20



*2026 Tennessee Congressional Map*



*2026 Congressional Map, Shelby County Insert*



*2022 Map of CD-9 in Relation to Other Congressional Districts*

21

94. The Legislature did not provide sufficient justification for the drastic split of Memphis and Shelby County—and, in particular, the dispersion of communities of color within Memphis and Shelby County.

95. The only justification provided by Legislators was the purported need to follow "population and politics." This justification is merely pretext.

96. One of the sponsors of the redistricting bill claimed on the Senate floor, that Census data was the *only* data source used to draw maps. Census data does not provide partisanship information; it does, however, show the racial composition of Memphis. There was no consideration of voter records that would show party affiliation nor voting records. Thus, assuming the truth of the statement that Census data was the sole source used to draw maps, any political motivation is clearly false and pretextual.

97. As a result, Black voters no longer have a meaningful opportunity to elect candidates of choice in CD-9.

**D.      *Evidence of Recent Discrimination in the Legislative Process***

98. Recent discrimination in the legislative process is a factor suggesting that this legislation evinces discriminatory intent. Contemporaneously, the Tennessee Legislature continued to show its racial animus, including by pressing race-centric legislation with destructive and discriminatory effects and taking other actions intended to silence Black voices in the political arena.

99. During the 111th General Assembly, many of the same Legislators who supported the maps at issue also voted to pass a law that placed onerous criminal and civil penalties on organizations that conduct voter registration drives for failing to comply with disclosure and preregistration requirements, submitting "incomplete" voter registration applications, or

22

disseminating communications regarding voter registration that failed to include a compelled disclaimer. *See* 2019 Tenn. Laws Pub. ch. 250, § 9. The impetus for the law's passage appeared to be the submission of thousands of voter registration applications filed by predominately Black voters through voter registration drives held by community organizations operating in Memphis. Within a few months, a federal court enjoined the enforcement of the law—citing First and Fourteen Amendment concerns. *See Tennessee State Conf. of N.A.A.C.P. v. Hargett*, 420 F. Supp. 3d 683 (M.D. Tenn. 2019). The Legislature was ultimately forced to repeal the challenged provisions.

100. State Senator Raumesh Akbari and State House Representative Joe Towns, both Black legislators, sponsored Senate Joint Resolution 80. The resolution proposed adding to the 2022 ballot a constitutional amendment that would amend the Tennessee state constitution to remove language permitting the use of enslavement and involuntary servitude as criminal punishments and replace it with the statement: "[s]lavery and involuntary servitude are forever prohibited." Amendment 3, based on SJR 80, Extraordinary Session. Although the amendment ultimately passed, a handful of Legislators (all white) opposed it, with one representative asserting he was concerned that prisoners might have a right to sue for relief under the revised amendment. Each of the dissenting Legislators voted to pass the redistricting plans.

101. The General Assembly passed a bill, HB 0580/SB 0623, prohibiting public school teachers from engaging their students in academic discussions regarding structural racism and unconscious bias in Tennessee or the United States. *See* HB 0580/SB 0623. The Tennessee Department of Education promulgated guidelines that set forth a detailed complaint process and disciplinary proceedings against any public school or public-school teacher that promotes such "prohibited concepts."

102. On April 6, 2023, the 113th General Assembly voted on a resolution to expel two Black representatives—Justin Jones (HD-52) and Justin Pearson (HD-86)—from the Tennessee House for joining in anti-gun protests at the Tennessee capitol after a brutal shooting at a Memphis elementary school left six individuals dead, including three children.

103. Although a white representative—Gloria Johnson—also joined the protests, she was not expelled. She would later state that she believed her race was the reason she was able to retain her seat. Both expelled representatives were elected from majority-POC House District in Shelby and Shelby Counties, and one of them—Representative Pearson—had also come under attack by Legislators for wearing West African attire on the floor of the House, despite the absence of any rule prohibiting him from doing so. Many of the Legislators voting to expel Jones and Pearson had also voted to pass the redistricting plans at issue.

104. During the same legislative session, the 113th Assembly passed HB 1376/SB 817, a bill that gives public institutions of higher education greater leeway to restrict the ability of students to organize protests and gatherings on campus and of professors to teach "a divisive concept." *See* HB 1376/SB 0817. One of the bill's sponsors stated during a committee meeting that this bill would allow the Ku Klux Klan (KKK) to host events on college campuses as long as the organization is designated to be "non-violent."

105. While lawmakers on the Criminal Justice Committee discussed a bill relating to adding death by electrocution as one alternative to carry out the death sentence, one member of the Committee suggested adding "hanging by a tree" as a method of execution—a clear reference to lynchings. The Tennessee Black Caucus called for sanctions against and/or resignation by the member. Their efforts were not successful on either front.

24

106. The U.S. Supreme Court has set forth the *Arlington Heights* factors, which can be used to establish discriminatory intent.

### E. *Historical Background*

107. Tennessee's ugly history of racial discrimination and racial animus is long and has continued into contemporary times. For example, "[t]he infamous Ku Klux Klan (KKK) was organized in May or early June of 1866 in a law office in Pulaski [Tennessee]; . . . [t]he official reorganization of the Klan into a political and terrorist movement began in April 1867" in Nashville, Tennessee.[1] The FBI website describes the Ku Klux Klan as "white supremacist group."[2] Despite this, fewer than ten years ago, Memphis public parks still had statues of Confederate General Nathan Bedford Forrest, founder of the Ku Klux Klan — and Jefferson Davis.

108. Jefferson Davis notably said when resigning from the U.S. Senate: "My own convictions, as to negro slavery are strong, It has its evils and abuses…. We recognize the negro as God and God's Book and God's Laws, in nature, tell us to recognize him–our inferior, fitted expressly for servitude…. You cannot transform the negro into anything one-tenth as useful or as good as what slavery enables them to be." Davis went on to become the President of the Confederacy, which killed hundreds of thousands of U.S. soldiers and fought to keep Black Americans enslaved.

109. Statues of these two individuals should ***never*** have been erected in post-Civil War Memphis. Yet they stood until fewer than ten years ago, a time when each and every current member of the Tennessee was born, and many already were serving in the General

---

[1] https://tennesseeencyclopedia.net/entries/ku-klux-klan/

[2] https://www.fbi.gov/history/cases-and-criminals/kkk-series

25

Assembly. In 2017, Memphis residents used a legal mechanism to transfer the land to a private nonprofit because this legislature had passed the Tennessee Heritage Protection Act to make removal impossible.

110. Far from being ancient history, "[t]he Tennessee Heritage Protection Act was initially enacted in *2013 and amended in 2016, 2018, 2023, and 2025*. Generally, the Tennessee Heritage Protection Act prohibits the removal, relocation, or renaming of a memorial that is, or is located on, public property." (Emphasis added). In short, the Act, which is alive and well, mandates that memorials that honor white supremacists who advocated, fought, and killed U.S. soldiers to preserve and institution of chattel slavery in America, which allowed physical and mental abuse, torture, and rape of Black persons in this country and Tennessee specifically.

111. In response to Memphis residents legally removing these symbols of racism, the 110th General Assembly (2017-2018) considered HB2552 and SB2578, which would have created a Class E felony when a member of a local governmental body knowingly votes to approve an ordinance or resolution that expressly conflicts with state or federal law relative to immigration or historical memorials; violators also would be subject to removal from office. Senators Dawn White and Joey Hensley of the General Assembly introduced the bills which sought to make it a felony for local officials to represent their Black constituents and vote to remove symbols of white supremacy. In 2018, the General Assembly also considered HB 1574 and SB2520, which prohibited "[t]he sale, transfer, or other disposition of a memorial or public property that contains a memorial by a county, metropolitan government, municipality, or other political subdivision of this state." The law would prevent others from doing what Memphis residents did to rid the public parks of the racist symbols. Not surprisingly, co-sponsors who remain in the General Assembly and who in May 2018 sought to preserve public displays

26

honoring white supremacy, in May 2025 voted in favor of dismantling Tennessee's one Black district and stripping its residents of their voting power.

112. In 2020, young people—including now-State Representative Justin Jones—occupied the Legislative Plaza outside this capitol for more than two months, demanding the removal of a bust of Klansman Forrest from the rotunda. The General Assembly responded, not by removing the tribute to the white supremacist terrorist group founder, but by criminalizing occupation of the Legislative Plaza, making it a felony.

113. In 2021, the Historical Commission voted to remove a bust of Klansman Nathan Bedford Forrest from the state capitol. In response, fewer than two weeks later, Senator Hensley introduced legislation to fire every member of the commission. He has been a member of the General Assembly continuously since January 2003.

114. Put simply, the General Assembly, several times with the past ten years, the General Assembly has considered it its mission to preserve symbols of white supremacy and to honor those who considered Black persons inferior.

115. On May 2, 2019, Tennessee Governor Bill Lee signed into law HB1079/SB971, which imposed numerous burdensome and unnecessary restrictions on First Amendment-protected activities. These restrictions included substantial civil and criminal penalties for any organization failing to include government-compelled content in political communications, turning in "incomplete" voter registration forms, and failing to meet burdensome registration and reporting requirements before seeking to help their fellow citizens register to vote. The law was slated to go into effect on October 1, 2019.

116. NAACP Tennessee, Democracy Nashville-Democratic Communities, The Andrew Goodman Foundation, and The Equity Alliance filed suit to stop HB1079/SB971 from becoming

27

effective. The plaintiffs brought the action (*Tenn. State Conf. of NAACP v. Hargett*, 420 F. Supp. 3d 683 (M.D. Tenn. 2019)) because provisions of the law would "chill the plaintiffs' voter registration efforts, which have focused on traditionally disenfranchised communities—African-Americans and other minorities, college students, and low-income voters. The court enjoined Tennessee from effectuating the law and after months of discovery, but before the cases could proceed to a stage at which the entry of judgment would have been proper, the Tennessee General Assembly enacted, and the Governor signed, 2020 House Bill 2363, which repealed the challenged provisions.

117.    The Tennessee Human Rights Commission ("THRC") was established in 1963 as a nonpartisan and independent agency responsible for enforcing civil rights laws in employment, housing and public accommodation as well as discrimination claims against the State of Tennessee. On May 12, 2025, Tennessee Governor Bill Lee signed into law HB910/SB860 which dissolved the THRC. Any civil rights complaints that were pending before the THRC were summarily dismissed on June 30, 2025 without any further investigation or resolution. There was no mechanism to transfer automatically the complaints to any other agency.

**F.    Events Leading to the Challenged Decision, Contemporaneous Statements, and Legislative or Administrative History.**

118.    Here, the *Arlington Heights* factors of events leading to the challenged decision, contemporaneous statements, and legislative history merge. Because from beginning to end, the entire legislative process took fewer than 48 hours, the knowledge of legislators and the intent must be derived primarily from actions and statements made during the extraordinary session.

119.    The most telling statements came when the proponents of the redistricting bill were questioned by their colleagues about the data replied upon to draw the maps at issue. For example,

28

Representative Bo Mitchel asked House Speaker Cameron Sexton the simple and direct question: "What data did you use to draw these maps?" Rep. Sexton gave a simple and direct answer: "The maps were based off the last census."

120. The following is colloquy between Representative John Ray Clemmons and Representative Jason Zachary:

> Rep. Clemmons: Yesterday, Speaker Sexton was asked about who drafted this bill, and how this came about—he pointed to the Senate Sponsors, Senator Stevens [and] Senator Johnson. Yesterday, Senator Stevens was asked the question, what numbers were relied upon to draw these maps, and his answer was pretty conclusive—that it was census data. Section 1, here, refers to all census descriptions and so forth. Is that correct, that the census data was the sole basis for drawing these lines for 2020?

> Rep. Zachary: Yes, it is my understanding the census was used to draft the map you have in front of you—based on the population.

> Rep. Clemmons: Well, that's pretty interesting, because since census data does not include any partisan scores or partisan data, and your entire argument this entire week has been that this is about politics and partisanship. So, if you solely relied on census data, I'm confused about how you knew partisan scores when drawing this map if that wasn't even considered.

> Rep. Zachary: Did you have a question?

> Rep. Clemmons: If that is your answer, that is fine by me and that is all I need.

125. Census data shows racial composition but does not contain any categories for political party affiliation.

126. The proponents of the redistricting bill did not pretend the maps were drawn using records that show political data such as the number of registered Republicans, Democrats, and independents in any then-existing or anticipated district. They did not claim that, in drawing the maps, voting records were analyzed to determine for which party residents in anticipated districts had voted recently or historically. In short, there is no claim during the legislative process that the map drawers relied on partisan data to carve CD-9 precisely as HB7003 does.

29

127. The claim that map drawers only considered Census data, combined with the focused impact of the redistricting on Black and other voters of color, the abandonment of traditional redistricting principles—including but not limited to compactness—and the extraordinarily rushed and exclusionary redistricting process overcomes any presumption of legislative good faith.

128. Although they do not claim to have used partisan data in drawing the map, map drawers were well-aware that HB7003 would split Black and other voters of color in Memphis because of the demographic makeup of the city. It is unconstitutional to use race as a proxy for partisanship.

129. Memphis is routinely touted as having the largest Black population of any city in the United States. The notion that the General Assembly somehow did not know, even without looking at the specific racial demographics of the 2020 Census, that the vast majority of the population of Memphis is Black is far-fetched and defies credulity.

130. As Senator Jeff Yarbro stated during the extraordinary session:

> Since the sponsor is unaware as he says of the racial makeup, let me just let's talk about this for a second. So, District 9 takes a population of approximately, I believe, 220,000 residents of Memphis. They are 70% Black and that's the district that goes into Tipton County up to Lake County and across the Kentucky border. District 9 takes about 270,000 roughly… around 270,000 citizens of Memphis and about 70% of those residents are black, but District 8 takes 440,000 citizens of Memphis and Shelby County; 27% of those are Black. 72% of the white population is put into one district. 75% of the Black population is carved into two. Now we are being asked to believe that it's just the luck of the draw just happenstance that that happened. That's what we're being asked to believe. You are asking us to believe that the political leadership of this state was in a room with maps working with an attorney who's worked on the last several decades of redistricting.

132. It is also unreasonable to believe that the General Assembly somehow developed collective amnesia as to the history behind the make-up of District 9. As Senator Heidi

30

Campbell stated during the extraordinary session, "Tennessee's ninth congressional district was not drawn by accident. It was drawn because for most of this country's history, Black Tennesseans were locked out of political power by law, by violence, and by design."

133. As stated by Senator Sara Kyle during the extraordinary session, the redistricting bill is "on the back of Memphis blacks in eliminating their representation into districts where they will be 30, 32% Black. Not enough to have a majority vote to get a seat at the table."

## G. Departure from Normal Practices and Procedures

134. One such factor is "departures from normal procedures." Here, nothing about Tennessee's May 2026 redistricting procedures was normal.

135. As an initial matter, rather than taking place in the normal course of redistricting following the decennial Census, the redistricting literally took place during an "extraordinary session" of the General Assembly. Senator Charlane Oliver stated during the extraordinary session: "In the entire history of Tennessee, this legislature has never, not once redrawn congressional maps between apportionments without a court order, not once until, until the moment federal protection was removed."

136. Without a special proclamation from the Governor, no such redistricting could have occurred. Indeed, the Governor called the extraordinary session fewer than two weeks after the normal session ended. Next, the Governor's proclamation was issued on Friday, May 1, 2026, and called for the extraordinary session to begin at 2:00 p.m. on Tuesday, May 5, 2026. After the intervening weekend, the General Assembly adopted rules for the extraordinary legislative session that limited public comment and shortened the time frame for the public to view any new U.S. House of Representatives map. No potential maps were publicized in the days prior to the extraordinary session. No proposed legislation was provided in advance. Thus, citizens and

31

members of the General Assembly were given very little time and/or opportunity to take part in the redistricting process. Furthermore, the extraordinary session began on Tuesday, May 5, 2026, a Tennessee election day, with primaries taking place in Cheatham County, Davidson County, Dickson County, Montgomery County, Robertson County, and Sumner County. Thus, some members of the public who wanted to attend in person or participate in the extraordinary session had to choose between attending and/or participating in the session or voting in the primary elections.

137. Section 2-16-102 of the Tennessee Code, enacted in 1972, provides: "The general assembly shall establish the composition of District for the election of members of the house of representatives in congress after each enumeration and apportionment of representation by the congress of the United States. *The District may not be changed between apportionments*." (Emphasis added). Thus, for more than 50 years, the law and the normal procedure in Tennessee was that no late-decade redistricting could take place.

138. On May 5, 2026, during the extraordinary session, SB7002 was introduced by Senator Jack Johnson of District 27 and HB7002 was introduced by Representative Cameron Sexton of District 25. The publicly available caption text for SB7002 and HB7002 provides: "Redistricting, Congressional - As introduced, removes prohibition on changing congressional District between apportionments. - Amends TCA Title 2, Chapter 16."

139. Also on May 5, 2026, Senator Jack Johnson and Representative Cameron Sexton introduced SB7001 and HB7001, respectively. The publicly available caption text for SB7001 and HB7001 provides: "Congress - As introduced, suspends application of the requirement that candidates for United States house of representatives meet the residency requirements for state senators and representatives contained in the Tennessee constitution for the 2026 election. -

32

Amends TCA Title 2." The bill summary provides: "In order to qualify as a candidate in a primary election for congress, present law requires, among other things, that the person resided in the county or district for one year immediately preceding the elections. This amendment creates an exception to such present law requirement for the 2026 primary election for the office of United States representative."

140. The purpose of the residency requirements is obvious—they ensure a connection between the voters within a district and the person tasked with representing them. This is the norm. The purpose of the suspension appears wholly to allow the election of candidates who have no history of living in the district they seek to represent. The lifting of such residency requirements is not normal procedure. In fact, at least one candidate finds himself in the peculiar position of being qualified to run in a district in which he is no longer permitted to vote. Thus, he cannot vote for himself under the current scheme.

141. Normal procedure requires district and precinct boundary changes to be published in newspapers and voters to be notified by mail. This normal procedure was jettisoned in favor of allowing county election commissions to meet notice requirements solely by posting any changes to the commission's website, assuming one exists.

142. Rather than the normal redistricting procedure of looking at demographic changes across the state based upon Census data, the extraordinary session focused almost exclusively on dividing up the district that historically encompassed Memphis, which according to the 2020 U.S. Census, has a population that is 62.9% Black and 10.4% Hispanic/Latino. The only goal of the extraordinary session was to dilute the voting power of the residents of Memphis.

143. The speed at which the redistricting process, the repeal of a longstanding statutory prohibition on late-decade redistricting, and the suspension of statutory residency requirements

33

took place was not normal. Fewer than 48 hours after the extraordinary session was to begin, it was over, and Memphis had been cracked into three Districts.

**COUNT I**
**42 U.S.C. § 1983**
**Discriminatory Purpose in Violation of the Fourteenth and Fifteenth Amendments to the United States Constitution as to Congressional District (CD-9)**

144. Plaintiffs repeat and re-allege each and every allegation in the paragraphs above, as if fully set forth herein.

145. 42 U.S.C. § 1983 authorizes suits for the deprivation of a right secured by the Constitution or the laws of the United States caused by a person acting under the color of state law.

146. Article 1 of the Fourteenth Amendment to the United States Constitution provides: "No state shall make or enforce any law which shall abridge the privileges and immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction equal protection of the laws."

147. Section 1 of the Fifteenth Amendment to the United States Constitution provides: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."

148. Where racial discrimination was "a motivating factor" behind state action, that is sufficient to show that the State engaged in unconstitutional discrimination. *Foster v. Chatman*, 578 U.S. 488 (2016) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)).

149. Factors that may provide direct or circumstantial evidence of intentional discrimination include the challenged law's "impact" on different racial groups; the "legislative .

34

. . history," including "contemporary statements by members of the decisionmaking body" or other decisionmakers; the "historical background" and the "sequence of events leading up to the challenged" law's enactment; and, "any departures from the normal legislative process." Arlington Heights, 429 U.S. at 265-68.

150. The Congressional Plan—and, specifically, changes made to Congressional District 9—was adopted with the purpose of disadvantaging Black voters and, and as intended and conceived, will have a specific dilutive effect on Black voters in this District.

151. There is ample evidence of discriminatory purpose present in this case. Specifically, there is a history of discriminatory official actions in the State, and evidence of procedural and substantive departures from the ordinary procedures followed by the lawmakers.

152. In addition, the legislative and administrative history underlying the extraordinary session support an inference that the Legislature acted with discriminatory purpose in drawing and approving Congressional District 9.

153. Legislators provided inadequate notice of proposed changes, sought to minimize public comment, and expedited the legislative process in a manner intended to minimize opportunity for debate and deliberation from anyone other than the redistricting plan's main proponents.

154. Examples of such conduct include the 48 hour time period between the opening of the session and the adoption of the plan; the last-minute announcement of the extraordinary session and hearings; a rushed legislative process; the adoption of amendments without adequate notice (or, in some cases, any notice) to certain Legislators; and Legislators' full awareness, based on testimony from members of the Tennessee Black Caucus and civil rights groups, including some Plaintiffs, about the undeniable racially discriminatory effect of the Congressional Plan.

155. Defendants will be unable to prove that the Congressional Plan would have been enacted without the discriminatory intent described above.

156. By engaging in the acts and omissions alleged herein, Defendants acted and continue to act under color of law to deny Plaintiffs the rights guaranteed to them by the Fourteenth Amendment to the U.S. Constitution and will continue to violate those rights absent relief granted by this Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Convene a court of three judges pursuant to 28 U.S.C. § 2284(a);

B. Declare that the portions of the Congressional plan relating to the drawing of Congressional District 9 was enacted with an impermissible discriminatory purpose on the basis of race in violation of the Fourteenth Amendment to the United States Constitution;

C. Issue temporary and permanent injunctions enjoining Defendants from enforcing or giving effect to plan as it pertains to District 9 including an injunction barring Defendants from conducting any elections under the newly adopted map;

D. Take actions necessary to revert back to the map properly adopted following the release of the Census or determine and order valid plans for the U.S. Congress that are not the product of intentional discrimination;

E. Make all further orders as just, necessary, and proper to ensure complete relief consistent with the Court's orders; and

F. Grant such further relief as the Court deems to be appropriate, including but not limited to an award of Plaintiffs' attorneys' fees, expenses, and reasonable costs, as authorized by 42 U.S.C. § 1988 and 52 U.S.C. § 10310(e).

36

Dated: May 13, 2026

Respectfully submitted,

**TURNER FEILD, PLLC**
/s/*VAN D. TURNER, JR.*
Van D. Turner, Jr. (TN Bar No. 022603)
2650 Thousand Oaks Boulevard, Suite
2325 Memphis, TN 38118
(901) 290-6610
vturner@turnerfeildlaw.com


**NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE**

Kristen Clarke*
Myesha Braden*
Anthony P. Ashton*
4805 Mt. Hope Drive
Baltimore, MD 20215
(410) 580-5777
legal@naacpnet.org

**LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW**

Robert Weiner *
Jennifer Nwachukwu*
1500 K Street NW, Suite 900
Washington, DC 20005
(202) 662-8600
Rweiner@lawyerscommittee.org
Jnwachukwu@lawyerscommittee.org

*Pro hac vice motions to be filed

37