**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| VICKI HALE, *et al.* | § | |
| | § | |
| *Plaintiffs,* | § | |
| V. | § | Case No. 3:26-cv-00603 |
| | § | [Lead Case] |
| WILLIAM LEE, *et al.*, | § | |
| | § | |
| *Defendants.* | § | |
| | § | |
| | § | |
| TENNESSEE STATE CONFERENCE | § | |
| OF THE NAACP, *et al.* | § | |
| | § | |
| *Plaintiffs,* | § | Case No. 3:26-cv-00638 |
| V. | § | [Consolidated Case] |
| | § | |
| | § | |
| TRE HARGETT, *et al.*, | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

## <u>FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

Plaintiffs NAACP Tennessee State Conference, League of Women Voters of Tennessee, Shelby County Voters Alliance, Free Hearts, Vickie Terry Noel Hutchinson, Pastor Ivory Jackson, Bishop Marvin F. Thomas, Sr., TaJuan Stout Mitchell, Gloria Sweet-Love, and Memphis Urban League (collectively, "Plaintiffs") bring this action against Tre Hargett, in his official capacity as Secretary of State of the State of Tennessee; Mark Goins, in his official capacity as Coordinator of Elections for the State of Tennessee; the State Election Commission; and Donna Barrett, Judy Blackburn, Jimmy Eldridge, Mike McDonald, Secondra Meadows, Vanecia Belser Kimbrow, and Kent Younce, in their official capacities as members of the State Election Commission (collectively, "Defendants"), and allege as follows:

# INTRODUCTION

1.      On May 5, 2026, the Tennessee Assembly convened an extraordinary session that included introduction of a map ("House Bill 7003" or "HB 7003") that eliminated the only majority Black district in the state of Tennessee, Congressional District 9, among other legislation. Fewer than 48 hours later, the Legislature adopted that map, despite objections made by lawmakers during rapid-fire committee hearings and floor debates making clear that the map intentionally targeted the state's sole majority Black Congressional district and would deny Black voters any opportunity to elect candidates of their choice for Congress.

3.      Before the adoption of HB 7003, U.S. Congressional District 9 ("CD 9") has been the sole majority Black district in the state of Tennessee for over 50 years and has always included almost all of the city of Memphis and almost all of Shelby County.

4.      Memphis, located in Shelby County, Tennessee, is the largest majority Black city in the United States. Likewise, Shelby County has the highest Black population of any county in the State of Tennessee, at nearly 55%.

5.      The Governor's May 1, 2026 proclamation calling the extraordinary session (the "Proclamation") did not result from any action by the Census Bureau: The Governor cited no dramatic shift in population since the 2020 Census that rendered the current map unrepresentative. Nor does the Proclamation make any claim that CD 9, as it was drawn, violated the constitution or any federal law. It does not claim that redistricting was legally mandated. The sole predicate for redistricting was the Supreme Court decision in *Louisiana v. Callais* just days earlier that made it more difficult to prevail on claims of racially discriminatory effect under Section 2 of the Voting Rights Act against any newly drawn district.

2

6.      The Governor asserted that redistricting would take place so that "Tennessee's congressional districts accurately reflect the will of voters." The will of the Shelby County's Black voters, however, had been reflected since Congressional District 9's ("District 9" or "CD 9"): the district has routinely elected candidates preferred by the overwhelming majority of the district's Black voters. Thus, it was a desire to reflect the will of *other*—i.e., non-Black—voters that motivated the 2026 redistricting action.

7.      The rush to eliminate the only majority Black district in Tennessee, just days after the Supreme Court made it harder to prove racially discriminatory effect in voting, manifests the intent to discriminate. Put simply, emboldened by the increased difficulty in proving racial discrimination, the Tennessee legislature saw an opportunity to racially discriminate with little fear of challenge or accountability, and it took that opportunity.

8.      That intent defied logic, fairness, and morality. The Tennessee Legislature instituted a process that by design lacked transparency, precluded opportunities for deliberation, and sought to prevent meaningful debate and silence voices of dissent. Furthermore, legislators passed HB 7003 without any appreciable consideration of testimony by lawmakers and members of the public, and without opportunity for presentation or consideration of any alternative plans free of the discriminatory intent animating HB 7003.

9.      Civil rights groups, including several Plaintiffs in this action, opposed the redistricting and urged the Legislature to keep the Black communities in Memphis whole and together. The Legislature ignored them, dismantling cohesive neighborhoods and communities of interest and dispersing them across three elongated, non-compact districts, eliminating the opportunity for Black citizens and other people of color to elect a candidate of their choice. Again and again, Black representatives told the Legislature that the plan would adversely impact Black

3

voters, dissolve communities of interest, and intentionally eliminate a district providing Black voters the opportunity to elect a candidate of their choice. In response, the all-white legislators backing the bill changed nothing.

10. The new Congressional map splits what was U.S. Congressional District 9 into three separate districts and parcels out segments of the geographically compact city of Memphis to new districts that snake hundreds of miles across the state into rural counties in Middle and West Tennessee. This reconfiguration deliberately "cracks" Black voters and dilutes their voting strength. In doing so, the Legislature subordinated traditional redistricting principles, such as geographic compactness, preserving communities of interest, and respect for political subdivisions, to racially-motivated objectives. Because of this new map, Black voters in Shelby County no longer have an opportunity to elect their candidates of choice.

11. The Tennessee Legislature was fully aware that these proposed changes to CD 9 would deny the votes of, and adversely impact, Black voters. Any claim to the contrary would require the Court to believe that the Legislature was wholly unaware that Memphis (the largest Black city in the country) was a majority Black city.

12. Furthermore, the Legislature treated "partisan reasons" as magic words that, once uttered, would protect it from any real scrutiny of its actions or motives. The claim that the Legislature was merely seeking partisan advantage rings hollow. Indeed, during the course of the extraordinary session, the Legislature put forth no partisan data on which it supposedly relied in drawing its discriminatory map. Thus, without any evidence in the legislative record to support its claim of partisanship, the Legislature drastically carved up a majority Black city, separating communities of interest, and isolating Black urban residents in districts dominated by white rural communities.

4

13. Courts have identified factors that evidence intent to discriminate in drawing electoral districts. One factor is the subordination of traditional redistricting principles. Here, the Legislature ran roughshod over longstanding principles that it had previously treated as central to its redistricting efforts, including geographic compactness, preservation of communities of interest, and respect for political subdivisions. The rejection of these principles signals the abandonment of normal legislative objectives, and the pursuit instead of racially-motivated goals. A further signal of racial motivation is how effectively the new map met those goals. The new map now denies Black voters in Shelby County the opportunity that they previously enjoyed to elect their candidates of choice.

14. Eliminating the only majority Black district in Tennessee strongly suggests racial intent. Legislatures are presumed to intend the natural and foreseeable consequences of their acts, especially when they are advised beforehand that those consequences will certainly occur.

15. Moreover, the Legislature went further by allowing new candidates to qualify to run who had not qualified previously. Republican candidate Charlotte Bermann already had qualified to run in the geographic area subject to the new district map. She would have been the presumptive nominee for her party. Charlotte Bermann, however, is Black. Only by reopening the already closed candidate qualification period, was a white Republican candidate, Brent Taylor, allowed to qualify and run in the newly gerrymandered district dominated by white rural voters.

16. In evaluating whether a legislative measure reflects discriminatory intent, courts also have assessed the process by which the Legislature adopted a new map, to evaluate whether it departed from normal procedures and barred opportunities for meaningful participation—especially by people of color—and stifled debate. The process here departed drastically from business as usual. It was abbreviated, opaque, and exclusionary.

5

17. Prior to the extraordinary session, by statute, redistricting between decennial apportionments was unlawful in Tennessee. The legislature's first act during the session was to eliminate that restriction.

18. The once-per-decade redistricting in the past has extended over weeks, with long, detailed hearings featuring diverse witnesses, and substantial debate both in committee and on the floor. The process here was extraordinarily truncated, taking just 48 hours from start to finish.

19. Tennessee's House and Senate committees quickly adopted this map with little debate or deliberation. On May 5, a Congressional map was introduced and considered in Committees. On May 6, multiple subcommittees voted out that map. On May 7, in rapid succession, those same maps were introduced in the House and Senate, voted on, and adopted. The entire process occurred over a period of roughly 48 hours.

20. False statements by legislators regarding the redistricting plan also evidence discriminatory intent. Here, the Governor and legislators claimed that the new plan only sought partisan advantage, the creation of a new Republican seat at the expense of the Democratic incumbent. A sponsor of the legislation, however, asserted that the drafters had consulted no data other than the 2020 Census. The Census, however, does not provide information on voting patterns or election results, or on partisan affiliations of the population surveyed. By contrast, the Census provides detailed data on the racial composition of the populations included in the existing and proposed districts.

21. As set forth in the 2021 edition of *A Guide to Local Government Redistricting in Tennessee*, which can be found on the Tennessee Comptroller of the Treasury website:

> While Tennessee law indicates that the 2020 census population figures are the official data set used for redistricting, U.S. Public Law 94-171 also requires the Census Bureau to report these population totals to all organizations charged with redistricting. These population totals include

6

racial categories (such as White, African American or Black, American Indian or Alaska Native, Asian, Native Hawaiian and Other Pacific Islander, or Other Race).[1]

In short, for decades, the Legislature has been fully aware of the racial make-up of CD 9 , Memphis and Shelby County, as recently reflected by the 2020 Census.

22.     In assessing whether redistricting reflected an intent to discriminate, moreover, courts consider the recent history of racial incidents and statements by the Legislature.  Here, a litany of such events affects the analysis, including expelling two Black Representatives in 2023 for conduct on the floor of the House, while not expelling a white representative who engaged in the same conduct.  In addition, the Legislature displayed the bust of the founder of the Ku Klux Klan in the State Capitol until 2021 and repeatedly passed laws to prevent removal from public grounds of imagery and symbols honoring him and other segregationists and white supremacists.

23.     The Tennessee Legislature's late-decade redistricting of the Congressional map is thus the poster child for discriminatory intent. It disenfranchises Black voters in CD 9 and makes unlawful use of race in violation of the Fourteenth and Fifteenth Amendment rights of Black voters and other voters of color.  The Legislature adopted these new maps knowing of, and fully intending, their discriminatory consequences. Furthermore, their claim of partisan motives was undercut by the proponents of the maps, who openly admitted using no data source that provides partisanship information in creating the maps.

24.     In light of the foregoing and below, Plaintiffs seek declaratory and injunctive relief that prohibits Defendants from conducting, holding, supervising, or certifying any election under the redistricting plans passed during the extraordinary session of the Tennessee General Assembly.

---

[1] https://comptroller.tn.gov/content/dam/cot/pa/documents/lg/GuideToRedistrict.pdf at 13.

7

25. Plaintiffs respectfully request that the Court order Defendants to remedy the unconstitutional and intentionally discriminatory dismantling of CD 9.

## JURISDICTION AND VENUE

26. Jurisdiction is appropriate under 28 U.S.C. § 1331. Plaintiffs' claims arise "under the Constitution, laws, or treaties of the United States," including the Fourteenth and Fifteenth Amendments to the United States Constitution, 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983, and 42 U.S.C. § 1988.

27. Jurisdiction is also appropriate under 28 U.S.C. § 1343 because Plaintiffs seek to "redress deprivation" of a "privilege or immunity secured by the Constitution of the United States" and seek "equitable relief . . . under [an] Act of Congress providing for the protection of civil rights, including the right to vote."

28. Venue in this Court is appropriate under 28 U.S.C. § 1391(b) because Plaintiffs' members' voting rights are being infringed upon in CD 9 and in this County.

## REQUEST FOR THREE-JUDGE PANEL

29. Because this action challenges the constitutionality of the apportionment of the state's Congressional delegation, Plaintiff respectfully requests the convening of a three-judge panel pursuant to 28 U.S.C. § 2284.

## PARTIES

*A. Plaintiffs*

30. Plaintiff **NAACP TENNESSEE STATE CONFERENCE** ("NAACP Tennessee") is a subsidiary organization of the National Association for the Advancement of Colored People, Inc. ("NAACP"), a national non-profit, non-partisan organization founded in 1909, which has more than 2,200 units across the nation and is powered by more than two million members.

8

31. The NAACP works to ensure the political, educational, social, and economic equality of all persons and to eliminate racial hatred and racial discrimination, including removing all barriers of racial discrimination through democratic processes.

32. NAACP Tennessee is a nonpartisan, multi-racial, non-profit, membership-based organization headquartered in Jackson, Tennessee, and is the state's unit of the largest and most preeminent civil rights organization in the country.

33. NAACP Tennessee was founded in 1946 to serve as the Tennessee arm of the NAACP. Its mission is to eliminate race-based discrimination through securing political, educational, social, and economic equality rights and ensuring the health and well-being of all persons.

34. NAACP Tennessee has three regional divisions—Eastern, Middle, and Western Tennessee—as well as 70 local branch units and 16 college chapters and youth councils. NAACP Tennessee and most of its local branch units are primarily volunteer-run, and all officers are volunteers. In total, NAACP Tennessee has 5,699 members across the state. NAACP Tennessee's membership is predominantly Black, but the organization also has members from the Hispanic community, other communities of color, and white members. Many Black members are residents and registered voters in long-standing CD 9 and long-time residents of Memphis and Shelby County.

35. Two central goals of NAACP Tennessee are to eliminate racial discrimination in the democratic process and to enforce federal laws and constitutional provisions securing voting rights. Towards those ends, NAACP Tennessee has filed lawsuits to protect the right to vote, regularly engages in efforts to register and educate Black voters, and encourages Black Tennesseans to engage in the political process by turning out the vote on Election Day.

9

36.     NAACP Tennessee has a history of fighting for fair redistricting maps, as well as advocating for responsive government, specifically in Memphis and Shelby Counties.

37.     During the extraordinary session of the General Assembly, Dr. Sekou Franklin of the NAACP Tennessee provided oral testimony before Senate and House committees, and submitted written testimony. NAACP Tennessee held its own Voters' Rights Town Hall on May 4, 2026, in Memphis. Based on the feedback received at the Town Hall, NAACP Tennessee submitted written testimony that made clear its members' objections to a late-redistricting process that was prohibited under a decades-old law; objections to a hastily scheduled process that coincided with local elections and denied opportunity for meaningful public participation; and objections to a process that was focused on elimination of the state's only majority Black district. The testimony also underscored the importance of keeping communities of interest together and not denying Black voters a voice by dismantling CD 9.

38.     NAACP Tennessee organized a public demonstration against the last-minute and unlawful extraordinary session, and public calls to eliminate CD 9. NAACP Tennessee spoke with Legislators about their objections to the proposed map. The NAACP Tennessee transported members from Memphis, Haywood County, Hardiman County, Crockett County, Madison County, and Carroll County to participate in the public demonstration.

39.     NAACP Tennessee brings this case on behalf of its members, including members who are registered voters and reside in long-standing District 9, and all three Districts created from dismantled District 9. These members have been subject to unconstitutional racial discrimination.

40.     Under the May 2026 map, it will be far more difficult for Black voters and Hispanic voters to elect the candidates of their choice. This will have a chilling effect on many minority

10

voters. Unfortunately, because of the May 2026 map, many Black voters believe that their vote does not count.

41. Under such conditions, it is more challenging to encourage many Black voters and Hispanic voters to participate in the electoral process. Thus, Tennessee NAACP must devote more resources to voter registration, voter education, and get-out-the-vote efforts.

42. The **LEAGUE OF WOMEN VOTERS OF TENNESSEE** ("LWVTN") is a non-partisan, non-profit, grassroots, membership-based organization. LWVTN seeks to promote civic engagement through informed and active participation in government. It accomplishes this mission in part by helping Tennessee citizens register to vote, educating voters about the issues that impact them, and encouraging voters to be active participants in democracy through engaging with elected officials and their policy decisions. Additionally, LWVTN focuses on racial equity in voting and believes it is important that voters have a reasonable opportunity to elect their candidates of choice.

43. LWVTN is a part of the League of Women Voters of the United States and has over 1,000 members statewide. LWVTN members include communities of color in long-standing CD 9 and in the three Districts created from dismantled District 9. LWVTN has nine local leagues across Tennessee.

44. LWVTN brings this case on behalf of its members, which include registered Black voters, Hispanic voters, and other voters of color who reside in long-standing CD 9 and in the three Districts created from dismantled CD 9, whose voting power has been unconstitutionally reduced given the configuration of the Districts in these counties.

11

45. As a result of the May 2026 map, it is more difficult for the LWVTN to conduct their civic engagement activities. The May 2026 map has caused confusion and chaos. As a result of the change, many voters and candidates do not know their new assigned districts.

46. The Tennessee Comptroller's address lookup website includes a disclaimer urging users to "verify all information with your local county election commission." Under such circumstances, it is challenging for LWVTN to provide voters with accurate information regarding assigned districts and polling places. This impedes LWVTN's work and mission.

47. Due to the May 2026 map, LWVTN must divert more resources to communications. LWVTN must diversify how it communicates to voters about the new May 2026 map.

48. Before the May 2026 map, the League of Women Voters Memphis's outreach was limited to Shelby County. Now, the League of Women Voters must distribute information from Memphis to the outskirts of Nashville. That area includes several rural areas that do not have local newspapers, thereby creating a huge communications and outreach challenge for LWVTN. LWVTN does not have the necessary resources to reach that entire area.

49. Under the May 2026 map, it is difficult for Black voters and Hispanic voters to elect the candidates of their choice. Under such conditions, it is more challenging to persuade many Black voters and Hispanic voters to participate in the electoral process. Thus, LWVTN will have to divert more resources to voter registration, voter education, and get-out-the-vote efforts.

50. Plaintiff **SHELBY COUNTY VOTER ALLIANCE** ("SCVA") is a non-partisan organization that unites non-partisan 501(c)(3) organizations in Shelby County that work to ensure access to the polls, register voters, increase voter turnout, and fight for racial equity at the ballot box. SCVA was founded in Memphis, Tennessee in 2019. SCVA's mission is to build power by

12

working with Shelby County organizations to dramatically increase voter access, engagement, and turnout using data driven strategies and civic education.

51. During the extraordinary session in which the redistricting plans were passed, SCVA leaders publicly spoke about the importance of fair and equitable redistricting plans, with specific respect to Middle Tennessee. Further, SCVA worked with its members to organize a demonstration against the enacted plans and spoke with legislators about their concerns regarding the proposed map.

52. SCVA has diverted and continues to divert resources away from its voter registration and other election protection activities, in order to advocate against the late-decade redistricting process.

53. Had the Tennessee Legislature not dismantled CD 9, SCVA would not have needed to divert resources in the past, or continue to do so in the future, to combat the adoption of a discriminatory redistricting plan through, among other things, coalition-building and voter education in the three Districts created from dismantled District 9.

54. Prior to the enactment of the new May 2026 map, SCVA's civic engagement work was limited to Shelby County in long-standing CD 9. Now, SCVA will have to carry out civic engagement work in all the counties that share Shelby County's Congressional districts, making its work more difficult and cumbersome.

55. Plaintiff **FREE HEARTS** is an organization led by formerly incarcerated women that provides support, education, and advocacy in organizing families impacted by incarceration, with the ultimate goals of reuniting families and keeping families together. It was founded in Nashville, Tennessee. It has leadership across 18 counties in Tennessee, including Shelby County. Free Hearts' work includes voter education, voting rights restoration, and voter participation.

13

56.     The Free Hearts brings this case on behalf of its members, including Black members, and other members of color, who are registered voters and reside in former District 9 and all three of the Districts that have been created from the dismantling of District 9.

57.     The voting power of Free Hearts' members has been reduced as a result of the new May 2026 map. Under CD 9, Free Hearts' members, including Black voters and Hispanic voters, will no longer be able to elect candidates of their choice. Under such conditions, it is more challenging to persuade many Black voters and Hispanic voters to participate in the electoral process.  This is especially true for ex-offenders who must overcome significant legal and procedural hurdles to restore their voting rights. Thus, Free Hearts will have to devote more resources to voter registration, voter education, and get-out-the-vote efforts.

58.     Plaintiff **NOEL HUTCHINSON** is a Black lawfully registered Tennessee voter residing in Memphis, Tennessee, in former CD 9, now CD 5.  Mr. Hutchinson is over the age of eighteen and a United States citizen eligible to vote. Mr. Hutchinson is and will continue to be irreparably harmed by the Legislature's deliberate division of Shelby County's Black population across three districts with the purpose to deprive him and other voters of color of their right to vote and ability to elect candidates of choice and dilute the impact of his vote.

59.     Plaintiff **VICKIE TERRY** is a Black lawfully registered Tennessee voter residing in Memphis, Tennessee, in former CD 9, now CD 8.  Ms. Terry is over the age of eighteen and a United States citizen eligible to vote. Ms. Terry is and will continue to be irreparably harmed by the Legislature's deliberate division of Shelby County's Black population across three districts with the purpose to deprive her and other voters of color of their right to vote on an equal footing with other voters and to elect candidates of their choice and dilute the impact of her vote. Ms.

14

Terry is a member of NAACP Tennessee and the Executive Director of the NAACP Memphis Branch.

60. Plaintiff **PASTOR IVORY JACKSON** is a Black lawfully registered Tennessee voter residing in Memphis, Tennessee, in former CD 9, now CD 8. Pastor Jackson is over the age of eighteen and a United States citizen eligible to vote. Pastor Jackson is and will continue to be irreparably harmed by the Legislature's deliberate division of Shelby County's Black population across three districts with the purpose to deprive him and other voters of color of their right to vote on an equal footing with other voters and to elect candidates of their choice and dilute the impact of his vote. Pastor Jackson is the Pastor of Faith Temple Ministries Church of God in Christ.

61. Plaintiff **BISHOP MARVIN F. THOMAS, SR.** is a Black lawfully registered Tennessee voter residing in Memphis, Tennessee, in former CD 9, now CD 5. Bishop Thomas is over the age of eighteen and a United States citizen eligible to vote. Bishop Thomas is and will continue to be irreparably harmed by the Legislature's deliberate division of Shelby County's Black population across three districts with the purpose to deprive him and other voters of color of their right to vote on an equal footing with other voters and to elect candidates of their choice and dilute the impact of his vote. Bishop Thomas is the 62nd Bishop of the Christian Methodist Episcopal Church. He is a member of the NAACP National Board of Directors and a lifetime member of NAACP.

62. Plaintiff **TAJUAN STOUT MITCHELL** is a Black lawfully registered Tennessee voter residing in Memphis, Tennessee, in former CD 9. She remains assigned to the newly configured CD 9. Ms. Stout Mitchell is over the age of eighteen and a United States citizen eligible to vote. Ms. Stout Mitchell is and will continue to be irreparably harmed by the Legislature's deliberate division of Shelby County's Black population across three districts with the purpose to

15

deprive her and other voters of color of their right to vote on an equal footing with other voters and to elect candidates of their choice and dilute the impact of her vote. Ms. Stout Mitchell is a member of NAACP Tennessee.

63. Plaintiff **GLORIA SWEET-LOVE** resides in Brownsville, Tennessee. Sweet-Love is a United States citizen and a registered voter and votes regularly. She is President of NAACP Tennessee, where she also serves on the Association's executive board. She leads and directs much of the voter education work of the NAACP Tennessee State Conference concerning voting and once-a-decade redistricting. President Sweet-Love is a member of the NAACP National Board of Directors.

64. Plaintiff **MEMPHIS URBAN LEAGUE** ("MUL") is a nonprofit, nonpartisan, community organization that provides direct services and policy advocacy to help individuals and communities reach their full potential. Since its founding in 1943, MUL has been at the forefront of the Memphis and Shelby County community by working with youth, senior citizens, and the underserved and economically disadvantaged to expand economic opportunities and secure equality, power, and civil rights.

62. MUL provides direct services and policy advocacy to community members of Memphis. The key pillars of its programming focus on workforce and economic development; digital skills and education; education and youth development; and financial literacy. MUL also advocates for equity and inclusion, engaging local leaders and stakeholders to influence policy, promote civic participation, and amplify community voices.

63. The MUL engages in extensive voter education and registration work. MUL expends significant resources to hold and sponsor voter education and registration events during election years. For example, as a part of the National Urban League's 2026 Reclaim Your Vote

campaign, MUL and MUL Young Professionals ("MULYP"), a youth focused subsidiary of MUL, prepare in-person and webinar events to educate Memphians on the 2026 midterms voter registration requirements and deadlines, polling locations, and the candidates and issues. Through MULYP, MUL members also organize voter registration drives and door-knocking efforts to ensure Memphians are registered to vote in advance of upcoming elections.

64. MUL currently has approximately 50 active members, the majority of whom reside in Memphis. Its members include registered Black voters who reside in former CD 9, and who were unlawfully targeted, discriminated against, and denied an equal right to vote because of their race under the May 2026 Map.

## B. Defendants

65. Defendant **TRE HARGETT**, is Secretary of State and is Tennessee's Chief Election Officer. Secretary Hargett is responsible for overseeing the administration of the elections and appointing the Coordinator of Elections, currently Defendant Mark Goins, who serves "at the pleasure of the secretary of state" and may make regulations as necessary to carry out the election code with "the concurrence of the secretary of state." Tenn. Code § 2-11-201(a), (c).

66. Defendant **MARK GOINS** is the Coordinator of Elections, who is tasked with "generally supervising all elections" and "[a]uthoritatively interpret[ing] the election laws for all persons administering them." Tenn. Code § 2-11-201(a)(1), (4). As Coordinator of Elections, Goins is also charged with "obtain[ing] and maintain[ing] uniformity in the application, operation and interpretation of the election code." Tenn. Code Ann. § 2-11-201(b); see also id. §§ 2-11-202, 2-115.

67. Defendant **STATE ELECTION COMMISSION**, and its seven individual members in their official capacities, **DONNA BARRETT**, **JUDY BLACKBURN**, **JIMMY**

17

**ELDRIDGE**, **MIKE MCDONALD**, **SECONDRA MEADOWS**, **VANECIA BELSER KIMBROW**, and **KENT YOUNCE**, are tasked with appointing and supervising five election commissioners for each county in Tennessee, who in turn are tasked with overseeing elections and implementing relevant election laws and regulations in those counties. *See* Tenn. Code § 2-12-103(a). Among these responsibilities is ensuring voter registration records reflect each voter's assigned district, precinct, and polling place under the challenged map, and that ballots provided to voters reflect the congressional candidates for their districts under the challenged map. See Tenn. Code § 2-7-112.

## FACTUAL ALLEGATIONS

### A. *Statewide Demographics and The Enactment of the 2022 Congressional Map Demonstrate That a Second Round of Redistricting Was Unnecessary.*

68. The 2020 Census showed that voters of color make up approximately 26.5% of the voting age population ("VAP") of Tennessee, with Black VAP ("BVAP") at about 15.1% of total VAP and Hispanic VAP ("HVAP") at about 5.7% of the total VAP.

69. According to the 2020 Census, white, non-Hispanic people make up 73.5% of the voting age population ("WVAP").

70. Governor William B. Lee signed the prior Congressional map, Senate Bill 781 (the "2022 Plan") into law on February 6, 2022.

71. The 2022 Plan maintained a CD 9 centered in Memphis and Shelby County. Memphis is a majority-Black city (61.3% BVAP), home to 401,033 Black people, the largest concentration of Black people in the State. Shelby County, which contains Memphis, is a majority-Black county (51.4% BVAP), home to 493,757 Black people, which is over 40% of the State's Black population. CD 9 reflected these demographic realities and has been a majority Black district (61.1% BVAP) for decades.

18



Tennessee, District 9

*2022 Congressional District 9*

72. CD 9 was not drawn pursuant to a court order or injunction nor part of any court-ordered effort to comply with anti-discrimination law. Nor has it ever been held to have been drawn predominantly based on race. In fact, at least since 1962, when the Supreme Court's holding in *Baker v. Carr* helped establish the principle of one-person, one-vote in legislative districting, CD 9 existed as a majority-Black district simply because of the compact majority-Black city of Memphis and Shelby County at the District's core.

**B.** ***The 48 Hour Extraordinary Session Ushered in a Statutory Election Scheme Designed to Dilute Black Votes.***

73. On April 29, 2026, the U.S. Supreme Court decided *Louisiana v. Callais*, which, *inter alia*, concerned a racial gerrymandering challenge to the state of Louisiana's redrawing of its Congressional district lines following a preliminary finding by a different federal court that a Louisiana congressional districting plan creating only a single majority-Black district likely violated Section 2 of the Voting Rights Act. . The Court's ruling made clear that "§2 [of the Voting

19

Rights Act], *as properly construed*, can provide [a compelling state] interest" to use race in redistricting. 146 S.Ct. 1131, 1143 (2026). But the Court's *Callais* decision "update[d] the *Gingles* framework [to] realign it with the text of §2 and constitutional principles" in a manner that made it more difficult to prevail on claims of racially discriminatory effect under Section 2 . *Id.* at 1159.

74.     Unlike the district at issue in *Callais*, however, CD 9 was not drawn to comply with Section 2. Despite this, just hours after the U.S. Supreme Court announced its decision in *Callais*, white legislators in the General Assembly called for, and the Governor initiated, an unprecedented round of late-decade redistricting to dismantle Memphis-based CD 9. The obvious implication of this timing is that legislators recognized CD 9 was majority-Black and saw *Callais* as removing the legal prohibition of discrimination as a barrier to its dismantling. White officials made clear that their aim was breaking up the lone majority-Black district in the State, which represented the largest majority-Black city in the State.

75.     White legislators made clear that the state's late-decade redistricting was in response to the Supreme Court's decision in *Callais*. On the same day the *Callais* decision was issued, white U.S. Senator Marsha Blackburn stated, "I urge our state legislature to reconvene to redistrict another Republican seat in Memphis," in essence to take advantage of the perceived weakening of the VRA's anti-discrimination protections. This was even though white Senate Speaker Randy McNally acknowledged that Tennessee's existing 2022 Plan was "strong, fair and legal."

76.     White State Representative Andrew Farmer, who served as 2026 Chairman of the Tennessee House Judiciary Committee and the Congressional Redistricting Committee, stated that the General Assembly would not have engaged in late-decade redistricting were it not for *Callais*,

effectively acknowledging that Memphis and CD 9 were being targeted because of their majority-Black status and the perceived removal of the anti-discrimination protection of Section 2.

77. In haste, the Governor called an extraordinary session via the May 1, 2026 Proclamation. The Proclamation calls the Legislature, in relevant part, to consider and act upon legislation relative to "the composition of Tennessee's congressional District" and "mak[e] statutory changes that are necessary to effectuate changes to the composition of Tennessee's congressional District and to facilitate 2026 congressional elections."

78. The General Assembly convened an extraordinary session at the Capitol in Nashville on May 5, 2026 at approximately 2:00 p.m. pursuant to the Proclamation.

  i.  *May 5 Extraordinary Session Proceedings*

79. Section 2-16-102 of the Tennessee Code, enacted in 1972, provides: "The general assembly shall establish the composition of districts for the election of members of the house of representatives in congress after each enumeration and apportionment of representation by the congress of the United States. ***The districts may not be changed between apportionments.***" (Emphasis added). Thus, for more than 50 years, the law and the normal procedure in Tennessee was that no late-decade redistricting could take place.

80. On the first day of the truncated extraordinary session, legislators, all of whom were white, quickly advanced legislation to override the half-century ban on late-decade redistricting, which was enacted following the very first census after the Supreme Court's *Baker v. Carr* decision, mandating the creation of districts with equal populations following each decennial census. During a hearing the next day, the legislation's sponsor, Senator Jack Johnson, who is white, admitted that Tennessee had never before defied or made exceptions to this ban.

81. Black legislators repeatedly called attention to this gross departure from long-accepted practice. Representative Harold Love, Jr., for example, pointed out that "this process" contravened the ordinary rigorous practice and was "not being done the right way. 1981, 1992, 2001, 2012, 2022. Each of those moments were moments when a redistricting process took place. Bills were filed, bills were deliberated, bills were passed after data was collected from the 10-year, what we call the census. The reason that was done, because we wanted to make sure that if there were population shifts in the state, we didn't want any district having fewer people or one district having more people and the representation not being fair. And this was the process, and it has worked."

82. Speaker Sexton's response to Representative Love's query confirmed the highly unusual and opaque nature of the process. Speaker Sexton stated that "many individuals [he] believe[s] on social media [] have submitted maps."

83. Over the course of 48 hours, however, the white supermajority hastily discarded a legal prohibition on late-decade redistricting that had been in place for over 50 years and allowed for the redrawing of congressional lines in May of an election year. There was no support for abandoning the late-decade redistricting ban from any Black legislators.

84. On May 5, Representatives Cameron Sexton, Jason Zachary, Warner Todd, and Johnny Garrett, who are white, also introduced HB 7003, a placeholder bill for Congressional redistricting, which passed on first consideration.

85. Additionally, the Ad Hoc Rules Committee, controlled by white legislators, rejected proposals to allow for public hearings on redistricting legislation and to require legal analysis for compliance with the statutes and laws of Tennessee and the United States. The Committee instead reduced the transparency of the hurried and haphazard process by shortening

22

the time frame for the public to view any new May 2026 map. The Committee thus departed from the practice followed during the last two decades of redistricting, in which the General Assembly provided opportunities for public input and participation in the redistricting process. Consequently, the redistricting undertaking, which was supposed to "reflect the will of voters," precluded voters from participating.

86. The Ad Hoc Rules Committee also rejected a proposal from House Minority Leader Karen Camper, a Black representative from Memphis, that would have increased the transparency of the 2026 redistricting process, including by requiring the financial impact of any proposed plan to be considered and requiring House members who participate in drawing the district map to disclose any outside entity and all data involved in the process.

87. The white majority on the Rules Committee also adopted rules to punish protest or dissent, barring anyone who "disrupts" meetings for the entire Extraordinary Session. These rules failed to deter peaceful dissenters. Indeed, concerned citizens descended on the State Capitol to push back against the unanticipated, opaque and racially-charged redistricting effort.

88. By the close of the first day of the Extraordinary Session, no proposed maps had been made public or even made available generally to members of the General Assembly.

ii. *May 6 House Committee Proceedings*

89. Legislators in three separate committees voted and passed HB 7003 on May 6. Only white legislators voted in favor of the bill.

90. The bill originated in the Congressional Redistricting Committee, along with related redistricting and election administration bills House Bill 7001 ("HB 7001"), House Bill 7002 ("HB 7002"), House Bill 7004 ("HB 7004"), and House Bill 7006 ("HB 7006").

23

91. During debate on HB 7002, which removed the 1972 prohibition on changing congressional districts between apportionments, only three witnesses were allowed to testify. Dr. Sekou Franklin, Congressman Steve Cohen, and Attorney Walter Bailey testified about the importance of transparency and collaboration in the redistricting process, including the ability of community members to comment on proposed maps prior to their approval. Each speaker, including Dr. Sekou Franklin, the Political Action Chair of the NAACP Tennessee, described the proposed plan as an unprecedented and intentionally discriminatory attack on voting rights that would dismantle a cohesive majority-Black district and strip Black voters of meaningful political power. Dr. Sekou Franklin also discussed the historical context of racial discrimination in Tennessee and underscored that the actions of the Legislature were unlawful and unconstitutional.

92. At the beginning of discussions on HB 7003, Committee Chairman Representative Andrew Farmer pushed Amendment 19155 to a successful vote in seconds, with no debate or public comment. This Amendment established the contours of each congressional district.

93. Because of the lack of transparency, the public had no specific details or detailed notice that the proposed congressional map split communities of interest. For instance, the Committee Plan split Shelby County (and thus the city of Memphis) amongst three Congressional Districts. As a result, large segments of the Memphis community found themselves separated and split across three Congressional districts. Instead, they were submerged into the largely rural, white, non-Hispanic Districts, into communities that have no historical ties to Memphis and which have divergent social and policy interests.

94. After adoption of the Amendment, Committee members began debating on the bill. When asked on multiple occasions by Rep. Jesse Chism, a Black legislator from Memphis, about both the city of Memphis and Shelby County being predominantly African American jurisdictions,

24

bill sponsor and House Speaker Rep. Sexton refused to acknowledge the demographic makeup of each jurisdiction, despite the fact that Memphis is the largest majority Black city in the United States.

95. Furthermore, in a colloquy with Rep. Bo Mitchell regarding whether the sponsors attempted to avoid dividing Shelby County in the reconfiguration of the congressional districts, Rep. Sexton admitted that the map was drawn to add a third district in Shelby County.

96. Rep. Mitchell also asked Speaker Sexton the simple and direct question: "What data did you use to draw these maps?" Rep. Sexton gave a simple and direct answer: "The maps were based off the last census."

97. Representative Lowell Russell, Chairman of the House Congressional Redistricting Committee and a politician from the white-dominated Republican Party, affirmatively highlighted the white supermajority's racial motives. Representative Russell suggested during the hearing that cracking Memphis across three congressional districts would reduce crime and add resources to make Memphis "safer." He claimed a "friend" in the Memphis police department was happy to see the dismemberment of Memphis-based CD 9 for that reason. Black legislators like Representative Justin Jones understood this nonsensical suggestion that hurriedly splitting Memphis into three congressional districts would reduce crime to be a not-so-subtle appeal to race and racial stereotypes of Black criminality.

98. Only one witness was allowed to present public comment before the Congressional Redistricting Committee voted on moving the bill out of committee.

99. Legislators failed to make any substantive changes to HB 7003 based on the concerns raised about the map's intentional targeting of Black voters in CD 9 before referring the bill to the Finance, Ways, and Means Committee on the same day. The Redistricting Committee

25

passed the bill without any further changes in approximately 44 minutes. No Black members voted for the bill.

100. The Finance, Ways, and Means Committee passed the map in less than one hour. Only white committee members voted in favor of the bill.

101. HB 7003 then proceeded to the Calendar and Rules Committee, which voted to put the bill on the regular calendar for May 7.

### iii. *May 6 Senate Committee Proceedings*

102. The Senate heard debate on Senate Bill 7004 ("SB 7004"), the companion bill to HB 7003, as well as related redistricting Senate Bills 7003 and 7006.

103. The Senate Judiciary Committee, led by Chairman Todd Gardenshire, began debate on SB 7004. Bill sponsor Senator Todd Stevens, a white legislator from Huntingdon, noted in his opening remarks that only the map would be voted on in committee, with bill language to follow in subsequent amendment should the map pass. Chairman Gardenshire articulated this vote as "an amendment to adopt the amendment," the latter amendment being the proposed Congressional map.

104. In a colloquy between bill sponsor Senator Stevens and Senator London Lamar, a Black state senator from Memphis, Senator Stevens refused to acknowledge that Memphis, Shelby County, and former CD 9 in the 2022 Map were predominantly Black. Senator Stevens claimed he had no awareness of the racial demographics of the Memphis community. Senator Stevens is a graduate of the University of Memphis Cecil C. Humphreys School of Law.

105. Senator Stevens also acknowledged, when asked by Senator Lamar, that presumably the redistricting could have been conducted while the Legislature was in its regular session, which recently ended on April 23.

106. During the Senate Judiciary Committee hearing, Senator Raumesh Akbari underscored that, "redistricting has never occurred in the midst of an active election cycle where people have already qualified and the deadline is closed." Senator Akbari noted that, "this is so outside the scope or norms for any sort of redistricting process."

107. Despite widespread public interest, the Committee set aside less than an hour for this hearing and allowed only three members of the public to speak. Attorney Walter Bailey, Stacy Abrams, and Congressman Steve Cohen each discussed the racial motivation behind the cracking of Shelby County into three districts, the history that gave rise to the passage of the Voting Rights Act, the linkage between *Callais* and Governor Lee's call for redistricting, and the grave harm that racially discriminatory maps would cause to Black voters in Memphis and Shelby County.

108. The Judiciary Committee passed the map in approximately 1 hour and 18 minutes. Only white committee members voted in favor of the bill.

109. The bill then moved to the Senate Finance, Ways, and Means Committee for consideration. Senator Heidi Campbell asked if the prior 2022 Plan had created any risk of litigation. In response, Senator Stevens said, "The proposed map mitigates the risk of litigation." Senator Campbell then asked, "why?" In response, Senator Stevens said, "Because that's what it does. It mitigates the risk of litigation." Trying once again, Senator Campbell followed up asking, "I guess I'm asking you to be more specific. Why exactly?" Senator Stevens once again would only say, "And my response is it mitigates the risk of litigation."

110. This canned, uninformative statement was inconsistent with the concession of other white legislators that the prior 2022 Plan was "strong, fair, and legal." Indeed, throughout the Extraordinary Session, witnesses and legislators accurately testified that CD 9 was not drawn in response to any court order or Voting Rights Act challenge but was simply a naturally-occurring,

27

long-standing majority-Black district due to the demographics of Memphis. No witness or legislator challenged these facts. Thus, the 2022 Plan presented no risk of litigation that needed to be mitigated.

111.    Neither Senator Stevens nor any of the other white proponents of HB 7003 (introduced in the Senate as companion bill Senate Bill 7004) ever disclosed who actually drew the map. To the contrary, the only specific data source that any official acknowledged was Census data, which contains racial demographics, but not data on party affiliation or partisan information of any kind.

112.    The Finance, Ways, and Means Committee voted to send its companion bill to the full Senate. No Black Senators voted in favor of the bill.

iv.    *May 7 House Floor Debate*

113.    On May 7, in a colloquy on the House Floor between Representative John Ray Clemmons and Representative Jason Zachary, Representative Zachary claimed that the legislators only looked at Census data:

> Rep. Clemmons: Yesterday, Speaker Sexton was asked about who drafted this bill, and how this came about—he pointed to the Senate Sponsors, Senator Stevens [and] Senator Johnson. Yesterday, Senator Stevens was asked the question, what numbers were relied upon to draw these maps, and his answer was pretty conclusive—that it was census data. Section 1, here, refers to all census descriptions and so forth. Is that correct, that the census data was the sole basis for drawing these lines for 2020?
>
> Rep. Zachary: Yes, it is my understanding the census was used to draft the map you have in front of you—based on the population.
>
> Rep. Clemmons: Well, that's pretty interesting, because since census data does not include any partisan scores or partisan data, and your entire argument this entire week has been that this is about politics and partisanship. So, if you solely relied on census data, I'm confused about how you knew partisan scores when drawing this map if that wasn't even considered.
>
> Rep. Zachary: Did you have a question?

Rep. Clemmons: If that is your answer, that is fine by me and that is all I need.

114. Representative Zachary also claimed that "the map that you have in front of you was drafted based on the census population related to the last census, but it was absolutely drafted on politics." But Representative Zachary did not describe what it meant for the map to have been "drafted on politics" or how a map drafted using only Census data could provide the political information necessary to reach a partisan goal.

115. Census data shows racial composition of units of census geography but does not contain any categories for political party affiliation or prior election returns. Neither Representative Zachary nor any of the other white proponents of HB 7003 ever identified any source of political or election data that might have informed the map.

116. Likewise, neither Representative Zachary nor any of the other white proponents of HB 7003 ever disclosed the names of the parties, entities or organizations that drew the map.

117. Representative Torrey C. Harris, a Black representative from Memphis, spoke powerfully in opposition to white legislators' claim that the plan was based on politics and population:

> "I have to stand here, because earlier in committee on yesterday, it was said that this was based off of political desire. But I have to say it—as a Black man, as a Black man who lives in Memphis, as a Black man who lives in Congressional District 9, that I lose part of my voting power by this piece of map. You cannot celebrate democracy while carving out Black communities apart from political advantage. We all know it, whether we say it or not, that this map impacts Black people negatively. In fact, I will say it like this—after the Civil War, Black Americans have finally gained the right to be able to vote on paper. Some did not like that. They could not outright say that Black people should not vote anymore, so instead, they put in things like a poll tax, like a literacy exam, intimidation, drawing maps just like the ones that have been drawn today. We are diluting the Black voice. We are diluting the Black voice. That is why the 15th Amendment mattered so much—it was not just about Black people casting a ballot, it was about protecting the voice of Black people from being intentionally diluted. The people who championed the 15th Amendment believed that democracy could not survive if states

29

manipulated the system to silence Black voices. And now here we are, in 2026, watching efforts to dismantle the only majority Black congressional district in Tennessee.

So when people ask why this matters so much, the answer is very simple. It's because history has already shown us that what happens when Black people's voices become inconvenient to those in control, this new map shows, by diluting our Black voting power. So Sponsor, I ask that if the Supreme Court decided to say that a two dollar poll tax was okay, and the Governor called us back in, would we be okay with passing legislation to move a two dollar poll tax?"

118. Fellow Memphis Representative Antonio Parkinson reiterated the racial design of the map:

This is a very serious moment. This is a historic moment, actually. You cannot separate this vote from the historical reality of race in Tennessee and the American South. ***Memphis is not merely just a geographic region, it is a cultural, economic, and it is the center of Black life in Shelby County and in Tennessee. I want you to think about this. Nearly half—nearly half—of the Black population in the state of Tennessee lives in Memphis, in Shelby County. Nearly half. How can we sit here and say that this is not about race….*** Don't hide behind the maps.

119. After protest erupted in the balcony in response to Representative Greg Martin, a white legislator, speaking in favor of the bill, Speaker Sexton immediately put the bill to a floor vote. No white legislator responded to the questions, concerns, or statements of opposition made by representatives regarding the racially discriminatory motives driving the dismantling of CD 9..

120. On May 7, 2026, the full Tennessee House approved the plan and forwarded it to the Senate. Every representative who voted in favor of the plan was white.

*v.* *May 7 Tennessee Senate Floor Debate*

121. In a speech on the Senate floor on the Extraordinary Session's last day, Senator Charlane Oliver offered a rejoinder to the tenuous claims of white legislators that the cracking of Black-majority Memphis was undertaken for political purposes. Senator Oliver noted that partisanship was being used as a proxy to carry out a racial agenda. Specifically, she stated: "The

30

racial effect is not incidental to the partisan goal. The racial effect is the partisan goal." Senator Oliver observed: "So what does a 9-0 actually give you? It gives you the permanent silencing of Shelby County's Black community. That is the only answer. That is the only thing that changes when you change this map. And if the only legislative purpose of a map is the permanent silencing of a special, specific racial community, that is not partisan gerrymandering. That is racial discrimination with a partisan cloak." (Emphasis added).

122. Senator Lamar offered similar insight:

This is one of the most consequential votes any of us in this chamber will ever take in our [] lifetime. Not because of lines on a map, because of what those lines are designed to do: erase representation, dilute Black voting power, and tell Memphis that our voice only matters when it is controlled. So, let's stop acting like this is ordinary redistricting. There hasn't been a new census data. There is no emergency for the people. The only emergency here is for Republicans in this chamber saw a political opportunity after a Supreme Court decision weakened the Voting Rights Act that they have moved immediately to attack Black voting power.

This map does not reflect Memphis. It diminishes Memphis. It slices our city into pieces and stretches our communities hundreds of miles away to places of different needs, different economies, different histories, and different lived realities. You cannot take a majority Black city, fracture its voting power, and then tell us race has nothing to do with it.

***Racism does not become less racist because it's called partisan.***

(Emphasis added).

123. No white legislator responded to the objections or comments presented by either Senator Oliver or Lamar.

124. Given that members of the General Assembly insisted that the only data they used to draw the May 2026 map was U.S. Census data, which provides only racial data, and not past election results, any partisan goal could only have been achieved by using the race of voters as a proxy for their political affiliation.

31

125. On May 7, 2026, the full Tennessee Senate moved to substitute its plan, SB 7004, with HB 7003 and approved the plan. No Black legislators voted in favor of the bill.

vi. *Enactment of HB 7003 and Other Election Related Laws*

126. The full House approved the May 2026 map in a 70-26 vote. All Black representatives in the House voted against the Plan.

127. On May 7, 2026, Governor William B. Lee signed HB 7003 into law.

128. Over the objection of every Black legislator, the General Assembly also enacted HB 7001, which alters candidate qualification and other rules to accommodate the late-decade, mid-election cycle changes to Tennessee's congressional districts; H.B. 7002, which repealed the statute banning late-decade redistricting and HB 7005, which appropriated funds to institute these drastic measures during an ongoing election.

129. Governor Lee signed these bills into law on May 7, 2026.

**G. In Virtually Every Respect, the 2026 Extraordinary Session Departed from Normal Practices and Procedures.**

130. Far from taking place in the normal course of redistricting following the decennial Census, the redistricting literally took place during an "extraordinary session" of the General Assembly. Senator Charlane Oliver stated during the extraordinary session: "In the entire history of Tennessee, this legislature has never, not once redrawn congressional maps between apportionments without a court order, not once until, until the moment federal protection was removed."

131. The Governor called the extraordinary session fewer than two weeks after the normal session ended. The Governor's proclamation was issued on Friday, May 1, 2026, and called for the extraordinary session to begin at 2:00 p.m. on Tuesday, May 5, 2026, an extraordinarily short interval. After the intervening weekend, the General Assembly adopted rules

32

for the extraordinary legislative session that limited public comment and shortened the time frame for the public to view any new U.S. House of Representatives map. No potential maps were publicized in the days prior to the extraordinary session. No proposed legislation was provided in advance. Thus, citizens and members of the General Assembly were given very little time and/or opportunity to take part in the redistricting process. Furthermore, the extraordinary session began on Tuesday, May 5, 2026, a Tennessee election day, with primaries taking place in: Bradley County, Carroll County, Cheatham County, Coffee County, Davidson County, Dickson County, Dyer County, Franklin County, Greene County, Hamilton County, Hawkins County, Marion County, McMinn County, Montgomery County, Robertson County, Sullivan County, Sumner County, Rutherford County, Williamson County, and Wilson County.

132. On May 5, 2026, during the extraordinary session, Senator Jack Johnson of District 27 introduced SB 7002 and Representative Cameron Sexton of District 25 introduced HB 7002. The publicly available caption text for SB7002 and HB7002 provides: "Redistricting, Congressional - As introduced, removes prohibition on changing congressional District between apportionments. - Amends TCA Title 2, Chapter 16."

133. Also on May 5, 2026, Senator Jack Johnson and Representative Cameron Sexton introduced SB 7001 and HB7001, respectively. The publicly available caption text for SB 7001 and HB7001 provides: "Congress - As introduced, suspends application of the requirement that candidates for United States house of representatives meet the residency requirements for state senators and representatives contained in the Tennessee constitution for the 2026 election. - Amends TCA Title 2." The bill summary provides: "In order to qualify as a candidate in a primary election for congress, present law requires, among other things, that the person resided in the county or district for one year immediately preceding the elections. This amendment creates an

33

exception to such present law requirement for the 2026 primary election for the office of United States representative."

134. The purpose of the residency requirements is obvious—they ensure a connection between the voters within a district and the person tasked with representing them. This is the norm. The purpose of the suspension appears wholly to allow the election of candidates who have no history of living in the district they seek to represent. The lifting of such residency requirements is not normal procedure. At least one candidate finds himself in the peculiar position of being qualified to run in a district in which he is no longer permitted to vote. Thus, he cannot vote for himself under the current scheme.

135. Normal procedure requires district and precinct boundary changes to be published in newspapers and voters to be notified by mail. This normal procedure was jettisoned in favor of allowing county election commissions to meet notice requirements solely by posting any changes to the commission's website, assuming one exists.

136. The extraordinary session focused almost exclusively on dividing up the district that historically encompassed Memphis, which according to the 2020 U.S. Census, has a population that is 62.9% Black and 10.4% Hispanic/Latino. The goal of the extraordinary session was to target the voting power of Black residents of Memphis by dismantling CD 9.

137. The speed at which the redistricting process was carried out, the repeal of a longstanding statutory prohibition on late-decade redistricting, and the suspension of statutory residency requirements was not normal practice or procedure. Fewer than 48 hours after the extraordinary session was to begin, it was over, and Memphis had been cracked into three Districts.

34

## C. Analysis of CD 9

138. Shelby County is located in the southwest corner of the State and borders two states—Arkansas to its west and Mississippi to its south. The Mississippi River flows along the entire western edge of Shelby County. Memphis, in particular, shares many cultural attributes with the Mississippi Delta region and is considered part of the Mississippi Delta, which is:

> a distinct geographical area of the state traditionally featuring an agricultural economy concerned with flood control of the Mississippi River. The geography of the Delta has been colorfully and somewhat accurately described as beginning in the lobby of the Peabody Hotel at Memphis, Tennessee, and ending at Catfish Row in Vicksburg, Mississippi. Since early times, concentrations of blacks have resided in the Delta area.

*Jordan v. Winter*, 541 F. Supp. 1135, 1139 n.1 (N.D. Miss. 1982) (internal quotations omitted).

i. *The Demographic Concentration and Targeted Movement of Black Voters in Shelby County Is Indicia of Discriminatory Intent.*

139. Under the 2022 Map, and consistent with congressional districting in the state over the last fifty years, Memphis was almost entirely contained within a single compact district. The image below shows the contours of CD 9 under the 2022 Map with the red dotted line delineating the boundaries of Memphis and purple shading denoting the level of Black VAP in the area:

35



140. The newly drawn CD 9 is far less compact than it was under the old plans, which had kept Shelby County and Memphis mostly whole. Under the new plan, CD 9 now sprawls further east, pulling in portions of more rural white counties, including parts of Fayette, Maury, Williamson, and Rutherford counties. The district also includes the entirety of Hardeman, McNairy, Hardin, Wayne, Lawrence, Giles, Lincoln, Moore, Bedford, and Marshall counties, which are predominantly white.



*2026 Tennessee Congressional Map*

36



***2026 Congressional Map, Shelby County Insert***

141.     Midtown Memphis is now sliced into CDs 5, 8, and 9. Each of these districts inexplicably begins by carving out a sliver of Memphis and then stretching up and out to rural middle Tennessee, cutting through neighborhoods like Whitehaven. In the end, these three districts nearly evenly split the majority-Black communities within the City of Memphis and Shelby County:



142.     The three districts then snake outward to engulf entirely unrelated parts of Tennessee. CD 5, as shown below, is the top district. It begins with a tiny sliver of South Memphis, then extends up and out like a narrow funnel, following the Mississippi River and the Arkansas state line until it hits the corner of the state line bordering Missouri. CD 5 then pivots and stretches eastward hugging the Kentucky border. While it continues to jut eastward to pick up rural, predominantly white residents in Northern Tennessee, the district simultaneously dives down and scoops upward to sweep in large stretches of rural, predominantly white residents. Despite the winding journey CD 5 takes, a significant portion of its VAP stems from the narrow sliver of South Memphis, hundreds of miles away from the end of the district. The portion of Shelby County moved into CD 5 is 70.39% Black VAP.



143. CD 8 is the middle of the three districts, as shown in the image above. CD8 includes predominantly Black areas of northern Shelby County like Bartlett, then balloons outward for about 150 miles to capture areas with greater white populations such as Germantown as well as rural, predominantly white areas such as Perry County in central Tennessee. The portion of Shelby County drawn in CD 8 is 41% Black VAP.

144. The new CD 9 is the bottom of the three districts. The district mirrors District 5's narrow beginning in Memphis and sweeping journey across Tennessee. Like CD 5, CD 9 carves out a sliver of South Memphis, then veers out and eastward, running along the Mississippi and Alabama state lines, almost to Georgia, before jutting north into central Tennessee and meeting CD 5. Along this journey, CD 9 picks up low Black VAP precincts north of Collierville. CD 9 ultimately runs through 15 counties and ends in predominantly white Williamson County—a Nashville suburb—over 200 miles away from Memphis.

145.    All told, the 2026 Congressional map divides the predominantly Black VAP of Memphis and Shelby County roughly into thirds, and submerges these slivers into large areas with overwhelmingly rural white voters hundreds of miles away, rendering the dense areas of Black VAP in Shelby County a minority in each of the three districts:



146.    This surgical cracking of Memphis and Shelby County required breaking up numerous precincts and counties and introducing additional fragmentation elsewhere, in violation of the traditional principles of redistricting that Tennessee has long followed.

147.    The May 2026 Map is significantly less compact compared to the previous map. CD 5 under the May 2026 Map has lower Reock (.20) and Polsby-Popper (.09) scores compared to the 2022 Map (.28 and .13, respectively). Likewise, CD 8 under the May 2026 map also has lower scores across the compactness scores. CD 8 has a Reock score of .35 under the May 2026 Map and a score of .58 under the 2022 Map; a Polsby-Popper score of .2 under the May 2026 Map and a score of .29 under the 2022 Map. CD 9 has a significantly lower Reock score and comparable

40

Polsby Popper and Convex Hull score: CD 9 has a Reock score of .17 under the new map compared to its score of .29 under the 2022 Map; a Polsby-Popper score of .14 under the May 2026 Map compared to a score of .12 under the 2022 Map.

148. The May 2026 Map increases the number of county splits from 10 in the 2022 Map to 12 in the current map. It also increases the number of voting districts (VTDs) from 65 in the 2022 Map to 82 in the current map.

149. The Black communities in Memphis and Shelby County have shared interests such that they constitute a distinct community of interest. These shared connections include shared history, cultural practices and values, political beliefs, media, and socioeconomic interests. The May 2026 Map has sundered this community.

      *ii.      <u>Voting is Racially Polarized in Tennessee</u>*

150. Legislators were aware of and sought to capitalize on the racial polarization of voting in Tennessee. Under the May 2026 Map, Black voters in the challenged area are politically cohesive such that they overwhelmingly vote for the same candidates. In the 2024 Presidential General Election, Vice President Harris, a Black candidate, ran against Donald Trump, a white candidate. In CD 9, 69.3% of Black voters cast a ballot for Vice President Harris, while just 17.3% of white voters did the same. In CD 8, 73,7% of Black voters voted for Vice President Harris compared to just 30% of white voters voting for Vice President Harris. In CD 5, 67% of Black voters cast a ballot for Vice President Harris, while only 18.6% of white voters voted for her.

151. In 2020, Marquita Bradshaw, a Black candidate, ran against Bill Hagerty for U.S. Senate. In CD 9, 97.2% of Black voters cast a ballot for Bradshaw compared to just 15.0% of white voters. In CD 8, 90.2% of Black voters voted for Bradshaw while 17.6% of white voters did the

same. And in CD 5, 95.5% of Black voters cast a ballot for Bradshaw while 21% of white voters voted for Bradshaw.

152. Voting in primary elections in Tennessee is also racially polarized.

153. In the area where Black Tennesseans are suffering vote dilution under the May 2026 Map, their candidates of choice typically lose to other candidates because of white block voting. Black Tennesseans have never successfully elected a congressional representative of choice outside of the majority-Black CD 9. And CD 9 has only existed since the 1970s. The May 2026 Map eliminates Black Tennesseans' ability to elect their candidate of choice to Congress in CD 9 and continues to deny them the ability to elect their candidate of choice in any other district.

154. Due to racially polarized voting in CDs 5, 8, and 9 under the May 2026 Map, Black voters' candidates of choice will consistently lose elections in those districts. In the 2024 Presidential General Election Vice President Harris was Black voters' candidate of choice in the area covered by CDs 5, 8, and 9 under the May 2026 Map. Because of racially polarized voting, she would have lost in CDs 5, 8, and 9 under the May 2026 Map.

155. In the 2020 U.S. Senate Election, Marquita Bradshaw was Black voters' candidate of choice in the area covered by the May 2026 Map's CDs 5, 8, and 9. Because of racially polarized voting, she would have lost in CDs 5, 8, and 9 under the May 2026 Map.

iii. *Legislators Failed to Credibly Justify the Cracking of Memphis and Shelby County*

156. The Legislature's justification for the drastic split of Memphis and Shelby County—and the dispersion of communities of color within Memphis and Shelby County==was pretextual.

157. The justification provided by Legislators was the purported need to follow "population and politics." This justification is merely pretext.

42

158.    As noted, Senator Zachary, one of the sponsors of the redistricting bill claimed on the Senate floor, that Census data was the *only* data source used to draw maps. Census data does not provide partisanship information; it does, however, show the racial composition of Memphis.

159.    Further, the proponents of the redistricting bill did not pretend the maps were drawn using records that show political data such as the number of registered Republicans, Democrats, and independents in any then-existing or anticipated district.  They did not claim that, in drawing the maps, voting records were analyzed to determine which candidates residents in anticipated districts had voted for recently or historically.  In short, there is no evidence that supports the pretextual claim during the legislative process that the map drawers relied on partisan data to carve CD 9 precisely as HB 7003 does.  Rather, census data was used to carry out the goal of dismantling majority Black CD 9.

160.    If, as asserted, Census data were the sole source used to draw maps, the legislators relied on racial, not political data to draw the maps.  Using race as a proxy for partisan affiliation is unconstitutional. Moreover, any claim that during the map drawing that preceded or that was carried out during the extraordinary session, legislators did not look at the racial data is negated by the fact that such racial data was provided to the Legislature following the 2020 Census, *i.e.*, five years before the extraordinary session.

161.    In addition, when asked basic questions about the map and the process for drawing the map, the sponsors repeatedly failed to answer the question at hand or provided nonsensical answers. For instance, when Senator Stevens was asked how many district Memphis was in under the proposed map, he refused to answer. Senator Stevens—who spent three years attending law school in Memphis—also claimed he was unaware of whether CD 9 was a majority Black congressional district. And despite legislators directly asking who drew the map, the sponsors

43

provided evasive answers. These scripted responses and sloppy attempts to mask the true racial motivation underlying the dismantling of CD 9 makes clear that the bill sponsors and bill proponents were not acting in good faith, and are entitled no presumption of good faith.

162. Memphis is routinely touted as having the largest Black population of any city in the United States. The notion that bill sponsors and proponents in the General Assembly did not know that the vast majority of the population of Memphis is Black is far-fetched and defies credulity.

163. As Senator Jeff Yarbro stated during the extraordinary session:

> Since the sponsor is unaware as he says of the racial makeup, let me just let's talk about this for a second. So, District 9 takes a population of approximately, I believe, 220,000 residents of Memphis. They are 70% Black and that's the district that goes into Tipton County up to Lake County and across the Kentucky border. District 9 takes about 270,000 roughly… around 270,000 citizens of Memphis and about 70% of those residents are black, but District 8 takes 440,000 citizens of Memphis and Shelby County; 27% of those are Black. 72% of the white population is put into one district. 75% of the Black population is carved into two. Now we are being asked to believe that it's just the luck of the draw just happenstance that that happened. That's what we're being asked to believe. You are asking us to believe that the political leadership of this state was in a room with maps working with an attorney who's worked on the last several decades of redistricting.

164. It is also unreasonable to believe that the General Assembly somehow developed collective amnesia as to the history behind the make up of District 9.

165. As stated by Senator Sara Kyle during the extraordinary session, the redistricting bill is "on the back of Memphis Blacks in eliminating their representation into districts where they will be 30, 32% Black. Not enough to have a majority vote to get a seat at the table."

**D.** *Evidence of Recent Discrimination Designed to Reduce Black Political Representation*

166. Recent discrimination in the legislative process evinces the discriminatory intent behind this legislation. Contemporaneously, the Tennessee Legislature continued to show its

44

racial animus, including by pressing race-centric legislation, much of it intended to silence Black voices in the democratic process.

167. During the 111th General Assembly, many of the same Legislators who supported the maps at issue also voted to pass a law that imposed draconian criminal and civil penalties on organizations that conduct voter registration drives for failing to comply with disclosure and preregistration requirements, submitting "incomplete" voter registration applications, or disseminating communications regarding voter registration that failed to include a compelled disclaimer. *See* 2019 Tenn. Laws Pub. ch. 250, § 9. The impetus for the law's passage appeared to be the submission of thousands of voter registration applications filed by predominately Black voters through voter registration drives held by community organizations operating in Memphis. Within a few months, a federal court enjoined the enforcement of the law—citing First and Fourteen Amendment concerns. *See Tennessee State Conf. of N.A.A.C.P. v. Hargett*, 420 F. Supp. 3d 683 (M.D. Tenn. 2019). The Legislature was ultimately forced to repeal the challenged provisions.

168. On April 6, 2023, the 113th General Assembly voted on a resolution to expel two Black representatives—Justin Jones (HD-52) and Justin Pearson (HD-86)—from the Tennessee House for joining in anti-gun protests at the Tennessee capitol after a tragic shooting at a Memphis elementary school left six individuals dead, including three children. The expulsion of Representatives Jones and Pearson, and the process leading up to the expulsion, was unprecedented. Since the Civil War, the House of Representatives has only expelled two elected members, each of them following extensive investigations that uncovered serious wrongdoing. Here, however, no investigative committee was formed prior to the General Assembly's votes to expel Representatives Jones and Pearson.

169. Although a white representative—Gloria Johnson—also joined the protests, she was not expelled. She would later state that she believed her race was the reason she was able to retain her seat. Both expelled representatives were elected from majority-minority House Districts, one based in Memphis and the other in Nashville. Relatedly, Representative Pearson—had also come under attack by Legislators for wearing West African attire on the floor of the House, despite the absence of any rule prohibiting him from doing so. Many of the Legislators voting to expel Jones and Pearson had also voted to pass the redistricting plans at issue. The expulsion vote was another attempt to deny Black voters in Memphis of fair political representation.

170. The white supermajority in the Legislature has followed a consistent racially-charged pattern of overriding the electoral choices of Memphis voters. In response to the City of Memphis's lawful removal of statues of KKK founder and Confederate General Nathan Bedford Forrest and Confederate President Jefferson Davis in 2018, the House punished the City by stripping it of a quarter-million dollars earmarked to go toward planning of Memphis's bicentennial celebrations. Rep. Andy Holt, who is white, claimed that removal of the monuments was erasing history, stating "that's what ISIS does" and such an act deserved punishment. In 2023, the Legislature made further amendments to the Tennessee Heritage Protection Act, which was enacted to prevent municipalities, like Memphis, from taking down Confederate memorials.

171. In 2024, the Legislature passed S.B. 2572 which was intended to override police reforms passed by the Memphis City Council in the wake of the death of Tyre Nichols, a Black Memphian, who died following a brutal assault by police officers during a traffic stop. The Memphis City Council had enacted an ordinance directing police officers not to make traffic stops solely for low-level offenses. Despite the objections registered by the family of Tyre Nichols

46

against the S.B. 2572, who expressed concern that the bill "ratif[ied] the actions of the police officers" who killed Mr. Nichols, the Legislature enacted the bill into law in 2024. These actions degraded the political autonomy of Memphis voters.

172. In the months and weeks leading up to the enactment of the May 2026 Map, the General Assembly's white supermajority repeatedly moved to sabotage self-government in predominantly Black Memphis and Shelby County—seeking to disenfranchise a Black electorate by stripping its communities of the right to choose their own leaders based on thin, stereotyped, or racially-charged claims of criminality and incompetence.

173. This past legislative session, over the objection of Black legislators, the General Assembly passed H.B. 662/S.B. 714, authorizing an "unprecedented" state takeover of Memphis-Shelby County Schools. One school board member called the law "racist," noting that Memphis has "the Blackest public school system [] in the state of Tennessee." Memphis residents and Black legislators opposed the legislation, underscoring that supplanting Memphis's elected school board would effectively disenfranchise voters. But the bill's sponsor, white State Senator Brent Taylor, said that the democratically-elected members of the Memphis Shelby County School Board—eight out of the nine of whom are Black—was "as credible as my mother's Facebook page. Just because someone was elected, if they're incompetent to do the job, then they have to be held accountable."

174. Most recently, during this legislative session, and again over the objection of Black legislators, the General Assembly passed S.B. 443/H.B. 483, authorizing the Tennessee Attorney General to request an audit of the Shelby County District Attorney's Office and ultimately to seek the replacement of Shelby County's elected District Attorney. White officials promoted the legislation as being "focused on one of the most dangerous areas of Tennessee," reducing Memphis to a broad stereotype. Opponents of the legislation, like Senator Lamar, who is Black and

47

represents Memphis, pointed out that the white supermajority was singling out Shelby County and is "trying to degrade Memphis' rightfully elected officials because we don't like who they are." No part of the legislation explains why it targets Shelby County as opposed to any other district attorneys' offices across the state, in the effort to displace the electoral choices of local voters.

175. Uneven enforcement of the Assembly's decorum rules further exemplifies the racial bias animating the Legislature's actions. House Speaker Cameron Sexton purported to target lawmakers for punishment for locking arms on the House floor during the May 2026 redistricting, action that had a heavier impact on Black representatives. On May 12, 2026, House Speaker Sexton sent a letter to House Minority Leader Karen Camper with the decision that members would be removed from all standing committees and subcommittees. Every Black House legislator has been removed from Committees.

### E. Historical Background

176. Tennessee's ugly history of racial discrimination and racial animus is long and has continued into contemporary times. For example, "[t]he infamous Ku Klux Klan (KKK) was organized in May or early June of 1866 in a law office in Pulaski [Tennessee]; . . . [t]he official reorganization of the Klan into a political and terrorist movement began in April 1867" in Nashville, Tennessee.[2] The FBI website describes the Ku Klux Klan as a "white supremacist group."[3] Despite this, fewer than ten years ago, Memphis public parks still had statues of Confederate General Nathan Bedford Forrest, founder of the Ku Klux Klan — and Jefferson Davis.

177. Jefferson Davis notably said when resigning from the U.S. Senate: "My own convictions, as to negro slavery are strong, It has its evils and abuses…. We recognize the negro

---

[2] https://tennesseeencyclopedia.net/entries/ku-klux-klan/

[3] https://www.fbi.gov/history/cases-and-criminals/kkk-series

48

as God and God's Book and God's Laws, in nature, tell us to recognize him–our inferior, fitted expressly for servitude…. You cannot transform the negro into anything one-tenth as useful or as good as what slavery enables them to be." Davis went on to become the President of the Confederacy, which killed hundreds of thousands of U.S. soldiers and fought to keep Black Americans enslaved.

178. Statues of these two individuals should *never* have been erected in post-Civil War Memphis. Yet they stood until fewer than ten years ago, a time when each and every current member of the Tennessee Legislature was alive, and many already were serving in the General Assembly. In 2017, Memphis residents used a legal mechanism to transfer the land where these statues stand to a private nonprofit because the State Legislature had passed the Tennessee Heritage Protection Act to make removal impossible.

179. Far from being ancient history, "[t]he Tennessee Heritage Protection Act was initially enacted in 2013 and amended in 2016, 2018, 2023, and 2025. Generally, the Tennessee Heritage Protection Act prohibits the removal, relocation, or renaming of a memorial that is, or is located on, public property." (Emphasis added). In short, the Act, which is alive and well, mandates the preservation of memorials that honor white supremacists who advocated, fought, and killed U.S. soldiers to preserve the institution of chattel slavery in America, which allowed lynchings, physical and mental abuse, torture, and rape of Black persons in this country and Tennessee specifically.

180. In response to Memphis residents removing these symbols of racial violence and racial animus through a perfectly lawful transaction, the 110th General Assembly (2017-2018) considered HB2552 and SB2578, which would have created a Class E felony when a member of a local governmental body knowingly votes to approve an ordinance or resolution that expressly

49

conflicts with state or federal law relative to historical memorials; violators also would be subject to removal from office. Senators Dawn White and Joey Hensley of the General Assembly introduced the bills which sought to make it a felony for local officials to represent their Black constituents and vote to remove symbols of white supremacy. In 2018, the General Assembly also considered HB 1574 and SB2520, which prohibited "[t]he sale, transfer, or other disposition of a memorial or public property that contains a memorial by a county, metropolitan government, municipality, or other political subdivision of this state." The law would prevent others from doing what Memphis residents did to rid the public parks of the racist symbols. Not surprisingly, those bills' co-sponsors, who remain in the General Assembly and who in May 2018 sought to preserve public displays honoring white supremacy, in May 2026 voted in favor of dismantling Tennessee's one Black district and stripping its residents of their voting power.

181. In 2020, young people—including now-State Representative Justin Jones—occupied the Legislative Plaza outside this capitol for more than two months, demanding the removal of a bust of Klansman Forrest from the rotunda. The General Assembly responded, not by removing the tribute to the white supremacist terrorist group's founder, but by criminalizing occupation of the Legislative Plaza, making it a felony.

182. In 2021, the Tennessee Historical Commission voted, by a margin of 25-1, to remove a bust of Klansman Nathan Bedford Forrest from the state capitol. In response, fewer than two weeks later, Senator Hensley introduced legislation to fire every member of the commission. He has been a member of the General Assembly continuously since January 2003.

183. Put simply, several times within the past ten years, the General Assembly has taken official legislative action to preserve symbols of racial violence directed at Black Tennesseans,

50

and to maintain markers of white supremacy that honor those who considered Black persons inferior and advocated for or carried out violence against Black Tennesseans.

184. Likewise, Tennessee has a long history of discrimination against Black voters in western Tennessee. *See Rural West Tennessee African Am. Affairs Council v. Sundquist*, 209 F.3d 835, 843 n. 1 (6th Cir. 2000).

185. This history continues to the present day. On May 2, 2019, the Tennessee Assembly enacted a law HB1079/SB971, which imposed numerous burdensome and unnecessary restrictions on First Amendment-protected activities. These restrictions included substantial civil and criminal penalties for any organization failing to include government-compelled content in political communications, turning in "incomplete" voter registration forms, and failing to meet burdensome registration and reporting requirements before seeking to help their fellow citizens register to vote. Statements made on the House floor revealed that the true purpose of the bill was to retaliate against a single non-profit organization whose mission was focused on increasing the turnout of Black voters in the state.

186. NAACP Tennessee, Democracy Nashville-Democratic Communities, The Andrew Goodman Foundation, and The Equity Alliance filed suit to stop HB1079/SB971 from becoming effective. The plaintiffs brought the action (*Tenn. State Conf. of NAACP v. Hargett*, 420 F. Supp. 3d 683 (M.D. Tenn. 2019)) because provisions of the law would "chill the plaintiffs' voter registration efforts, which have focused on traditionally disenfranchised communities—African-Americans and other minorities, college students, and low-income voters. The court enjoined Tennessee from effectuating the law and after months of discovery, but before the cases could proceed to a stage at which the entry of judgment would have been proper, the Tennessee General

51

Assembly enacted, and the Governor signed, 2020 House Bill 2363, which repealed the challenged provisions.

187. Senator Charlane Oliver provided an extensive outline of legislative action that was motivated by discriminatory intent or had a stark impact on Black residents in Tennessee. In addition to legislative actions identified above, Senator Oliver noted on the Senate floor that the "very same sponsor of this congressional map, introduced and passed legislation to dismantle the Tennessee Human Rights Commission, an agency born directly from the Civil Rights Act of 1965. An agency whose foundational purpose was to protect Black Americans from racial discrimination. This year, during this regular session, this body voted to take over the Memphis Shelby County School Districts, the Memphis light, gas, and water utility board, and the Memphis Airport Authority. Institution by institution, board by board, systematically with surgical precision," the Assembly took action that ran contrary to the interests of this cohesive community.

## COUNT I
## 42 U.S.C. § 1983
**Discriminatory Purpose in Violation of the Fourteenth and Fifteenth Amendments to the United States Constitution as to Congressional District 9**

188. Plaintiffs repeat and re-allege each and every allegation in the paragraphs above, as if fully set forth herein.

189. 42 U.S.C. § 1983 authorizes suits for the deprivation of a right secured by the Constitution or the laws of the United States caused by a person acting under the color of state law.

190. Article 1 of the Fourteenth Amendment to the United States Constitution provides: "No state shall make or enforce any law which shall abridge the privileges and immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property,

52

without due process of law; nor deny to any person within its jurisdiction equal protection of the laws."

191. Section 1 of the Fifteenth Amendment to the United States Constitution provides: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."

192. Where racial discrimination was "a motivating factor" behind state action, that is sufficient to show that the State engaged in unconstitutional discrimination. *Foster v. Chatman*, 578 U.S. 488 (2016) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)).

193. Factors that may provide direct or circumstantial evidence of intentional discrimination include the challenged law's "impact" on different racial groups; the "legislative . . . history," including "contemporary statements by members of the decisionmaking body" or other decisionmakers; the "historical background" and the "sequence of events leading up to the challenged" law's enactment; and, "any departures from the normal legislative process." *Arlington Heights*, 429 U.S. at 265-68.

194. The May 2026 map—and, specifically, changes made to CD 9—was adopted with the purpose of disadvantaging Black voters and, and as intended and conceived, will have a specific dilutive effect on Black voters in this District.

195. Defendants admitted that the only data they used to draw the May 2026 map was U.S. Census data. That data includes *only* information on voters' race, not political preferences. So even to assume the result the General Assembly sought was political, it was achieved using race as a proxy for political affiliation. And the Supreme Court has made clear that race predominates in a districting plan when voters are sorted on the basis of race even if race is meant

53

to function as a proxy for political characteristics. *Alexander v. South Carolina State Conf. of the NAACP*, 602 U.S. 1, 7 n.1 (2024) ("A plaintiff can also establish racial predominance by showing that the legislature used 'race as a proxy' for 'political interest[s].'") (internal citations omitted); *Miller v. Johnson*, 515 U.S. 900, 914 (1995); *see also Cooper v. Harris*, 581 U.S. 285, 291, n. 1 (2017) (noting that strict scrutiny is warranted when "a legislature elevated race to the predominant criterion in order to advance other goals, including political ones").

196. There is ample evidence of discriminatory purpose present in this case. Specifically, there is a history of discriminatory official actions in the State, evidence of racial animus on the part of many legislators who supported the May 2026 Map, and evidence of procedural and substantive departures from the ordinary procedures followed by the lawmakers.

197. In addition, the legislative and administrative history underlying the extraordinary session support an inference that the Legislature acted with discriminatory purpose in drawing and approving CD 9.

198. Legislators provided inadequate notice of proposed changes, sought to minimize public comment, and expedited the legislative process in a manner intended to minimize opportunity for debate and deliberation from anyone other than the redistricting plan's main proponents.

199. Examples of such conduct include the 48 hour time period between the opening of the session and the adoption of the plan; the last-minute announcement of the extraordinary session and hearings; a rushed legislative process; the adoption of amendments without adequate notice (or, in some cases, any notice) to certain Legislators; and Legislators' full awareness, based on testimony from members of the Tennessee Black Caucus and civil rights groups, including some Plaintiffs, about the undeniable racially discriminatory effect of the May 2026 ,ap.

54

200. Defendants will be unable to prove that the May 2026 map would have been enacted without the discriminatory intent described above.

201. By engaging in the acts and omissions alleged herein, Defendants acted and continue to act under color of law to deny Plaintiffs the rights guaranteed to them by the Fourteenth and Fifteenth Amendments to the U.S. Constitution and will continue to violate those rights absent relief granted by this Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Convene a court of three judges pursuant to 28 U.S.C. § 2284(a);

B. Declare that the portions of the May 2026 map relating to the drawing of Congressional District 9 were enacted with an impermissible discriminatory purpose on the basis of race in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution;

C. Issue temporary and permanent injunctions enjoining Defendants from enforcing or giving effect to plan as it pertains to District 9 including an injunction barring Defendants from conducting any elections under the newly adopted map;

D. Take actions necessary to revert back to the map properly adopted following the release of the Census or determine and order valid plans for the U.S. Congress that are not the product of intentional discrimination;

E. Retain jurisdiction over this matter until the Defendants, their agents, employees, and those persons acting in concert with them have complied with all orders and mandates of this Court;

F.     Award plaintiffs their attorneys' fees, expenses, and costs incurred in vindicating their rights in this action;

G.     Make all further orders as just, necessary, and proper to ensure complete relief consistent with the Court's orders; and

H.     Grant such further relief as the Court deems to be appropriate, including but not limited to an award of Plaintiffs' attorneys' fees, expenses, and reasonable costs, as authorized by 42 U.S.C. § 1988 and 52 U.S.C. § 10310(e).

Dated: June 5, 2026

Respectfully submitted,

<table>
<tr><td>

**TURNER FEILD, PLLC**
/s/*VAN D. TURNER, JR.*
Van D. Turner, Jr. (TN Bar No. 022603)
2650 Thousand Oaks Boulevard, Suite 2325
Memphis, TN 38118
(901) 290-6610
vturner@turnerfeildlaw.com

</td><td>

**NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE**
Kristen Clarke*
Anthony P. Ashton**
4805 Mt. Hope Drive
Baltimore, MD 20215
(410) 580-5777
legal@naacpnet.org

</td></tr>
<tr><td>

**LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW**
Robert Weiner **
Jennifer Nwachukwu*
Olivia Sedwick***
1500 K Street NW, Suite 900
Washington, DC 20005
(202) 662-8600
rweiner@lawyerscommittee.org
jnwachukwu@lawyerscommittee.org
osedwick@lawyerscommittee.org

</td><td>

**NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.**
Kathryn Sadavasian***
Colin Burke**
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
ksadavasian@naacpldf.org
cburke@naacpldf.org

</td></tr>
</table>

**BRYAN CAVE LEIGHTON PAISNER LLP**
Meryl Macklin**
Jon Fetterly**
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
(415) 675-3433
meryl.macklin@bclplaw.com
jon.fetterly@bclplaw.com

*Admitted *pro hac vice*
**_Pro hac vice_ motions to be filed
*** *Pro hac vice* motion pending