# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| VICKI HALE, *et al.* | § § § | |
| *Plaintiffs,* | § | |
| V. | § § | Case No. 3:26-cv-00603 [Lead Case] |
| WILLIAM LEE, *et al.*, | § § | |
| *Defendants.* | § § § | |
| TENNESSEE STATE CONFERENCE OF THE NAACP, *et al.* | § § § | |
| *Plaintiff,* | § | Case No. 3:26-cv-00638 [Consolidated Case] |
| V. | § § § | |
| TRE HARGETT, *et al.*, | § § | |
| *Defendants.* | § § | |

## BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ................................................................................................... 1

II. FACTUAL BACKGROUND ................................................................................. 1

III. STANDARDS FOR A PRELIMINARY INJUNCTION ..................................... 5

IV. ARGUMENT ........................................................................................................ 5

    A.    Plaintiffs Are Likely to Succeed on the Merits. ....................................... 5

        1.    The Dismantling of CD 9 Disproportionately Harms Black and Other Voters of Color. .................................................................. 8

        2.    Tennessee's History of Discrimination Supports a Finding of Intentional Discrimination. ......................................................... 13

        3.    The Sequence of Events and Contemporaneous Statements from Decisionmakers Support an Inference of Intentional Discrimination. ...... 14

        4.    Procedural and Substantive Departures Support a Finding of Intentional Discrimination. ................................................. 16

    B.    Plaintiffs are Likely to Suffer Immediate and Irreparable Harm ......................... 17

    C.    The Balance of the Equities and the Public Interest Both Weigh in Plaintiffs' Favor. ....................................................................... 18

V. CONCLUSION ................................................................................................... 19

Case 3:26-cv-00638    Document 31-1    Filed 06/09/26    Page 2 of 25 PageID #: 186

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. South Carolina St. Conf. of the NAACP*,
  602 U.S. 1 (2024)..................................................................................................5, 6, 9

*Allen v. Milligan*,
  599 U.S. 1 (2023)........................................................................................................10

*Allen v. Milligan*,
  608 U.S. ___ (2026)..................................................................................................5, 18

*Cooper v. Harris*,
  581 U.S. 285 (2017)........................................................................................................6

*Cousin v. McWherter*,
  46 F.3d 568 (6th Cir. 1995) ............................................................................................13

*Dahl v. Bd. of Trustees of Western Mich. Univ.*,
  15 F.4th 728 (6th Cir. 2021)............................................................................................18

*Elrod v. Burns*,
  427 U.S. 347 (1976)......................................................................................................17

*Fischer v. Thomas*,
  78 F.4th 864 (6th Cir. 2023) ............................................................................................5

*Flowers v. Mississippi*,
  588 U.S. 284 (2019)........................................................................................................7

*G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*,
  23 F.3d 1071 (6th Cir. 1994) ..........................................................................................18

*Hunt v. Cromartie*,
  526 U.S. 541 (1999)........................................................................................................8

*League of Women Voters of N.C. v. North Carolina*,
  769 F.3d 224 (4th Cir. 2014) ..........................................................................................17

*McCleskey v. Kemp*,
  481 U.S. 279 (1987)......................................................................................................13

*Miller v. Johnson*,
  515 U.S. 900 (1995)......................................................................................................6, 9

*N. Carolina St. Conf. of NAACP v. McCrory*,
831 F.3d 204 (4th Cir. 2016) ........................................................................................6

*Nken v. Holder*,
556 U.S. 418 (2009) ......................................................................................................17

*Overstreet v. Lexington-Fayette Urban County Government*,
305 F.3d 566 (6th Cir. 2023) ........................................................................................17

*Perez v. Abbott*,
253 F.Supp.3d 864 (W.D. Tex. 2017) ............................................................................6

*Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*
324 U.S. 806 (1945) ......................................................................................................18

*Purcell v. Gonzales*,
549 U.S. 1 (2004) ..........................................................................................................18

*Rural West Tenn. African-American Affairs Council v. Sundquist*,
209 F.3d 835 (6th Cir. 2000) ........................................................................................13

*Shaw v. Reno*,
509 U.S. 630 (1993) ........................................................................................................5

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*,
600 U.S. 181 (2023) ........................................................................................................5

*Tenn. State Conf. of the NAACP v. Lee*,
746 F.Supp.3d 473 (M.D. Tenn. 2024) ..........................................................................5

*TN State Conf. of NAACP, et. al v. TN Gov., et al.*,
Case No. 26-0591-II (May 26, 2026) ..............................................................................3

*Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*,
429 U.S. 252 (1977) .............................................................................................. *passim*

**Statutes**

Tenn. Code. Ann. § 2-16-102 .....................................................................................2, 3

1972 Tenn. Pub. Acts, ch. 740, § 1 ..................................................................................2

**Constitutional Provisions**

U.S. Const. amend. XIV ......................................................................................5, 12, 17

U.S. Const. amend XV ........................................................................................5, 12, 17

# I.     INTRODUCTION

Memphis is the city with the largest Black population in the United States. Within Tennessee's congressional map, it anchors a district that has, for decades, aligned with virtually all of the redistricting criteria ordinarily given deference by courts. Congressional District 9 is geographically compact; it is home to a community of interest; it respects geographical boundaries and more. Days after the Supreme Court's decision in *Callais v. Louisiana*, state lawmakers embarked down a path that was opaque, shrouded in secrecy and racially charged. That path led to a less than 48-hour state legislative session that achieved one goal – dismantling the state's only majority Black congressional district that had been in place for decades.

Despite the Legislature's thinly veiled claims that it targeted Congressional District 9 for partisan reasons only, the evidence makes clear that the legislature was not blind to the fact that they were intentionally cracking the Black population of Memphis and Shelby County into three different sections. The evidence shows that the goal was to intentionally and purposefully target Black voters and deny them any and all ability to elect a candidate of their choice. These actions defy the 14th and 15th Amendments' prohibition on intentional racial discrimination. This Court should enjoin the use of this unconstitutional map in the 2026 Congressional election.

# II.     FACTUAL BACKGROUND

On May 5, 2026, the Tennessee General Assembly convened in extraordinary session to adopt a legislation ("HB 7003 or 2026 Plan") that eliminated Tennessee's only majority Black Congressional district, Congressional District 9 ("CD 9"). During truncated hearings and debate, lawmakers and witnesses demonstrated to the overwhelmingly white legislators that the map intentionally denied Black voters fair representation. Disregarding those objections, the Legislature enacted the new map less than 48 hours later.

1

CD 9 has been the only majority Black district in Tennessee since 1980. In the redistricting plan adopted after the 2020 Decennial Census. ("2022 Plan"), the Black Voting Age Population ("BVAP") in CD 9 was 61.3 percent. That majority did not result from any remedial action or race-influence line drawing but rather reflected the natural distribution of the population in Memphis and Shelby County. For decades, more than half the State's Black population has lived in Shelby County.

On April 29, 2026, the U.S. Supreme Court decided *Louisiana v. Callais,* overturning a congressional map for Louisiana that featured two majority-Black districts drawn as the result of litigation under Section 2 of the Voting Rights Act of 1965 ("VRA"). Two days after the decision, on May 1, 2026, Tennessee Governor Bill Lee issued a Proclamation calling a special session of the Legislature to "effectuate changes to the composition of Tennessee's congressional District[s] and to facilitate 2026 congressional elections." The Proclamation cited no dramatic shift in population since the 2020 Census that rendered the current map unrepresentative. It made no claim that CD 9 violated the constitution and cited no mandate under federal law. The sole predicate for redistricting was the just-issued *Callais* decision, which made it harder to challenge redistricting plans for discrimination.

Tennessee law has prohibited late-decade redistricting since 1972. *See* Tenn. Code. Ann. § 2-16-102 ("The districts may not be changed between apportionments."); 1972 Tenn. Pub. Acts, ch. 740, § 1. Despite this ban, the General Assembly convened on May 5, 2026, to do just that.

The first order of business was to remove the ban on late-decade redistricting. *See* H.B. 7002, 114th Gen. Assemb., Extr. Sess. (Tenn. 2026) (enacted May 7, 2026).[1]

The General Assembly then hurriedly pushed through a new map that eliminated Tennessee's sole Congressional district with a majority Black population. During a hasty, abbreviated hearing on the legislation, the Legislature permitted only three people to testify—U.S. Congressman Steve Cohen, who represents CD 9, Dr. Sekou Franklin, and Attorney Walter Bailey. They put the legislators on notice that the new map would intentionally discriminate against Black voters. Dr. Franklin, the Political Action Chair of the Tennessee State Conference of the NAACP, described the plan as an unprecedented attack on voting rights that would dismantle a cohesive majority-Black district and strip Black voters of meaningful political power. Dr. Franklin also requested, "if [race was] not a factor, then explain to us who actually drew the maps." *Hearing Before the H. Cong. Redistricting Comm.*, 114th Gen. Assemb., 2d Extr. Sess., at 46:50 (Tenn. 2026) (statement of Dr. Sekou Franklin). The Legislature has not answered that request. In splitting the Black population of Shelby County between three districts with extraordinary precision, Congressman Cohen charged, "used race as a basis to divide" a community of interest. *Id.* at 27:45 (statement of Congressman Steve Cohen).

During debate, Black Representatives Jesse Chism and Torrey Harris of Memphis repeatedly asked Speaker Sexton and Rep. William Lamberth if they knew the racial composition of Memphis and Shelby County. Speaker Sexton refused to acknowledge the demographic makeup of the jurisdictions and claimed that no racial data, only political data, were used to reconfigure

---

[1] The NAACP immediately challenged the bill that repealed the ban, HB 7002, in a state court lawsuit in Davidson County Chancery Court. *See TN State Conf. of NAACP, et. al v. TN Gov., et al.*, Case No. 26-0591-II (May 26, 2026). That court found that, although the language of HB 7002 expressly provides: "Tennessee Code Annotated, Section 2-16-102, is amended by deleting the last sentence of the section," which prohibits redistricting between apportionments, that somehow "a safer conclusion would be that the prohibition remains in effect as the general rule but that HB 7003 constituted a more specific statute that created an exception for 2026." *Id*. at 21.

the districts. *See id.* at 1:27:27 (statement of Speaker Cameron Sexton). Other representatives echoed concerns that the new plan would eliminate Black electoral opportunity.

Despite being placed on notice and cautioned about the discriminatory targeting, the legislators made no substantive changes to the bill and referred it to the Finance, Ways, and Means Committee on the same day, May 6, 2026. That Committee took an hour to pass the maps, with only white members voting in favor. The bill then went to the Calendar and Rules Committee, which set it to go before the General Assembly the next day.

During the General Assembly's consideration of the map, the only justification offered for splitting Memphis and Shelby County and dispersing communities of color among three districts was a purported need to follow "population and politics." *Id.* at 1:21:35, 1:26:13, 1:27:27, 1:28:30, 1:36:14, 1:36:56, 1:39:59, 1:49:26 (statements of Speaker Cameron Sexton). A sponsor of the redistricting bill claimed on the Senate floor that the Census was the *only* data source used to draw the maps. S*ee House Floor Session: 2d Extraordinary Session, 3d Legislative Day, Tennessee General Assembly*, at 1:39:45–1:41:11 (2026) (statements of Rep. John Ray Clemmons and Rep. Jason Zachary). That claim conflicted with assertions that the Legislature sought only partisan advantage. Census data do not reveal partisan splits, though they do show racial breakdowns. Further, no legislator suggested during the debates that anyone had considered records showing party affiliation or election results.[2]

In addition, when asked basic questions about the map and how it was drawn, the sponsors were evasive and failed to provide meaningful answers. For instance, Senator Stevens reluctantly admitted that Memphis was split in three districts under the proposed map after refusing to answer this question earlier in the Judiciary Committee debate. And despite having attended law school in

---

[2] Indeed, Tennessee voters do not register to vote with a political party, and therefore, even had voter registration data been consulted, it would not have allowed lines to be drawn based on party affiliation.

Memphis, he claimed not to know whether CD 9 was a majority Black congressional district. *See Senate Session: 2d Extraordinary Session, 3d Extraordinary Day, Tennessee General Assembly*, at 1:50:42–1:51:19 (May 7, 2026) (statements of Speaker Randy McNally and Sen. John Stevens). When asked who drew the map, the sponsors provided evasive answers. These cagey, scripted responses and feigned ignorance supported a view that partisanship was merely a pretext for dismantling CD 9.

### III.   STANDARDS FOR A PRELIMINARY INJUNCTION

A preliminary injunction is warranted if the movant establishes that: (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm without a preliminary injunction, (3) the balance of the equities weighs in their favor, and (4) the grant of an injunction serves the public interest. *Fischer v. Thomas*, 78 F.4th 864, 868 (6th Cir. 2023). Plaintiffs meet this standard.

### IV.   ARGUMENT

**A.   Plaintiffs Are Likely to Succeed on the Merits.**

Plaintiffs allege intentional vote dilution in violation of the Fourteenth and Fifteenth Amendments.[3]  The claim requires a showing that the redistricting legislation had "the purpose and effect of diluting the minority vote." *Alexander v. South Carolina St. Conf. of the NAACP,* 602 U.S. 1, 39 (2024), quoting *Shaw v. Reno,* 509 U.S. 630, 649 (1993).  Plaintiffs must—and do—overcome the presumption of legislative good faith for the claim of intentional discrimination. Plaintiffs need not show that discriminatory purpose was the "sole[ ]" or even a "primary" motive

---

[3] Plaintiffs do not allege a claim under Section 2 and therefore *Callais* does not apply.  The U.S. Supreme Court's ruling granting a stay in *Allen v. Milligan*, 608 U.S. ___ (2026) does not suggest otherwise.   The district court in that case found intentional discrimination based on the State's "deliberate 'repetition of discrimination previously adjudicated'" under Section 2 of the Voting Rights Act. Slip Op. at 2-3. The Court's reference to *Callais* in *Allen* reflected the intertwining of the Section 2 and constitutional claims.

for the legislation. *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 265-66 (1977). Their burden is satisfied by a showing that the racial discrimination was a "motivating factor" behind the State's action. *See Tenn. State Conf. of the NAACP v. Lee*, 746 F.Supp.3d 473, 504 (M.D. Tenn. 2024), citing *Arlington Heights*, 429 U.S. at 266.

"Eliminating racial discrimination means eliminating **all of it**." *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.,* 600 U.S. 181, 206 (2023) (emphasis added). Consequently, unlike in a racial gerrymandering claim, to prove intentional vote dilution, plaintiffs need not show that race was the sole or predominant factor in the decision. Any consideration is unlawful. States cannot intentionally base their decisions on race, even if doing so also would advance partisan objectives. The Supreme Court repeatedly has warned against using race as a proxy for political characteristics. *See Alexander v. South Carolina State Conf. of the NAACP*, 602 U.S. 1, 7 n.1 (2024) ("A plaintiff can also establish racial predominance by showing that the legislature used 'race as a proxy' for 'political interest[s].'") (internal citations omitted); *N. Carolina St. Conf. of NAACP v. McCrory,* 831 F.3d 204, 222 (4th Cir. 2016) ("Using race as a proxy for party may be an effective way to win an election. But intentionally targeting a particular race's access to the franchise because its members vote for a particular party, in a predictable manner, constitutes discriminatory purpose."); *Miller v. Johnson*, 515 U.S. 900, 914 (1995); *see also Cooper v. Harris*, 581 U.S. 285, 291, n. 1 (2017) (noting that strict scrutiny is warranted when "a legislature elevated race to the predominant criterion in order to advance other goals, including political ones"); *Perez v. Abbott,* 253 F.Supp.3d 864, 889 (W.D. Tex. 2017) (equality of opportunity under Section 2 "is lacking where the mapdrawers take steps to intentionally disadvantage Hispanic voters in the district, even if done to further political goals").

The evidence establishes that HB 7003 intentionally discriminates based on race. Indeed, Tennessee's effort to redistrict exemplifies intentional discrimination. Mere hours after the U.S. Supreme Court rendered its decision in *Callais*, the State launched its redistricting campaign dismantling CD 9, which, for over 50 years, had had been anchored by Memphis and Shelby County and stood as the only majority Black congressional district in Tennessee. CD 9, moreover, had not been drawn as a remedial district under the VRA. It reflected the residential patterns of Memphis, the largest city in the country with a majority Black population.

Tennessee last redistricted as part of the usual decennial cycle after the 2020 Census. The 2022 plan emerging from the process included CD 9 as a majority Black district. Tennessee law has prohibited late-decade redistricting since 1972, and the State followed that law until May 2026. But when the Supreme Court issued the *Callais* decision on April 29, 2026, making it harder to prove discrimination in VRA § 2 redistricting cases, Governor Lee issued the proclamation for the extraordinary session a mere two days later. Four days later, the legislature was back in session. And fewer than 48 hours after that, the legislature had jettisoned the ban on late-decade redistricting and adopted new maps that wiped out the only majority-Black district.

These events standing alone practically announce an intent to discriminate and adopt a map that, in the eyes of the majority-white legislature, "look[s] like Tennessee." The details of the plan confirm that intent. The cracking of Black voters in the Memphis/Shelby County area and the strategic dispersal of BVAP across CD 5, CD 8, and CD 9 demonstrate the pervasiveness of race in the redistricting process. With remarkable precision, the Legislature anchored the newly configured districts in Shelby County and extended them hundreds of miles to include rural white communities to meet its population requirements. False and evasive explanations of the process compounded the misconduct. Even fortified by the presumption of good faith, the State's

pretextual assertions of purely partisan intent cannot withstand the powerful evidence of racial intent.

The assessment of discriminatory intent does not stop with the markers manifest in the nature and timing of Tennessee's redistricting plan. The court must conduct "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights,* 429 U.S. at 266; *see also Flowers v. Mississippi*, 588 U.S. 284, 302 (2019) (intent can be inferred from all "relevant circumstances that bear upon the issue of racial discrimination"). Direct evidence includes "[o]utright admissions of impermissible racial motivation." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). Although such admissions are "infrequent," *id.,* Plaintiffs have such evidence here. Senator Brent Taylor, who is white, said the quiet part out loud in an interview with National Public Radio: "I think it's better for the congressmen in these districts to actually represent the interests and values of Tennesseans . . . [a]nd that's much better accomplished in districts that look like Tennessee rather than just a simply large urban core district like the old district 9 was."

As to circumstantial evidence, the Court in *Arlington Heights* itemized key factors showing racial bias, including discriminatory effect ("whether [the impact of official action] bears more heavily on one race than another"); historical background of the decision; specific sequence of events leading up to the challenged decision; departures from normal procedures; and statements by members. 429 U.S. at 267-68.

1. **The Dismantling of CD 9 Disproportionately Harms Black and Other Voters of Color.**

Plaintiffs challenge CD 9 in HB 7003, which targets and disadvantages Black voters in the Memphis/Shelby County area. Plaintiffs have provided documentary evidence, videos of the legislative proceedings, and multiple expert reports showing that the May 2026 redistricting plan intentionally deprives Black voters of the opportunity to elect candidates they prefer.

8

A demographic comparison of the 2022 and 2026 maps corroborates that race was a motivating factor in the 2026 redistricting. As Anthony E. Fairfax explains in his expert report, the State's decision to carve Shelby County's population into three congressional districts, rather than two, reveals the General Assembly's racial motive. *See* Expert Report of Anthony E. Fairfax ("Fairfax Report"), Exhibit A, ¶¶ 86-92. Given the density of Shelby County's BVAP, any two-district configuration of Shelby County using the same combined area as CD 8 and CD 9 under the 2022 Map would leave at least one congressional district (and possibly two) with a BVAP of at least 38.77 percent. *See id.* ¶¶ 41-46. Cracking Shelby County across three congressional districts stretching into rural central Tennessee, rather than two districts centered in western Tennessee, evinces an intent to reduce the BVAP in Shelby County to a level that all but guarantees that Black voters are denied an opportunity to elect candidates of their choice. *See id.* ¶¶ 40-49. Indeed, the only other county in the State that is divided into three separate congressional districts is Davidson County—the county with the second-largest BVAP in Tennessee after Shelby County. *See id.* ¶ 50.

Splitting Shelby County into three districts was hardly the only way in which the General Assembly abandoned traditional race-neutral districting criteria: the 2026 Map performs worse than the 2022 Map for virtually every traditional redistricting metric. The 2026 Map replaces compact districts with elongated ones, *see id.* ¶¶ 67-77 & tbl. 13, and splits more communities of interest and political subdivisions—most significantly, trisecting the state's largest Black population center, *see id.* ¶¶ 50, 78-85 & tbl. 12. The empirical metrics confirm what a visual comparison of the maps lays bare that the General Assembly enacted the 2026 Map "'as a purposeful device to minimize or cancel out the voting potential'" of Black voters in Memphis and

Shelby County. *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 38 (2024) (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)).

Plaintiffs' expert Dr. Baodong Liu is a professor of Political Science at the University of Utah. Dr. Liu's research has focused on the relationship between election systems and the ability of minority voters to participate fully in the political process and to elect representatives of their choice. Dr. Liu's report showed that, under the May 2026 Map, Black voters in Memphis and Shelby County overwhelmingly vote for the same candidates. In the 2024 Presidential General Election, Vice President Harris, a Black candidate, ran against Donald Trump, a white candidate. In CD 9, 92.6% of Black voters cast a ballot for Vice President Harris, while just 15.8% of white voters did the same. Liu Decl., Exhibit B, at 3-4.  In 2020, Marquita Bradshaw, a Black candidate, ran against a white candidate for U.S. Senate. In CD 9, 96.9% of Black voters cast a ballot for Bradshaw compared to just 13.5% of white voters.  Liu. Decl. at 3.  The percentages were similar in CD 8 and CD 5. *Id.*

Dr. Liu concluded that the tripartite division of Shelby County ensures that Black voters in the Memphis area are a minority constituency in each new district, disabling them from forming the electoral majority and electing a candidate of their choice, despite their cohesiveness as an electoral bloc.

The manner in which the 2026 Plan divides Memphis's and Shelby County's Black population cannot be explained by the State's purported partisan motives. Dr. Moon Duchin used an ensemble or simulation analysis to evaluate the role that race played in the design of the May 2026 map and to test the plausibility of the Legislature's claim that it drew the map to achieve partisan goals without considering race. This form of analysis produces random samples of thousands or millions of districting plans that follow specified rules and priorities. Duchin Decl.,

10

Exhibit C, at 3. Dr. Duchin's use of a similar methodology was credited by the Supreme Court in *Milligan*. *Allen v. Milligan*, 599 U.S. 1, 34 n.7 (2023) (noting with approval that Dr. Duchin's "randomized algorithms" found "plans with two majority-black districts in literally thousands of different ways.").

In her analysis for this case, Dr. Duchin ran three sets of simulations to test how a cartographer could have achieved the partisan and racial composition of the May 2026 map. First, as a baseline, Dr. Duchin produced a set of "neutral" maps that followed traditional districting principles but did not target a particular racial composition of districts or a particular partisan outcome. Duchin Decl. at 4. In this analysis, the maps produced almost always (at least 88.8% of maps) included a majority-Black district by voting age population, even without any use of race as a redistricting criteria. Duchin Decl. at 4. Next, Dr. Duchin trained the algorithm to aim for maps in which Donald Trump would have received a 60% share of the two-party vote in the 2020 Presidential Election in all nine congressional districts (partisan-targeted simulated maps). Duchin Decl. at 4. In the final set of simulated maps, Dr. Duchin trained the algorithm to aim for an even split of the Black population across three districts that intersect in Shelby County (race-targeted simulated maps). Duchin Decl. at 4.

Dr. Duchin found that both the race-targeted and the partisan targeted methods produce congressional districting plans that closely approximate the partisan advantage in the 2026 Plan. Duchin Decl. at 5. However, only the race-targeted method approximated the racial demographics of the 2026 plan. The 2026 Plan has a near-even split of the Black population in the Southwest corner of the state— all three districts intersecting Shelby County have a BVAP exceeding 26.5%, but none hit 32%. Duchin Decl. at 5. Maps designed to target partisan advantage never produced BVAP shares like the 2026 Plan: in fact, in the one-million partisan-targeted simulated maps, CD-

5 never had a BVAP above 22.5%. In the three Shelby County-based districts (which, as in the 2026 Plan, are the three districts with the highest Black populations in the State) and the typical BVAP in the district with lowest Black population hovers around 17.2%—well below CD-5 in the 2026 Plan—while the two other districts have BVAPs exceeding 37%—substantially above CD-8 and CD-9 in the 2026 Plan. Duchin Decl. at 5. [4] By contrast, in the one-million simulated maps that used race to draw the districts, the median BVAP in the third-highest district (CD-5) is 26.7% and the other two districts range from 29% to about 31% BVAP, a near-perfect match to the May 2026 map. Duchin Decl. at 5, 7.

Moreover, of these two approaches, to achieving partisan advantage, only the race-targeted approach could have been carried out using Census data alone. Duchin Decl. at 4. The Decennial Census contains a Redistricting Data File (known as the PL 94-171) that has very few data fields: it contains total population and voting age population, broken down by race and ethnicity. Census data does not contain any partisan or electoral data, so maps that targeted partisan performance based directly on partisan data could not be created from Census data alone, but would have required some other data source. Duchin Decl. at 4. However, the Legislators responsible for developing the May 2026 map stated that they consulted only Census data and disclaimed using any other data source.

Based on the simulation analysis and the legislators' claim to have used only Census data, Dr. Duchin concluded that the use of racial targets was much more likely than partisan targeting to produce three Shelby County based districts in which the Black voting age population is below 32%, as it is in the 2026 plan. Duchin Decl. at 4, 5.

---

[4] Other attempts to approximate the racial demographics of the May 2026 plan using non-racial criteria also failed. Duchin Decl. at 5 n.4.

As noted, the Supreme Court's direction that partisan gerrymandering is not justiciable does not apply to intentional vote dilution claims under the 14th and 15th Amendments, as compared to a claim of racial gerrymandering, which Plaintiffs here do not allege. The report of Dr. Traci Burch, a Professor of Political Science at Northwestern University and a Research Professor at the American Bar Foundation, shows why such a requirement would be inappropriate and uninformative as to intentional discrimination. Burch Decl., Exhibit D, at 2.

Today, voting preferences in Tennessee cannot be explained by voters' views on economic and social issues—so called "nonracial issues." In fact, polarization levels in the electorate with respect to "nonracial" issues are increasingly shaped by racial attitudes. Burch Decl. at 16-76. Because in Tennessee the voting patterns are racially polarized and racial attitudes drive electoral outcomes and legislative actions, a professed claim to harm Democrats cannot and does not neutralize evidence of a motivation to harm Black voters.

**2.** **Tennessee's History of Discrimination Supports a Finding of Intentional Discrimination.**

The second *Arlington Heights* factor is the historical background of the decision. Since the American Civil War, Black Memphians faced institutional barriers to exercising the franchise and building political power. *See* McKinney Decl., Exhibit E, at 4-5. Western Tennessee has a documented history of official discrimination in voting. *See Rural West Tenn. African-American Affairs Council v. Sundquist*, 209 F.3d 835, 843 n. 1 (6th Cir. 2000) (finding no error in the district court's determination of a history of official discrimination in voting in western Tennessee). Courts have made similar findings in other parts of the state. *See, e.g.*, *Cousin v. McWherter*, 46 F.3d 568, 571 n.3 (6th Cir. 1995) (noting the comprehensive trial court record establishing the "long history of the past and present discrimination African-Americans have faced in Hamilton County.").

13

This history extends to incidents "reasonably contemporaneous with the challenged decision." *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987). The Tennessee Legislature has repeatedly sought to override the choices made by Black Memphians, undermine their elected officials, and take over local government functions. Am. Compl. ¶¶ 166-171. As recently as the 2026 regular session, legislators authorized the takeover of the predominantly Black Memphis-Shelby County school board and the auditing of the Shelby County District Attorney's Office, as well as the potential replacement of the Shelby County District Attorney. *Id.* at ¶¶ 173-174. The 2026 redistricting is merely the latest of recent efforts to disenfranchise and silence Black voices in Shelby County, to erode self-government in that community, and to denigrate their political choices.

This disdain for the autonomy of Memphis and Shelby County voters occurred against the backdrop of a long history of racial segregation and subordination that continues to the present day. McKinney Decl. at 37. Tennessee has the second highest rate of disenfranchisement in the country, and while Black Tennesseans constitute approximately 17% of the state's population, they also are 43% of all system-impacted individuals disenfranchised for felony convictions. *Id.* at 34. Black voters in Fayette County challenged its dilutive county commissioner map, resulting in a new map with three majority-minority districts after four years of litigation. *Id.* at 36.

The history of discrimination, extending to the present, supports the showing of discriminatory intent.

**3.    The Sequence of Events and Contemporaneous Statements from Decisionmakers Support an Inference of Intentional Discrimination.**

The third and fourth *Arlington Heights* factors are the "specific sequence of events leading up to the challenged decision" and "contemporary statements by members of the decisionmaking body[.]" *Village of Arlington Heights*, 429 U.S. at 267–68.

14

The statements by the legislative sponsors and supporters of the 2026 redistricting reveal a clear strategy whenever race was invoked: deny any use of drawing the map and then deny any knowledge of the demographics of the state, no matter how implausible. For instance, Senator Stevens claimed that the map "removed racial data from the mapping process entirely," but professed not to whether Memphis, where he attended law school, was majority Black or whether CD 9 was the only majority-Black congressional district. Burch Decl. at 9. Speaker Sexton too denied knowledge of the racial demographics of CD 9. Burch Decl. at 9. Representative Lamberth denied knowing whether Memphis, Shelby County, or CD 9 were predominantly Black. Burch Decl. at 9–10. These assertions strain credulity. Sponsors claimed instead that the mapdrawers used "census data" to draw the map, apparently unaware that although the Census includes breakdowns of race, it contains no data on voting patterns or political parties. Burch Decl. at 10.

In the face of these implausible, scripted answers, opposing lawmakers expressed skepticism regarding these professions of a race-blind process. Senator Yarboro pointed out that the map treated Democrats differently based on race, splitting 75% of Black Democrats into two non-compact congressional districts while uniting 75% of white Democrats into one compact congressional district. Burch Decl. at 11. He asserted that this different racial treatment resulted in white Democrats having better representation than Black Democrats because Black Democrats would be "racially and geographically isolated from power." Burch Decl. at 11.

If there were any doubt about the falsity of the self-serving denials of racial motivation, the statement of Senator Taylor would dispel it. He opined that "it's better for the congressmen in these districts to actually represent the interests and values of Tennesseans," which can be "much better accomplished in districts that *look like* Tennessee." Burch Decl. at 11 (emphasis added).

15

The residents of old CD 9, to Senator Taylor, were the "urban core[,]" who apparently did not qualify as "Tennesseans" worthy of representation.

### 4. Procedural and Substantive Departures Support a Finding of Intentional Discrimination.

The fifth *Arlington Heights* factor, which concerns departures from normal procedures in enacting the challenged law weighs heavily in favor of Plaintiffs. The process the General Assembly employed to produce and pass the 2026 plan departed significantly from previous redistricting efforts in many important ways. First, the General Assembly's decision to redistrict late-decade was itself a substantial departure from the process it has followed for decades. Burch Decl. at 6. Prior to 2026, Tennessee had not engaged in redistricting between appointments for at least 50 years. In fact, Tennessee law banned such late-decade redistricting. Burch Decl. at 6. The legislature hurriedly passed HB 7002, removing the ban.

Second, compared to previous redistricting efforts, this process was rushed with minimal public transparency on the map-drawing process or the maps themselves. In 2022, legislators publicized the proposed congressional maps to the public 12 days before the map was enacted. Burch Decl. at 6. In 2012, legislators publicized the maps seven days before enactment. Burch Decl. at 6. In May 2026, the General Assembly passed the redistricting plan just one day after publicizing the maps. Burch Decl. at 5–6.

The rushed and secretive process of producing maps made it nearly impossible for legislators to submit amendments, alternative plans, or other feedback on the map. For instance, the House Redistricting Committee met only four hours after the proposed maps were made available to the public. Burch Decl. at 6–7. The House Rules Committee rejected proposals by Black legislators. Burch Decl. at 6–7.

In the House, the proposed map was scheduled for a floor vote just twenty-four hours after being available to the public. Burch Decl. at 7. The House Rules Committee also set the deadline for amendments at 24 hours before the House vote on the bill, rejecting a proposal by Representative Jones to permit filing amendments up to one hour before the vote. Burch Decl. at 5–7. Burch Decl. at 7. Representative Jones pointed out the absurdity of this deadline by saying "there was no way to file timely considered amendments because we were rushed through this process in less than 24 hours, given less than 24 hours to consider this map." Burch Decl. at 7.

In addition, the General Assembly disregarded most traditional redistricting criteria, another significant departure from previous redistricting cycles. Burch Decl. at 8. For example, prior maps sought to avoid splitting cities between districts and considered whether the districts were compact. For the 2026 map, Speaker Sexton stated that the mapdrawers did not examine the boundaries of cities, and he refused to say whether compactness was considered. Burch Decl. at 8

**B.      Plaintiffs are Likely to Suffer Immediate and Irreparable Harm**

The Constitution guarantees equal protection of the law and freedom from intentional discrimination in voting. *See* U.S. Const. amend. 14 § 1, 15 § 1. Defendants violated the constitutional rights of Black and other voters of color by dismantling CD 9 and intentionally denying them an equal opportunity to participate in the political process and elect their preferred candidates. "[T]he loss of constitutional freedoms 'for even minimal periods of time … unquestionably constitutes irreparable injury.'" *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Overstreet v. Lexington-Fayette Urban County Government*, 305 F.3d 566, 578 (6th Cir. 2023) ("violation of the plaintiff's constitutional rights" constitutes irreparable harm). If Plaintiffs cannot participate equally in the upcoming election, "there can be no do-over and no redress" after the election occurs. *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th

Cir. 2014). The injury is not only irreparable, but absent intervention from this Court, will continue, as Plaintiffs will be forced to vote under a map designed to dilute their votes and deny them fair representation in Tennessee. *See* Sterling Decl. at ¶ 12; Sweet-Love Decl. at ¶¶ 14-16; Gould Decl. at ¶¶ 11-14; Harrington Decl. at ¶¶ 4-15; Terry Decl. at ¶ 7; Hutchinson Decl. at ¶ 8; Thomas Decl. at ¶ 9; Mitchell Decl. at ¶¶ 7-9; Sharpe Decl. at ¶ 10; Carson Decl. at ¶¶ 17, 21; Randolph Decl. at ¶¶ 11-16, Exhibits F-P, respectively.

**C.      The Balance of the Equities and the Public Interest Both Weigh in Plaintiffs' Favor.**

Courts assess the balance of the equities and the public interest together because they "overlap considerably." *Nken v. Holder*, 556 U.S. 418, 435 (2009). With interlocutory stays, "[t]hese factors merge when the Government is the opposing party." *Id*. The serious harms inflicted by redistricting plans that unconstitutionally discriminate based on race outweigh any interest Defendants might assert as to administrative convenience or other burdens they may face. "Proper application of the Constitution, moreover, serves the public interest…as 'it is always in the public interest to prevent the violation of a party's constitutional rights.'" *Dahl v. Bd. of Trustees of Western Mich. Univ.*, 15 F.4th 728, 736 (6th Cir. 2021), quoting *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994). Both the balance of the equities and public interest weigh in favor of a preliminary injunction.

In *Purcell v. Gonzales*, 549 U.S. 1 (2004) (per curiam), after all, the Court applied an equitable doctrine reflecting the understandable reticence of courts to displace a state's electoral plans at the last minute. Equitable doctrines are subject to equitable defenses designed to prevent litigants from gaming the judicial system.[5] The finding that a state has acted with discriminatory

---

[5] *Allen v. Milligan*, 608 U.S. ___ (2026), is consistent with this point. The State in *Milligan* sought to reinstate a longstanding redistricting plan. It did not create a new one on the eve of primary elections to discriminate against Black voters while evading any possible review, as Tennessee has done here.

intent necessarily means that the state has not acted in good faith. The Court explained in *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.* that the maxim "He who comes into Equity must come with clean hands" is "far more than a mere banality . . . . That doctrine is rooted in the historical concept of the court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith." 324 U.S. 806, 814–15 (1945). *Purcell* cannot become a reverse statute of limitations, immunizing the State to perpetrate the most egregious discrimination so long as it does so it sufficiently close to the election. Otherwise, a state could create a map on the eve of an election excising Black voters from any district, and courts would be powerless to stop it.

## V. CONCLUSION

For these reasons, the Court should preliminarily enjoin the 2026 map.

Submitted: June 9, 2026.

Respectfully submitted,

**TURNER FEILD, PLLC**
Van D. Turner, Jr. (TN Bar No. 022603)
2650 Thousand Oaks Boulevard, Suite 2325
Memphis, TN 38118
(901) 290-6610
vturner@turnerfeildlaw.com

**LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW**
/s/*JENNIFER NWACHUKWU.*
Robert Weiner **
Jennifer Nwachukwu*
Olivia Sedwick***
1500 K Street NW, Suite 900
Washington, DC 20005
(202) 662-8600
rweiner@lawyerscommittee.org
jnwachukwu@lawyerscommittee.org
osedwick@lawyerscommittee.org

**BRYAN CAVE LEIGHTON PAISNER LLP**
Meryl Macklin**
Jon Fetterly**
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
(415) 675-3433
meryl.macklin@bclplaw.com
jon.fetterly@bclplaw.com

**NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE**
Kristen Clarke***
Anthony P. Ashton**
4805 Mt. Hope Drive
Baltimore, MD 20215
(410) 580-5777
legal@naacpnet.org
aashton@naacpnet.org

**NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.**
Kathryn Sadavasian***
Colin Burke**
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
ksadavasian@naacpldf.org
cburke@naacpldf.org

*Admitted *pro hac vice*
***Pro hac vice* motions to be filed
*** *Pro hac vice* motion pending

20

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing motion was filed on June 9, 2026. A true and correct copy of that filing was forwarded on the same day via the Court's CM/ECF system on all counsel of record.

/s/ Jennifer Nwachukwu
Jennifer Nwachukwu

21