# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| VICKI HALE, *et al.* | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | Case No. 3:26-cv-00603 |
| V. | § | [Lead Case] |
| | § | |
| WILLIAM LEE, *et al.*, | § | |
| | § | |
| *Defendants.* | § | |
| | § | |
| | § | |
| TENNESSEE STATE CONFERENCE | § | |
| OF THE NAACP, *et al.* | § | |
| | § | |
| *Plaintiff,* | § | Case No. 3:26-cv-00638 |
| V. | § | [Consolidated Case] |
| | § | |
| | § | |
| TRE HARGETT, *et al.*, | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

**Expert Report of Dr. Traci Burch**

1

<u>Background and Qualifications</u>

I am a Professor of Political Science at Northwestern University and a Research Professor at the American Bar Foundation. I also serve as Editor-in-Chief of *Law and Social Inquiry*, a peer-reviewed law and social science journal. I received my Ph.D. in Government and Social Policy from Harvard University.

I have led several large, long-term quantitative and qualitative research projects on political participation in the United States. I have participated in and coauthored several book chapters and articles that examine race, political participation, and inequality, and I am widely regarded as an expert on political behavior, barriers to voting, race and politics, and political participation. My work has been widely cited and replicated and has won several awards. I have received several grants for my work. I routinely review the work of my peers for tenure, promotion, scholarly journals, university presses, and grants and have served as a reviewer for the American Political Science Review, The American Journal of Political Science, The Journal of Politics, Political Behavior, the National Science Foundation, Cambridge University Press, Princeton University Press, the University of Chicago Press, Oxford University Press, Science Advances, and many other entities.

I am the author of several books and articles examining voter turnout and political participation, race and ethnic politics, and criminal justice using multiple methods. In particular, my articles "Did Disfranchisement Laws Help Elect President Bush? New Evidence on the Turnout and Party Registration of Florida's Ex-Felons" and "Turnout and Party Registration among Criminal Offenders in the 2008 General Election," which appeared in the peer-reviewed journals Law and Society Review and Political Behavior, respectively, included my calculations of felony disenfranchisement and voter turnout among people with felony convictions. My academic book on the community-level effects of criminal convictions on political participation, *Trading Democracy for Justice*, was published by the University of Chicago Press and also won multiple national awards from the American Political Science Association and its sections, including the Ralph J. Bunche Award for the best scholarly work that explores the phenomenon of ethnic and cultural pluralism and best book awards from the law and politics and urban politics sections. *Trading Democracy for Justice*, along with many of my articles, relies on the analysis of large criminal justice and voter registration data files.

In addition to my published work, I have conducted analyses of legal financial obligations, re-registration after felony convictions and barriers to voting as an expert witness. I have testified in cases involving *Arlington Heights* and the Senate Factors under Section 2 of the Voting Rights Act. I have also testified before the U.S. Commission on Civil Rights about the collateral consequences of felony convictions with respect to voting and other issues.

My curriculum vitae is provided in the appendix. I am being compensated at the rate of $400 per hour for work in this case, plus expenses. My compensation does not depend on the opinions I render. My prior expert engagements are set forth in my CV. In all cases where an opinion was issued, the courts accepted my expert testimony.

2

<u>Scope of the Report</u>

I was asked by counsel for the Plaintiffs to provide information that may be relevant to an analysis of whether the passage of HB7003 was racially discriminatory. My analysis is guided by the framework established by the Supreme Court in *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252 (1977). I understand that other experts will address the racially disparate impact of the new plan; I will discuss the historical background, the sequence of events leading up to the enactment of the redistricting plan, the procedural or substantive deviations from the normal decision-making process, and contemporaneous statements by the decision-makers. I also was asked to discuss the respective roles of race and partisanship generally and in Tennessee. For all analyses, I rely on sources and methods that are common in my discipline of political science, including examination of the relevant scholarly literature, survey and other data, legislative records, and other documents.

<u>Historical Background of Black Representation in Tennessee</u>

Throughout history, the people of Memphis repeatedly have been denied the opportunity for representation and self-governance. Tennessee, like other southern states, used several practices that limited Black electoral power. For instance, the General Assembly implemented poll taxes and banned helping illiterate voters, which caused Black registration to decline precipitously (Kousser 1973; Wright 2000). The state also allowed White primaries while violence and intimidation further limited Black voting power (Bullock and Gaddie 2009: 287). As a result, no Black people served in Tennessee's state General Assembly between 1888 and 1964.

Memphis and Shelby County were chronically denied equal representation because the Tennessee General Assembly did not redraw districts after 1901. Charles W. Baker and other Tennessee residents sued the General Assembly, arguing that they were denied equal representation ("Baker v. Carr," Supreme Court Historical Society). Although the population of Shelby County was more than 600,000, they had the same representation in the General Assembly as smaller counties—Chester County had only 8,200 residents ("Baker v. Carr," Supreme Court Historical Society. The Supreme Court held in *Baker v. Carr* that such inequality of representation was unconstitutional and could be addressed by courts. The passage of the Voting Rights Act of 1965 further increased Black registration, representation, and officeholding, primarily in heavily Black areas of the state (Bullock and Gaddie 2009). Population change also helped Black residents elect their candidates of choice: the 9th congressional district centered on Memphis, which has been a majority Black city since 1986 (Bullock and Gaddie 2009: 298), was represented by Harold Ford, Sr. from 1975 to 1996, then by his son Harold Ford, Jr. from 1997 to 2006. Representatives Ford Sr. and Ford Jr. are the only Black members of Congress elected

3

from Tennessee.[1]  Since then, Steve Cohen, a White civil rights lawyer, has held the 9th district seat.

Recent decades have seen a gradual erosion of Black political power in Tennessee. Partisan realignment reduced the influence of Black legislators, who lost their leadership positions in state General Assembly (Franklin and Block, Jr. 2020). There are no Black Republicans in the Tennessee General Assembly, so there are no Black members in the majority of either chamber.  Black legislators have reported being ignored and not having the chance to speak.  Representative Johnnie Turner, because she was ignored and prevented from speaking on bills deliberated on the House floor, staged a protest in which she waved a mop covered by a yellow bag so she "could be seen" (Franklin and Block, Jr. 2020).  Representative Jones reports that lack of visibility is still a problem for Black legislators today, saying, "You know, one thing I've noticed, I don't know if its because I'm a person of color, or I'm Black but sometimes it seems like the Speaker doesn't see my hand or the hands of people who look like me to speak.[2]

This loss of power is consequential, because Black voters elect representatives who are responsive to their concerns, particularly regarding anti-discrimination and anti-poverty policies. In Tennessee, the Tennessee Black Caucus of State Legislators is more likely to support anti-discrimination policies and is more likely to push for legislation that helps poor and working-class communities (Franklin and Block, Jr. 2020; Wright 2000).  Similarly, Steve Cohen was rated as one of the most effective Democratic lawmakers in the U.S. House, where he advocated for the passage of the first formal congressional apology for slavery and also secured millions of dollars for community projects in Memphis (Hacker et al. 2026).

The loss of political power statewide is coupled with recent, significant efforts by the Tennessee General Assembly to reduce the representation and self-governance of Memphis.  The state General Assembly punished Memphis for removing Confederate monuments from public parks (Criss 2018); support for Confederate symbols and lost cause ideology has been linked to racial attitudes (Cooper et al. 2022).[3]  The Tennessee General Assembly also took over Memphis-

---

[1] "Black American Members by State and Territory."  United States House of Representatives. https://history.house.gov/Exhibitions-and-Publications/BAIC/Historical-Data/Black-American-Representatives-and-Senators-by-State-and-Territory/

[2] 24:45 5/5/26 Meeting of the Ad Hoc Committee on Rules.

[3] Cooper et al. write, "The primary driver of the partisan transformation of the contemporary southern Democratic and Republican coalitions then is anchored upon a racial cleavage. The near absence of a black presence in the modern Republican Party in the South allows for its adherents to embrace the Confederate past and the symbols tied to it. Conversely, the racially and ethnically diverse modern Democratic coalition, one in which African Americans comprise a plurality of its voters . . . is no longer conducive to and welcoming of Confederate sympathizers. So, through well over a hundred years of partisan change, it has finally come to pass that the party once excoriated by southern whites as responsible for the "War of Northern Aggression," is currently home to a white majority that is now the greatest defender of a Confederate legacy originally created and perpetuated by Democrats" (Cooper et al. 2022: 103).

4

Shelby County Schools shortly after the passage of HB7003 (Moore 2026).  The General Assembly also passed legislation to roll back traffic stop reforms passed in Memphis after Tyre Nichols, a Black man, was beaten to death by police (Matisse 2024).

In a famous incident, Representative Justin Pearson[4] a Black representative of Memphis, along with Representative Justin Jones from Nashville, were expelled from the Tennessee House for protesting at the state capitol (Sanders and Garber 2023).  A third, White female representative from Nashville who protested, Representative Gloria Johnson, was not expelled (Sanders and Garber 2023).  Prior to the expulsion of Representatives Pearson and Jones, the Tennessee House had previously expelled only two members—one after a felony conviction and one after he was found to have had inappropriate sexual contact with 22 women (Sanders and Garber 2023).  The respective city councils reinstated the two representatives and they were subsequently reelected in special elections.

In May of 2026, the Tennessee General Assembly acted to reduce Black political power again in the aftermath of the passage of HB7003. This time, Speaker Cameron Sexton stripped all Democratic representatives, *which includes all Black members of the TN House*, of their committee assignments for protesting HB7003 (Stockard 2026).  Senator Oliver also faced sanctions, including reassignment from the Government Operations Committee, for her protest on the Senate Floor, which involved standing on her desk, holding a banner, and singing protest songs from the civil rights era.[5]

Timeline of Events Leading up to New Congressional Plan

| May 4, 2026 | HB7003 Filed |
| May 5, 2026 | SB7004 Filed |
| May 6, 2026, 9:00am | Map made public[6] |
| May 6, 2026, 9:00am | Filing deadline for regular consideration amendments to HB7003[7] |
| May 6, 2026, 1:00pm | Scheduled meeting of the Congressional Redistricting Committee[8] |

[4] Representative Pearson is running for the district 9 seat that was changed by HB7003.

[5] Senator Charlane Oliver.  "They Snatched My Sign, Now They Want to Take Away My Pay." https://senatorcharlaneoliver.substack.com/p/they-snatched-my-sign-now-they-want

[6] 1:52:00 5/7/2026 Senate session – 2nd Extraordinary Session 3rd Extraordinary Day tnga.granicus.com/player/clip/33451?view_id=775&redirect=true

[7] Section 60, "Amendments to Bills"https://capitol.tn.gov/Archives/House/114GA/Publications/114th%20ES%202%20Ad%20Hoc%20Report.pdf

[8] Agenda. https://tnga.granicus.com/AgendaViewer.php?view_id=775&clip_id=33444

| May 6, 2026, 1:15pm | Scheduled meeting of the Finance, Ways and Means Committee[9] |
| May 6, 2026, 4:30pm | Scheduled meeting of the Calendar and Rules Committee[10] |
| May 7, 2026, 9:00am | Scheduled House Floor Session[11] |
| May 7, 2026, 10:00am | Scheduled Senate Floor Session[12] |

Departures from Normal Procedures

The redrawing Tennessee's map in 2026 was itself was a departure from decades of procedure. In order to enact a new map, the General Assembly first passed HB7002, which amended the 1972 law that prohibited redrawing district lines between apportionments.[13] Thus, the General Assembly jettisoned more than 50 years of precedent to clear the way for HB7003.

HB7003 was passed in a process that was unusually short compared with prior congressional redistricting cycles. In prior redistricting cycles, congressional maps were made available to the public twelve days prior to passage in 2022 (Brown 2022), and just over a week prior to passage in 2012 (Yue 2021). According to Senator Stevens, the map in HB7003 was made available only one day before passage on May 6th at 9am.[14] Even some Republican lawmakers had not seen the proposal as of May 3rd.[15] Representative Jones reiterated on May 5th that the maps had not been provided to him or other legislators.[16] As a result, it was difficult for

---

[9] Agenda. https://tnga.granicus.com/AgendaViewer.php?view_id=775&clip_id=33446

[10] Agenda. https://tnga.granicus.com/AgendaViewer.php?view_id=775&clip_id=33447

[11] Agenda. https://wapp.capitol.tn.gov/apps/VideoCalendars/VideoCalendarOrders?CalendarID=33613&GA=114

[12] Agenda. https://wapp.capitol.tn.gov/apps/VideoCalendars/VideoCalendarOrders?CalendarID=33616&GA=114

[13] Memorandum and Order, *Sherman et al. v Hargett et al.* United States District Court for the Middle District of Tennessee (No. 3:26-cv-00616).

[14] 1:52:00 5/7/2026 Senate session – 2nd Extraordinary Session 3rd Extraordinary Day tnga.granicus.com/player/clip/33451?view_id=775&redirect=true

[15] "Michele Reneau, State Representative: Special Session: I'd love to hear your thoughts." 2026. Available online https://www.electmichele.com/post/special-session-i-d-love-to-hear-your-thoughts?fbclid=IwY2xjawRlh1xleHRuA2FlbQIxMABzcnRjBmFwcF9pZBAyMjIwMzkxNzg4MjAwODkyAAEeRKZwzKeO1pAaqjZ_G8pM3pmsXnmvkSFrjl7mHXqp2K7q1S-HdX0bI2pcdDs_aem_Ac4CyVtZlT55Ga2DWLWLLw. Accessed 5 June 2026.

[16] 23:55 5/5/26 Meeting of the Ad Hoc Committee on Rules. https://tnga.granicus.com/player/clip/33436?view_id=784&redirect=true

6

legislators to submit amendments and for the public to submit alternative plans and to provide feedback on the maps.

The opportunity to provide public comments was limited.  The rules committee voted down proposals by Leader Camper and others to extend the ability of the public to evaluate maps by holding off on consideration for 72 hours after the full text, maps, and data were made available.[17]  The meeting of the House Redistricting Committee was scheduled for only four hours after the map was made available to the public, which provided only four hours to evaluate the demographic and political changes made to the map before the public could appear before the committee.

Democratic representatives had no opportunity to file timely amendments given the scheduling of consideration of HB7003 exactly 24 hours after the map was made public.  The rules committee voted down a proposal by Representative Jones to file amendments up to one hour before session[18] and instead set the deadline for amendments 24 hours before session.[19]  Amendments "not timely filed" require a two-thirds majority vote in order to be considered, and members speaking on such amendments are given only one minute to introduce the bill.[20]  Representative Jones noted in reference to his Amendment 22 to HB7001 that "the reason that they're not timely filed is that there was no way to file timely considered amendments because we were rushed through this process in less than 24 hours, given less than 24 hours to consider this map."[21]

Statements of Legislators

*Rationales for Passing HB7003*

When examining the rationales for passing HB7003, it is important to recognize that the redistricting did not take place because of a court order or outcry from voters.[22]  In fact, Senator Jack Johnson, who sponsored both the senate companion to HB7003 and the previous map, said

---

[17] 1:03:03 5/7/2026 House Floor Session – 3rd Legislative Day – 2nd Extraordinary Session
tnga.granicus.com/player/clip/33450?view_id=775&redirect=true
[18] 5/5/26 Meeting of the Ad Hoc Committee on Rules.
https://tnga.granicus.com/player/clip/33436?view_id=784&redirect=true
[19] 39:17 5/5/26 Meeting of the Ad Hoc Committee on Rules.
https://tnga.granicus.com/player/clip/33436?view_id=784&redirect=true
[20] 1:38:00 5/7/2026 House Floor Session – 3rd Legislative Day – 2nd Extraordinary Session
tnga.granicus.com/player/clip/33450?view_id=775&redirect=true.  See also "Amendments to Bills."
https://capitol.tn.gov/Archives/House/114GA/Publications/114th%20ES%202%20Ad%20Hoc%20Report.pdf
[21] 1:03:00.  5/7/2026 House Floor Session – 3rd Legislative Day – 2nd Extraordinary Session
tnga.granicus.com/player/clip/33450?view_id=775&redirect=true
[22] 2:44:04 5/7/2026 Senate session – 2nd Extraordinary Session 3rd Extraordinary Day
tnga.granicus.com/player/clip/33451?view_id=775&redirect=true

7

that the previous map "is legal, its logical, its fair, it recognizes the regional differences among our three grand divisions, and it will give all of Tennesseans a strong voice in Washington."[23] Representative Lamberth also agreed that the previous map was "constitutional" and had survived several legal challenges.[24]

Legislators who presented and supported HB7003 advanced several rationales for the map. For example, Representative Lamberth said that the new map was designed to make the districts more competitive and "to have a more diverse set of voices at the table."[25] Speaker Sexton said that the map was drawn based on "population and politics."[26] However, in contrast to previous redistricting cycles, legislators did not consider most traditional redistricting criteria. When asked whether the map proposed by HB7003 tried to keep Memphis intact as communities of interest, Speaker Sexton said that they did not look at the boundaries of cities.[27] When the previous map was drawn, there was an effort to minimize splits of political jurisdictions.[28] Speaker Sexton would not say that compactness was considered in the design of HB7003.[29]

It also is important to note that, despite the Supreme Court's holding that "partisan gerrymandering claims present political questions beyond the reach of the federal courts" in *Rucho v. Common Cause* in 2019, leadership sponsoring the bill said that partisanship was not a factor in designing the previous map. When asked by Senator Yarboro whether the goal in drawing the previous congressional map was "to eliminate the prospects for a Democratic congressman to continue representing middle Tennessee and to improve the prospects of a Republican representing the entirety of the state outside of Shelby County in the United States Congress," Senator Johnson replied, "No."[30]

---

[23] 42:25 1/20/2022 Senate Floor Session 39th Legislative Day
tnga.granicus.com/player/clip/25736?view_id=610&redirect=true
[24] 08:15 5/6/2026 Meeting of the Congressional Redistricting Committee of Extraordinary Session II. tnga.granicus.com/player/clip/33444?view_id=775&redirect=true
[25] 13:30 5/6/2026 Meeting of the Congressional Redistricting Committee of Extraordinary Session II. tnga.granicus.com/player/clip/33444?view_id=775&redirect=true
[26] 1:26:15 5/6/2026 Meeting of the Congressional Redistricting Committee of Extraordinary Session II. tnga.granicus.com/player/clip/33444?view_id=775&redirect=true See also 22:15 5/6/26 Meeting of the Finance, Ways, and Means Committee of Extraordinary Session II. tnga.granicus.com/player/clip/33446?view_id=775&redirect=true
[27] 1:36:14. 5/6/2026 Meeting of the Congressional Redistricting Committee of Extraordinary Session II. tnga.granicus.com/player/clip/33444?view_id=775&redirect=true
[28] 45:40 1/20/2022 Senate Floor Session 39th Legislative Day
tnga.granicus.com/player/clip/25736?view_id=610&redirect=true

[29] 1:37:30 5/6/2026 Meeting of the Congressional Redistricting Committee of Extraordinary Session II. tnga.granicus.com/player/clip/33444?view_id=775&redirect=true
[30] 52:45 1/20/2022 Senate Floor Session 39th Legislative Day
tnga.granicus.com/player/clip/25736?view_id=610&redirect=true

Moreover, not all Republicans agreed with the sentiment that HB7003 should promote partisanship over all other values.  Representative Michele Reneau wrote, "In a properly functioning system, representation should follow population—not mid-cycle political strategy."[31]  Moreover, she wrote, "The stated goal of creating a 9-0 congressional delegation raises a bigger concern.  Our responsibility is to represent people first—not parties."[32]

*The Role of Race*

When presenting the house and senate versions of the congressional map, the bill sponsors went to great lengths to stress that race was not a factor in drawing the maps.  For example, Senator Stevens said that the map "removed racial data from the mapping process entirely."[33]  Representative Sexton also said that no racial data were used in the drawing of the map.[34]  In fact, sponsors of the bill were so determined to prove that race was not a factor in drawing the map, they denied even knowing that Memphis, Shelby County, and the 9th Congressional district were majority-minority, a prospect that the gathered audience found laughable.[35]  For instance, when asked by Senator Lamar whether he was aware that Memphis was primarily African-American, Senator Stevens said that he was not aware, despite having lived in the city for several years while attending law school.[36]  Senator Stevens also denied being aware that the 9th congressional district was the only majority African-American district in Tennessee.[37]  Speaker Sexton also denied knowing the racial demographics the 9th congressional district.[38]  Representative Lamberth also said that he did not have those demographics when

---

[31] "Michele Reneau, State Representative: Special Session : I'd love to hear your thoughts." 2026.  Available online https://www.electmichele.com/post/special-session-i-d-love-to-hear-your-thoughts?fbclid=IwY2xjawRlh1xleHRuA2FlbQIxMABzcnRjBmFwcF9pZBAyMjIwMzkxNzg4MjAwODkyAAEeRKZwzKeO1pAaqjZ_G8pM3pmsXnmvkSFrjl7mHXqp2K7q1S-HdX0bI2pcdDs_aem_Ac4CyVtZlT55Ga2DWLWLLw.  Accessed 5 June 2026.

[32] Ibid.

[33] 2:03:53 5/7/2026 Senate session – 2nd Extraordinary Session 3rd Extraordinary Day tnga.granicus.com/player/clip/33451?view_id=775&redirect=true

[34] 1:25:15 5/6/2026 Meeting of the Congressional Redistricting Committee of Extraordinary Session II.  tnga.granicus.com/player/clip/33444?view_id=775&redirect=true

[35] 1:50:26 5/7/2026 Senate session – 2nd Extraordinary Session 3rd Extraordinary Day tnga.granicus.com/player/clip/33451?view_id=775&redirect=true

[36] Ibid.

[37] Ibid.

[38] 1:25:15 5/6/2026 Meeting of the Congressional Redistricting Committee of Extraordinary Session II.  tnga.granicus.com/player/clip/33444?view_id=775&redirect=true

9

asked whether he was aware that Memphis, Shelby County, and the 9th congressional district were predominantly Black.[39]

It is important to note that at least one lawmaker who was responsible for the maps was aware of the demographics of the 9th congressional district and Shelby County. When asked who drew the proposed map, Senator Stevens responded that he and the Speaker were the sponsors of the map.[40] When Senator Lamar followed up and asked directly if he drew the lines in the proposed map, Senator Stevens answered, "Yes, we sponsored the map."[41] Senator Johnson, who sponsored SB7004, which was the companion bill to HB7003, knew that Shelby County and the 9th congressional district were majority African-American. Senator Johnson, when advocating for the passage of HB1034 in 2022, said that the 9th congressional district "is a majority-minority district, has been and it will continue to be."[42] He said later that Nashville was only 27% African-American, which was not enough for a majority-minority district unlike Shelby County.[43] Also in 2022, Representative Lamberth voted in favor of the previous map minutes after it was described by Representative Marsh as creating nine districts, including one majority-minority district.[44]

Moreover, even though several sponsors said that racial data were not used to draw the districts, the bill sponsors never answered fully or clearly questions regarding the data used to draw the map or who drew the map. In response to several questions about the data used by map drawers, sponsors respondent that they used "census data" to draw the map.[45] However, the census bureau neither collects nor releases partisan data for redistricting, but it does include racial data.

Several Democratic legislators expressed suspicion at the assertion that race was not involved in drawing the map. Lawmakers expressed doubts that the splitting of the Black

[39] 09:23 5/6/2026 Meeting of the Congressional Redistricting Committee of Extraordinary Session II. tnga.granicus.com/player/clip/33444?view_id=775&redirect=true
[40] 1:51:40 5/7/2026 Senate session – 2nd Extraordinary Session 3rd Extraordinary Day tnga.granicus.com/player/clip/33451?view_id=775&redirect=true
[41] 1:52:11 5/7/2026 Senate session – 2nd Extraordinary Session 3rd Extraordinary Day tnga.granicus.com/player/clip/33451?view_id=775&redirect=true
[42] 57:20 1/20/2022 Senate Floor Session 39th Legislative Day tnga.granicus.com/player/clip/25736?view_id=610&redirect=true

[43] 58:40 1/20/2022 Senate Floor Session 39th Legislative Day tnga.granicus.com/player/clip/25736?view_id=610&redirect=true
[44] 1:18:48 1/24/2022 House Floor Session 40th Legislative Day tnga.granicus.com/player/clip/25790?view_id=610&meta_id=631437&redirect=true
[45] See 2:08:55 5/7/2026 Senate session – 2nd Extraordinary Session 3rd Extraordinary Day tnga.granicus.com/player/clip/33451?view_id=775&redirect=true and 1:38:20 5/6/2026 Meeting of the Congressional Redistricting Committee of Extraordinary Session II. tnga.granicus.com/player/clip/33444?view_id=775&redirect=true

community could have been achieved with such precision across districts by chance.  For instance, Senator Yarboro argues that the map treats Black and White Democrats differently, splitting 75% of Black Democrats into two districts that are not geographically compact, while putting 75% of White Democrats into a geographically compact district.[46] Moreover, this state of affairs meant that White Democrats would be better represented than Black Democrats because White Democrats still would live in the same town as their representative and could get their issues resolved, while the Black community would be "racially and geographically isolated from power."[47]

It also is worth noting a final thread regarding reflecting the will of Tennessee voters.  For instance, Senator Brent Taylor said, "I think it's better for the congressmen in these districts to actually represent the interests and values of Tennesseans . . . [a]nd that's much better accomplished in districts that look like Tennessee rather than just a simply large urban core district like the old district 9 was" (Fowler 2026).  Notwithstanding the fact that scholars have long considered words such as "urban" and "inner-city" to be racially coded (Silverman 2016; Hurwitz and Peffley 2005), the people of Memphis and Shelby County also are Tennesseans.

Race and Partisanship in Tennessee

Like many southern states, Tennessee's electorate was racially polarized prior to the election of President Barack Obama.  However, even though Tennessee's racial realignment began before 2008, it accelerated with the candidacy of Barack Obama (Franklin and Block, Jr. 2020).  Already by that year, 94% of voters in the Tennessee Republican primary were White, compared with 2% of Republican primary voters identifying as Black (McKee and Springer 2015: 600).  The exodus of White voters has continued such that by 2018, 63% of urban and 67% of rural White Tennesseans identified as Republican, compared with about 50% of White Tennesseans in 1996 (Hood and Mckee 2022: 190).  Meanwhile, Black Tennesseans have, and continue to, support the Democratic Party overwhelmingly (Franklin and Block, Jr. 2020). As Table 3.2 from Franklin and Block Jr. (2020), reproduced below, shows, the gap in Black-White polarization in Tennessee has grown over time. Research has shown that race is key to understanding this increasing partisan sorting.

*Table 1: Black White Vote Differentials in Tennessee.  Excerpted from Table 3.2 in Franklin and Block, Jr. 2020.*

| Black-White Vote Differences (Ecological Inference Analysis) | Mean % | Standard Error |
|---|---|---|
| 2000 | 19.1 | 1.0 |
| 2004 | 28.6 | 1.4 |

[46] 2:22:30 5/7/2026 Senate session – 2nd Extraordinary Session 3rd Extraordinary Day tnga.granicus.com/player/clip/33451?view_id=775&redirect=true
[47] 2:26:40 5/7/2026 Senate session – 2nd Extraordinary Session 3rd Extraordinary Day tnga.granicus.com/player/clip/33451?view_id=775&redirect=true

11

| 2008 | 38.9 | 0.63 |
|---|---|---|
| 2012 | 46.0 | 0.62 |

With respect to alternative explanations for the relationship between race and partisanship, the evidence suggests that abortion attitudes are not as important for vote choice in Tennessee despite its salience in elite rhetoric. The Vanderbilt University poll has found that increasing numbers of Tennessee voters identify as "definitely" or "somewhat" pro-choice, with 56% of registered voters choosing one of those two options in April of 2025 (Vanderbilt University 2025). Only 3% of Tennessee registered voters thought that abortion should be the top priority of the Tennessee state government (Vanderbilt University 2025). Economic anxieties have been important in recent Tennessee elections. However, In Tennessee, only 19% of respondents to the April 2025 Vanderbilt Poll thought that the economy should bet the top priority of the Tennessee state government (Vanderbilt University 2025).

**I reserve the right to supplement this report as needed. Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct**.

Executed on June 8, 2026

_Traci Burch_
Traci R. Burch, Ph.D.

Works Cited

Brown, Melissa.  2022.  "GOP Eyes Nashville Split to Gain Seat." *Nashville Tennessean*.

Bullock, Charles S., and Keith Gaddie. *The triumph of voting rights in the South*. University of Oklahoma Press, 2009.

Criss, Doug.  2018.  "Memphis Took Down Two Confederate Statues.  State Lawmakers are Punishing the City for It." *Cnn.com*.  Available online https://www.cnn.com/2018/04/18/us/memphis-statues-retaliation-trnd.  Accessed 5 June 2026.

Cooper, Christopher A., M. V. Hood III, Scott Huffmon, Quentin Kidd, H. Gibbs Knotts, and Seth C. McKee. "Switching sides but still fighting the Civil War in southern politics." *Politics, Groups, and Identities* 10, no. 1 (2022): 100-116.

Fowler, Stephen.  2026.  "After Redistricting, What Does Representation Mean to Tennessee Voters?" *NPR*.  Available online https://www.npr.org/2026/05/15/nx-s1-5822329/memphis-gerrymandering-representation-voting-rights.  Accessed 5 Jun 2026.

Franklin, Sekou M., and Ray Block Jr. *Losing power: African Americans and racial polarization in Tennessee politics*. University of Georgia Press, 2020.

Hacker, Jacob S., Zoltan Hajnal, G. Agustin Markarian and Mackenzie Lockhart.  2026.  "The Return of the Dixiecrat South." *The American Prospect*.  Available online https://prospect.org/2026/06/03/return-of-dixiecrat-south-voting-rights-act-racial-gerrymandering/.  Accessed 5 June 2026.

Hood III, M. V., and Seth C. McKee.  2022. *Rural republican realignment in the modern south: The untold story*. Univ of South Carolina Press.

Hurwitz, Jon, and Mark Peffley. "Playing the race card in the post–Willie Horton era: The impact of racialized code words on support for punitive crime policy." *Public Opinion Quarterly* 69, no. 1 (2005): 99-112.

Kousser, J. Morgan. "Post-Reconstruction Suffrage Restrictions in Tennessee: A New Look at the VO Key Thesis." *Political Science Quarterly* 88, no. 4 (1973): 655-683.

Matisse, Jonathan.  "Tennessee Gov. Lee Signs Bill to Undo Memphis Traffic Stop Reforms after Tyre Nichols Death." *PBS News*.  Available online https://www.pbs.org/newshour/politics/tennessee-gov-lee-signs-bill-to-undo-memphis-traffic-stop-reforms-after-tyre-nichols-death.  Accessed 5 June 2026.

McKee, Seth C., and Melanie J. Springer. "A tale of "Two Souths": White voting behavior in contemporary Southern elections." *Social Science Quarterly* 96, no. 2 (2015): 588-607.

Moore, Joel. 2026. "Gov. Lee Signs Takeover Bill, Announces Oversight Board for MSCS." *Action News 5*. Available online https://www.actionnews5.com/2026/05/22/mscs-takeover-bill-signed-into-law-by-governor-lee/. Accessed 5 June 2026.

Sanders, Robyn and Andrew Garber. 2023. "The Unconstitutional Expulsion of Legislators." Brennan Center for Justice. Available online https://www.brennancenter.org/our-work/research-reports/unconstitutional-expulsion-legislators. Accessed 5 Jun 2026.

Silverman, Robert Mark. "Urban policy without broaching the topic of race, really? Response to David Imbroscio's "Urban Policy as Meritocracy: A Critique"." *Journal of Urban Affairs* 38, no. 1 (2016): 105-109.

Stockard, Sam. 2026. "Tennessee House Speaker Suspends All Dems from Committees, Citing Decorum Violation." *Tennessee Lookout*. Available online https://tennesseelookout.com/2026/05/13/tennessee-house-speaker-suspends-dems-for-decorum-violation/. Accessed 5 June 2026.

Supreme Court Historical Society. "Significant Case: Baker v. Carr (1962)." Available online https://civics.supremecourthistory.org/article/baker-v-carr/. Accessed 5 June 2026.

Vanderbilt University Center for the Study of Democratic Institutions. "VU Poll Spring 2025 Topline Results." Available online https://www.vanderbilt.edu/csdi/Spring_2025_topline.pdf. Accessed 4 Jun 2026.

Wright, Sharon D. "The Tennessee Black caucus of state legislators." *Journal of Black Studies* 31, no. 1 (2000): 3-19.

Yue, Stella Yu. 2021. "Tennessee General Assembly won't yet release publicly submitted redistricting proposals." *Nashville Tennessean*.

Case 3:26-cv-00638   Document 31-5   Filed 06/09/26   Page 15 of 15 PageID #: 382