# EXHIBIT E

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| VICKI HALE, *et al.* | § § § | |
| *Plaintiffs,* | § § | Case No. 3:26-cv-00603 |
| V. | § § | [Lead Case] |
| WILLIAM LEE, *et al.*, | § § | |
| *Defendants.* | § § § | |
| TENNESSEE STATE CONFERENCE OF THE NAACP, *et al.* | § § § | |
| *Plaintiff,* | § § | Case No. 3:26-cv-00638 |
| V. | § § | [Consolidated Case] |
| TRE HARGETT, *et al.*, | § § § | |
| *Defendants.* | § § § | |

## <u>EXPERT REPORT OF DR. CHARLES McKINNEY, JR.</u>

1

Expert Report on the History of Official Voting Discrimination in Tennessee
Charles W. McKinney, Jr.
June 8, 2026

Contents

1. Introduction
2. General Overview
3. CV

Case 3:26-cv-00638    Document 31-6    Filed 06/09/26    Page 3 of 52 PageID #: 385

Section 1.  Introduction

1.  My name is Charles W. McKinney, Jr.

2.  I am a Professor of History and Africana Studies at Rhodes College in Memphis, Tennessee. I teach course on African American History, the Civil Rights Movement, United States History, African American Politics, 20th Century United States History, Slavery, and Reconstruction in the United States. The history of voter discrimination, voter suppression, the role of race and politics and American life, Southern History, and the struggle for civil and political rights waged by African Americans are frequent topics in a variety of my courses. My CV is included at the end of this document.

3.  My Ph.D. is from Duke University. I have lived and worked in Tennessee since 2005.

4.  I have been asked by plaintiff's counsel to write a report on the history of voter suppression in Tennessee. This report relies on publicly available sources and literature commonly used in the academic discipline of History.

5.  I am paid at a rate of $250/per hour for the work in this case. My compensation does not affect the conclusions that I reach in this report.

6.  The conclusions in this report are provided with a high degree of professional certainty. I reserve the right to further modify, augment, or supplement my report, particularly if additional information becomes available to me.

3

Section 2.

**A History of Voter Suppression in Tennessee**

**Summary**

This report shows how the state of Tennessee has, over the course of the 160 years since Reconstruction, amassed a sustained record of voter suppression and discrimination. During this time, the state has used literacy tests, poll taxes, white primaries, voter identification laws, racial gerrymandering, and other techniques with the clear intent to discriminate against Black Tennesseans. The reactionary dynamism displayed by the state is evident in the continued use of voter restriction laws that, while on their face are race-neutral, have a clear impact on the ability of Black voters to exercise their right to vote in a free and fair manner.

**Introduction**

In the state of Tennessee, the legacy of voter suppression and disfranchisement has its moorings in the Reconstruction era. In the wake of the Civil War, Tennessee established a pattern that would remain consistent throughout the state's history: tentative gains in the voting rights of African Americans always being followed by muscular efforts to restrict/constrict those rights. While African American Tennesseans have never constituted a majority of the electorate in the state, their presence in major urban centers in the West (Memphis) and Central (Nashville) portions of the state created opportunities for Black citizens to elect Black politicians to a host of local positions on school boards and city councils. These efforts have almost always been met with a *reactionary dynamism* – a state response that delimits Black electoral possibility by employing

both old, tried and tested measures to suppress the vote, or new innovations that, when carried out, have the same effect of contracting Black voter impact.

After Tennessee was reinstated into the Union, African American men were among the earliest population of Black voters in the South to be granted the franchise. They, along with Black women, wasted little time in building lives for themselves and moving a bit closer to the mainstream of American life. Black people across the state engaged in the work of forging lives in the light of freedom: they built vibrant communities, schools, and churches. They created businesses, found family members, created new extended families, and formally sanctioned their unions in marriage. Black folks also actively participated in both the civic and political lives of their cities and connected to Black communities across the South and nation in an effort to bolster their new-found freedoms.

The initial indication of a state-level commitment to Black enfranchisement was short-lived. As Black citizens across the state exercised their new right to vote and worked to expand the meaning of freedom, White political leaders moved to curtail Black rights in an effort to reassert white domination and move the state back toward slavery-era political relationships. The central tool in the process of reactionary dynamism was Black disfranchisement, a legislative maneuver that often powerfully complemented racial violence. In 1866, the Memphis Massacre left dozens of Black citizens dead, and hundreds of homes, churches and businesses burned – a violent reassertion of white supremacy that struck at the heart of Memphis's Black community. The state began passing some of the first laws dedicated to racial segregation in the South in the 1870s. During a state constitutional convention, white political leaders passed a series of laws that successfully diminished Black electoral power across the state. Most of these mechanisms remained in place for decades. With the advent of legal segregation in the 1890s, Tennessee firmly

established a racial operating system that, while not completely harkening back to slavery, certainly moved Black citizens further away from the prospect of full freedom and equality.

**General Overview**

As Tennessee entered the 20th century, it stood in partnership with every southern state in its dedication to racial domination and political exclusion. The racial animosity expressed in the state found increased sympathy in national political circles. With the election of a segregationist Democratic president in 1912, Jim Crow policies which already ruled the day were solidified in terms of patronage and the appointment of Blacks to low level federal positions in the administration. Legal segregation also emboldened Republican political leadership to more vigorously pursue the purge of Black Republicans from the party in the hopes of creating a "lily white" constituency.[1] The first decades of the century saw Tennessee maintain its racially exclusionary electoral policies. The removal of Black voters from the rolls across the state also facilitated heightened levels of discrimination in educational funding for Black schools across the state. In the 1960s, at the height of the Civil Rights Movement, state legislators worked intentionally to curtail the possibility of Black candidates winning citywide offices by moving cities like Memphis from precinct voting to at-large voting.

---

[1] Although the Republican Party was the "Party of Lincoln", and the first political home to African Americans, that affiliation would shift dramatically over time as the Republican Party became less invested in Black equality, and as the Democratic Party began to espouse policies that resonated with the aspirations of Black voters. On party realignment, see Stern, Mark. "Party Alignments and Civil Rights: Then and Now." *Presidential Studies Quarterly* 25, no. 3 (1995): 413–27. http://www.jstor.org.rhodes.idm.oclc.org/stable/27551458; Wright, Gavin, Voting Rights, Deindustrialization, and Republican Ascendancy in the South (September 2020). Institute for New Economic Thinking Working Paper Series No. 135
https://doi.org/10.36687/inetwp135 , Available at SSRN: https://ssrn.com/abstract=3731832; Joshua Farrington, *Black Republicans And the Transformation of the GOP* (Univ. of Pennsylvania Press, 2016); Nancy Weiss, *Farewell to the Party of Lincoln* (Princeton University Press, 1983); Corey Fields, *Black Elephants in the Room: The Unexpected Politics of African American Republicans* (University of California Press, 2016).

The initial years of Tennessee's readmission into the Union encapsulated the perils and possibilities of equality for African Americans. Tennessee's readmission to the Union in 1866 made it the first former confederate state to be reinstated. The State Legislature also ratified the 14th Amendment that same year.[2] Emboldened by Reconstruction, Black political leaders across the state heightened their efforts to organize Black communities in the anticipation of greater freedom. Powered by state convenings, Black political organizations were well on the way to registering tens of thousands of African American men who lobbied for the franchise in their ongoing effort to make freedom real to formerly enslaved men and women. By 1869, 40,000 Black men had been registered to vote.[3]

As African Americans pursued their newly gained freedoms, they faced an aggressive and violent reaction in the form of both legislative action and racial violence. In the same year that Tennessee ratified the 14th Amendment and returned to the nation, a massacre occurred in Memphis that left over 40 Black people dead, numerous women raped, and over 100 Black owned homes, churches and businesses burned to the ground. The massacre was a toxic stew that contained a bloody preview of all the elements of repression that Black people would face in the years ahead: lynching, mob violence, Klan-sponsored terrorism, the forcible imposition of racial apartheid, and state-sanctioned violence. The massacre was a violent reaction to the pursuit of political, economic, and social equality in the city and state. The horrendous nature of the violence sent shockwaves throughout the country and spurred Congress to respond with an investigation.[4]

---

[2] https://sharetngov.tnsosfiles.com/tsla/exhibits/aale/aahtimelin.htm
[3] Nashville Public Library, "150 Years Later: A 'Brief' History of the Fifteenth Amendment and other Voting Laws", https://library.nashville.gov/blog/2020/12/150-years-later-brief-history-15th-amendment-and-other-voting-laws. Accessed 5/31/26; Joseph Cartwright, *The Triumph of Jim Crow: Tennessee Race Relations in the 1880s (*University of Tennessee Press, 1976), 12.
[4] Stephen V. Ash, *A Massacre in Memphis: The Race Riot That Shook The Nation One Year After the Civil War* (Hill and Wang, 2013)*; Beverly Bond and Susan O'Donovan, eds., *Remembering the Memphis Massacre: An American Story* (University of Georgia Press, 2020); John Hope Franklin, *Reconstruction After the Civil War* (University of

7

In 1868, Black political power was still in its infancy. However, by that time, the Klan-fueled campaign of intimidation and terror with the aim of subverting that power was in full bloom. Klan fueled violence across the state and economic intimidation led to a sharp decline in Black political mobilization. The state's most prominent Black political entity, The Union League, saw a significant decline in both activity and influence. After the governor deployed the militia to combat Klan violence across the state in the summer of 1868, the Republican Party's hold on statewide political power became even more tenuous. These were the conditions that set the stage for the state's constitutional convention in 1870.[5]

In 1870, the state ratified a new constitution. As with other moments in this period of the state's history, the revision of the constitution contained both the perils and prospects of potential equality for Black Tennesseans. In the previous year, Republicans lost control of both the governorship and the State Legislature, due in large part to a steady program of Black electoral intimidation. Conservative Democrats (many of whom were former Confederates), back in control of the state, took little time to begin reversing the gains made by Black people and their political allies in the Republican Party. The legislature repealed the state's anti-KKK Act, which made Klan members engaged in terrorist activity subject to arrest, fines, and imprisonment for up to five years.[6]

Prior to the convening, the convention's suffrage committee met to discuss the issue of the Black vote. While most of the members of the committee voted to retain Black voting rights, a vocal minority voted to revoke the franchise for Black Tennesseans. While the new constitution affirmed Black men's right to vote, it also removed statutory restrictions on former Confederates,

---

Chicago Press, 1994), chapter 9; Armstead L. Robinson, *Plans Dat Comed from God: Institution Building and the Emergence of Black Leadership in Reconstruction Memphis* (New York: Garland Publishing, 1994).
[5] *Triumph*, 12; Bordewich, *Klan War: Ulysses S. Grant and the Battle to Save Reconstruction* (Knopf, 2023).
[6] <u>Ku Klux Klan | Tennessee Encyclopedia</u>; *Klan War, 72-91;* Franklin, *Reconstruction*, 158-159.

8

enabling them to officially resume their quest for political dominance in the state. Moreover, the new constitution implemented a poll tax, a legislative tool designed to suppress the votes of poor (mostly Black) voters in the state.[7] Even while the status of Black citizens improved incrementally, the legislative animosity shown toward them was a clear indication that the constitutional contradiction woven into the fabric of the state from the first day of its readmission to the Union would only grow fester over time. For the former Confederates who regained control of the state's apparatus in these years, the path to expanded political autonomy and control of the state rested on the dramatic reduction both of the Black vote and Black autonomy.

The forward momentum for full racial equality and justice for Black residents of the state was constantly met with vigorous resistance. One of the central responses to Black advancement crafted by state political leadership was the implementation of racial segregation. Segregation and voter suppression served as two mutually reinforcing mechanisms of domination in the state. The statewide anxieties around racial equality and the open question of what racial operating system would the South adopt lent themselves to the implementation of policies that separated Black folks out of public spaces and accommodations.[8] In 1870, the same year as the state constitutional convention, the legislature passed an anti-miscegenation law prohibiting marriage between Whites and Blacks, or "descendants of Negro ancestors to the third generation. In 1873, the state segregated public education, a move that caused considerable damage to already underfunded Black public schools across the state.[9] In 1875, the Legislature passed sweeping legislation, "Chapter 130", that gave "hotel keepers, carriers of passengers and keepers of places of

---

[7] Cartwright, *Triumph,* 15; Franklin, *Reconstruction*, 160; Dewey Grantham, "Tennessee and Twentieth-Century American Politics", *Tennessee Historical Review*, 54:3, Fall 1995, 210-229.
[8] Gildrie, Richard P. "Lynch Law and the Great Clarksville Fire of 1878: Social Order in a New South Town." *Tennessee Historical Quarterly* 42, no. 1 (1983): 58–75. http://www.jstor.org.rhodes.idm.oclc.org/stable/42626339.
[9] James Anderson, *The Education of Blacks in the South* (University of North Carolina Press, 1988).

amusement" the right to control or deny access as "that of any private person over his private house."[10]

Black Tennesseans, much like their peers in all other Southern states, had to bear the brunt of racial segregation as they sought to build upon their newfound freedom. And, like their peers in other former Confederate states, Black folks reckoned with a hard truth: for the political leadership of their state, vibrant Black political, social and economic life were anathema to the segregationists who controlled the state's political apparatus.

After the white supremacist takeover of state government, voter intimidation against Black voters ran rampant across the state.[11] By the late 1880s, the elimination of "the Negro vote" had become a central political imperative, one that White politicians used to great effect to consolidate white supremacy in the state. The combination of "some force and a great deal of fraud" proved to be a powerful formula for political success for Democrats across the state.[12] In Black Belt counties (including Shelby County) where Black Republicans dominated the voter rolls, Democratic machinery consolidated power at the expense of Republicans and the democratic process.[13] In the statewide elections of 1886, Fayette and Shelby Counties, both Black Republican strongholds with dominant numerical majorities, Democrats mysteriously outvoted Republicans, scoring massive victories after having lost by large margins two years previously. In Haywood County, the Republican nominee for governor won handily by garnering sixty percent of the vote. Two years later, the Democratic nominee won by a two to one margin. On election night, white men armed

---

[10] Chapter 130, Acts of Tennessee, House Bill No. 527; Charles McKinney, "The Balcony Project" (An Exploration of Segregation): https://www.orpheum-memphis.com/plan-a-visit/the-balcony-project. Accessed 6/2/26.

[11] On Memphis, see Paula J. Giddings, *A Sword Among Lions: Ida B. Wells and the Campaign Against Lynching* (Amistad, 2008)*; On Nashville, see Bobby Lovett, *The African American History of Nashville, Tennessee, 1780-1930* (University of Arkansas Press, 1999) chap. 2.

[12] J. Morgan Kousser, *The Shaping of Southern Politics: Suffrage Restriction and the Establishment of the One-Party South, 1880-1910),* 107.

[13] "Black Belt" counties typically include Shelby, Fayette, Haywood, and Hardeman.

with rifles stood watch at polling places to "guard" ballot boxes and the places where election officials counted the ballots. Despite the official protests of federal election supervisors and widespread coverage of the political corruption in newspapers across the state, fraudulent elections faced few headwinds. The state's political infrastructure rested on a foundation of racial exclusion reinforced by state-sanctioned voter fraud.[14]

In 1889, the state's political leadership convened the legislature to pass a series of bills explicitly designed to suppress Black votes during elections. The Myers Act required voters in districts or towns that cast more than five hundred votes in 1888 to register once again twenty days prior to every election. In practical terms, this meant that if a voter wanted to participate in local, state, and federal elections, they would have to re-register four times during election season. Since most Black voters lived in the state's major cities, the act had a disproportionate impact on their ability to vote. The Lea Law provided for two separate ballot boxes for state and federal elections, an innovation specifically designed to prevent federal supervisors from intervening in the event of voter fraud. The Dortch Law ushered in the usage of the secret ballot. Political parties would no longer print their own ballots. Instead, the state would now print a single ballot. While this was an innovation that, on its face, seemed neutral, it had the effect of making voting *much* harder for illiterate and low-literacy voters. However, another provision of the law stipulated that people who were eligible to vote in 1857 could receive assistance in marking their ballot. Since no Black people could vote in that year, no Black voter had access to this provision. The central purpose of the Dortch Law was to disenfranchise Black Republicans. State officials initially targeted areas of

---

[14] Richard Couto, *Lifting the Veil: A Political History of Struggles for Emancipation* (Knoxville: University of Tennessee Press, 1993) 41-88; Granberry, Dorothy. "When the Rabbit Foot Was Worked and Republican Votes Became Democratic Votes: Black Disfranchisement in Haywood County, Tennessee." *Tennessee Historical Quarterly* 63, no. 1 (2004): 34–47; Kousser, *Shaping,* 107-109; Kousser, *Shaping*, 104-123; Franklin, *Reconstruction*, 211-219; Grantham, "Tennessee and Twentieth-Century American Politics"; Lester Laymon, *Blacks in Tennessee, 1791-1970* (University of Tennessee Press, 1977), chap. 3.

11

the state where most Blacks lived. The poll tax passed by the legislature also achieved its intended effect: it devastated Black voting in Republican precincts across the state. Black voter turnout dropped sixty-eight percent from 1888 to 1892. The Supreme Court's ruling in *Plessy v. Ferguson*, legalizing racial segregation, provided a grim conclusion to a period marked by increasingly successful legislation designed to separate Black people out of the mainstream of American life.[15]

The Democratic Party's dominance – along with its racial repercussions – continued unabated well into the twentieth century. Armed with the ability to "win" elections by any ethical or unethical means necessary, Tennessee Democrats weathered political challenges from Republicans during Reconstruction and an insurgent Populist uprising.[16] With White Democratic control entrenched in almost all precincts and districts, and with the passage of muscular voter suppression laws in the 1880s, local, state, and federal elections all felt the weight of voter exclusion. With a contracted electorate and the entrenchment of racial apartheid, white supremacy continued to be a central mechanism for political victory.

As with almost all other former Confederate states, one-party rule in Tennessee streamlined the Democratic Party's capacity to enforce and expand segregation. Although Republicans remained competitive in the eastern portion of the state, the Party was effectively blocked from power in all other sections.[17] Black Tennesseans had little recourse as they were denied equal protection and suffered through the perpetual underfunding of Black public educational

---

[15] *Plessy v. Ferguson 163 U.S. 537 (1896);* Kousser, *Shaping of Southern Politics*; J. Morgan Kousser, "Post-Reconstruction Suffrage Restrictions in Tennessee: A New Look at the V.O. Key Thesis", *Political Science Quarterly* 88:4 (December, 1973), 655-683; Carol Anderson, *One Person, No Vote: How Voter Suppression Is Destroying Our Democracy* (Bloomsbury, 2018)*,* chapters 1-2; George C. Stoney, "Suffrage in the South: The Poll Tax, https://socialwelfare.library.vcu.edu/issues/suffrage-south-poll-tax/ (6/2/26); Tennessee Encyclopedia, "Disfranchising Laws", https://tennesseeencyclopedia.net/entries/disfranchising-laws/. Accessed 6/2/26. On the *Plessy* case, see Lawrence Goldstone, *Inherently Unequal: The Betrayal of Equal Rights by the Supreme Court, 1865-1903* (Walker and Company, 2011), chapters 11-13.
[16] On the Populists, see Lawrence Goodwyn, *The Populist Moment: A Short History of the Agrarian Revolt in America* (Oxford University Press, 1978).
[17] Grantham, *"Tennessee and Twentieth Century Politics"*, 212.

Case 3:26-cv-00638   Document 31-6   Filed 06/09/26   Page 13 of 52 PageID #: 395

institutions. They had little choice except to identify the best possible methods to navigate a state that grew, with each year, increasingly unequal.[18] One party rule also enabled the state's Democrats to set legislative priorities that heavily favored both established and emerging business centers in the state, such as agricultural interests in West Tennessee and nascent industrial areas in the central part of the state. However, in keeping with the state's racial ethos, Democratic elites continued to dramatically underfund rural infrastructure, social welfare programs, and public education.[19]

One party rule carried with it another perilous feature. With general elections no longer genuinely competitive, the focus of Tennessee state governance shifted entirely to internal Democratic primaries. This political vacuum catalyzed the rise of powerful municipal machines, most notably the organization led by Edward Hull "Boss" Crump in Memphis. Elected mayor in 1909, Crump consolidated an immense political apparatus that leveraged patronage, municipal contracts, and systemic control over local polling locations. By the 1920s, the Crump machine operated as a state-level kingmaker. Because Shelby County could reliably deliver a massive, disciplined voting bloc in Democratic gubernatorial and senatorial primaries, Crump effectively dictated statewide policies, judicial appointments, and legislative agendas from his urban stronghold, reducing general elections to a mere formality.[20]

Crump's political dynasty was a monument to the complex, complicated effects of voter suppression. While Crump worked hard to convey an image as a kindly patrician, his machine readily used all the tools in the arsenal of repression – intimidation, legal maneuvers, and violence – to carry out a democratic agenda. Touting himself as a progressive reformer, Crump modernized

---

[18] Lester Laymon, *Black Tennesseans,* chap. 1.
[19] On the politics of the One-party South, see V.O. Key, *Southern Politics in State and Nation* (University of Tennessee Press, 2024)*;* C. Vann Woodward, *Origins of the New South* (LSU Press, 1971); Edward Ayers, *The Promise of the New South: Life After Reconstruction* (Oxford University Press, 2007).
[20] Wayne Dowdy, *Mayor Crump Don't Like It: Machine Politics in Memphis* (University Press of Mississippi, 2006).

Memphis infrastructure and lobbied for fiscal reform. However, his long tenure as the Boss of Memphis (with statewide influence) rested on his ability to deliver a critical mass of Black votes for the purposes of maintaining political power. The bloc of Black voters that Crump cultivated over the course of his tenure served as a firewall for his power. A centerpiece of that power was the relationship Crump cultivated with elite Black political leaders in the city such as Robert R. Church, Jr. Church, a lifelong Republican, worked to build the electoral power of the GOP in Memphis. He helped create the Lincoln League in 1916, a powerful political organization dedicated to building Black political power in the GOP. Within months of its founding the League registered over ten thousand African Americans in Shelby County.[21]

While Church organized and mobilized Black voters in Shelby County, it was Boss Crump who paid their poll taxes and arranged for transportation on election days – all in the service of voting for Crump's handpicked machine candidates. The transactional nature of the relationship was stark: for voting for Crump's candidates, Blacks received a dollop of political patronage, public parks, and other segregated amenities, such as segregated libraries.[22] Black leaders were able to garner some concessions from Crump and maintain their leadership positions within the larger community. However, this influence rested atop the knife edge of political allegiance to Boss Crump, an avowed segregationist who at no point in his long tenure believed in the equality of the races. Crump refused to grant Black citizens even the smallest of political positions. As Black folks continued to live, work, and struggle behind the veil of segregation, progress was measured almost solely by the limits of Crump's political imperatives. The Crump Machine did irreparable harm to the nascent struggles for freedom in Memphis. Any protest or cultivation of activism within the

---

[21] Darius Young, *Robert R. Church, Jr., and the African American Political Struggle* (University Press of Florida, 2019), 15-29; David M. Tucker, *Lieutenant Lee of Beale Street (*Vanderbilt University Press, 1971).
[22] Knowlton, Steven A. "The "Negro Branch" library in Memphis: A case study of public services in a segregated southern city." *Libraries: Culture, History, and Society* 1, no. 1 (2017): 23-45.

Black community was met with the coercive power of the machine. Crump derived his formidable power from the sustained exclusion of Blacks from a two-party political process.[23]

Across the state, voter suppression remained a dynamic tool for the effective undermining of Black political power. In all of the state's major cities, white democrats utilized voter suppression, intimidation, and violence to maintain a firm grip on electoral power. As Black communities across the state began to press for greater freedom, and as the nascent momentum of the civil rights movement increased, white political leaders rarely hesitated to wield all manners of legislative maneuver in order to retain power. Each city witnessed variations on the theme of voter suppression.

In Chattanooga, white leaders used structural exclusion, economic retaliation, and political maneuvers to dilute Black political power. The municipal charter served as the foundation of the city's suppression efforts. The charter, adopted in 1911, created a five-member Board of Commissioners elected through an at-large voting system, one of the chief tools in city leaders' toolkit to dilute the electoral power of Black voters who lived in segregated sections of the city and could vote as a bloc. At-large voting ensured that no Black candidates would be elected to office for the first six decades of the twentieth century. In addition to at-large voting, city leaders implemented a host of local ordinances to suppress voting and civil rights mobilization, such as making it illegal to pay another person's poll tax and banning "ward workers" who assisted elderly or illiterate Black voters in the voting booth. The city also instituted a property scheme that gave voting privileges to non-resident property owners, a move that allowed whites living in the suburbs

---

[23] Elizabeth Gritter, *River of Hope: Black Politics and the Memphis Freedom Movement, 1865-1954* (University Press of Kentucky, 2014). On the coercive power of the Crump era, see Jason Jordan, "We'll Have No Race Trouble Here": Racial Politics and Memphis's Reign of Terror", in Aram Goudsouzian and Charles McKinney, eds., *An Unseen Light: Black Struggles for Freedom in Memphis, Tennessee*, 130-149; Preston Lauterbach, "Memphis Burning", Places Journal, March 2016. https://placesjournal.org/article/memphis-burning/?cn-reloaded=1. Accessed 6/7/26.

to (illegally) vote in city elections, thereby inflating white voter power. When Black residents began an aggressive voter registration campaign in the early 1960s, many registrants lost their jobs in the city's industrial sector. Legal intimidation and economic coercion shadowed the movement for freedom in Chattanooga.[24]

Nashville, often hailed as one of the most progressive cities in the entire South, used gerrymandering, consolidation, and structural adjustments to subvert Black electoral power and blunt the efforts of civil rights activists. Like so many other southern cities, Nashville made aggressive moves in the early 1960s to head off a rapidly expanding (and very organized) Black political class, one anchored by the presence of three Historically Black Colleges, Fisk, Meharry Medical College, and Tennessee A&I (now Tennessee State University). The Nashville Christian Leadership Council, an affiliate of the Southern Christian Leadership Council (SCLC) began a massive voter registration campaign in the late 1950s. Anchored by three Black colleges and one of the most vibrant Black communities in the Upper South, Black Nashville was rapidly approaching a demographic tipping point: the ability to elect local Black leadership and play a role in shaping municipal policy. City and county leaders responded to this possibility by merging the city with the overwhelmingly white, conservative suburban electorate of Davidson County. Overnight, the Black percentage of the new metropolitan entity plummeted, shifting the balance of power firmly back in the direction of the white community. To ensure the maintenance of electoral domination and inoculate the metropolitan government from 14th Amendment federal legal challenges, city leadership instituted a district-based election system for its 40-member Metro

---

[24] Waalkes, Mary, and Donna Summerlin. "Flying Below the Radar: Activist, Paternalist, and Obstructionist Responses to the Civil Rights Movement in Three East Tennessee Communities." *Tennessee Historical Quarterly* 66, no. 3 (2007): 270–93. http://www.jstor.org.rhodes.idm.oclc.org/stable/42628304.

Council. While this arrangement provided token Black representation on the Council, it also made it virtually impossible for Black members of the Council to form any type of voting bloc to push for more progressive civil rights policies. The movement for greater freedom in Nashville was shaped – and shadowed – by the city's ability to manipulate the electoral terrain of the city with the expressed purpose of limiting the democratic possibilities of Nashville's Black citizens.[25]

There were numerous instances of voter suppression, intimidation and violence being used to maintain white political dominance across the state. However, one of the most egregious examples of voter suppression and intimidation in the civil rights period occurred in Fayette and Haywood Counties, in the western part of the state. Of the 28,000 people living in Fayette County (the third poorest county in the nation) three quarters of the population was Black. In Haywood County, Black people were just under two thirds of the population. Very few Black residents in either county had been allowed to register and vote; most Black citizens had been barred from voting since the end of Reconstruction. Residents in both counties vividly remembered the lynching of Elbert Williams in 1940 after he attempted to register to vote.[26]

When Congress passed the Civil Rights Act of 1957, the first civil rights bill passed since 1875, the new law endowed the Justice Department with new powers, one of which was the ability to file civil suit in federal court on behalf of any individual or group whose right to vote had been denied. Emboldened by the new law, local activists John McFerren of Fayette County and C.P. Boyd of Haywood County formed the Fayette County Civic League and the Haywood County Civic and Welfare League, respectively, in 1958 and began a modest voter registration effort with

---

[25] Michael Belknap, *Federal Law and Southern Order: Racial Violence and Constitutional Conflict in the Post-Brown South* (University of Georgia Press, 1995); Benjamin Houston, *The Nashville Way: Racial Etiquette and the Struggle for Social Justice in a Southern City* (university of Georgia press, 2012); Anthony Siracusa, *Nonviolence Before King: The Politics of Being and the Black Freedom Struggle* (University of North Carolina Press, 2021)
[26] Laurie Green, *Battling the Plantation Mentality: Memphis and the Black Freedom Struggle* (Chapel Hill: UNC Press, 2007), 226-227.

an eye toward voting and getting Black citizens included on jury pools. Almost immediately after fourteen residents registered to vote, they were met with threats of economic intimidation. After thirteen of the registered men refused to vote, James Estes, an attorney, filed a complaint with the State Election Commission on their behalf. Estes also helped Black residents see the liberating possibilities of civic engagement when he defended a local Black man accused of murder in a Klan-related incident. Though an all-White jury found the defendant guilty, Estes' powerful presence in the community – and his willingness to stand up to the white power structure – emboldened a large swath of people.[27]

In 1959, the civic organizations launched an even more aggressive voter registration campaign. In spring of that year, hundreds of Blacks began lining up to register. By May, over 500 Black men and women were registered. After election officials began obstructing the registration process, Estes filed a complaint with the U.S. Civil Rights Commission. In August, Black registrants were barred from casting their ballots in the primary; Democratic Party officials limited voting to "all known white Democrats." Civic League leaders responded by filing suit against the Democratic Party.[28] Before the case was adjudicated, whites in both counties engaged in a host of responses to the brewing insurgency. These responses spanned the range from strategic resignations to a series of brutally repressive measures. First, members of the Election Commission and the Fayette County registrar resigned, hoping their departures would slow voter registration down considerably. After the Attorney General's Office informed both counties that a consent decree had been signed to prevent the exclusion of Black voters, Fayette County limited

---

[27] Wynn, Linda T. "Toward A Perfect Democracy: The Struggle of African Americans in Fayette County, Tennessee, to Fulfill the Unfulfilled Right of the Franchise." *Tennessee Historical Quarterly* 55, no. 3 (1996): 202–23; Ballantyne, Katherine. "We Might 'Overcome Someday': West Tennessee's Rural Freedom Movement." *Journal of Contemporary History* 56, no. 1 (2021): 117–41. https://www-jstor-org.rhodes.idm.oclc.org/stable/27067701.
[28] Wynn, *Ibid*, 213.

registration to one day a week. Whites in both counties created a "Blacklist", naming Black registrants, activists, and White supporters. Black people who had registered to vote began getting fired. Many people lost not only their jobs, but credit and insurance policies. Some white physicians began refusing to see Black patients. Grocery and drug stores refused to sell food and medicine. Teachers who had registered to vote were fired. White merchants refused to sell goods and services to people on the list. While over 1200 Black voters cast a ballot in the 1960 elections, 400 sharecroppers and tenant farmers were forced off the land. The White Citizens Council and the KKK openly terrorized Black folks in both counties. For many Whites in Fayette County, the sudden and vigorous expansion of Black voters posed a direct threat to white domination. Voting-age Black residents outnumbered whites by almost two to one in the county. As was the case in previous generations, while the concern about "Negro supremacy" lay front and center as an issue, whites often discussed their fear of an "unscrupulous politician" upsetting the "welfare" of the county with notions of racial equality.

To provide housing to the displaced, activists set up surplus army tents on a Black landowner's land. Tent Cities in both Fayette and Haywood Counties gained national attention. National civil rights organizations gave aid, raised money, and assisted in providing day-to-day needs. The Congress of Racial Equality (CORE) publicized the plight of the Tent City residents nationally. Both sides in the struggle were undeterred. Black evictees remained determined to fight for their rights. White residents continued with economic reprisals and evictions, while contending that the troubles in both counties were the result of educated outside agitators stirring up trouble among happy, complacent Black folks, and that the evictions were due to mechanization. In November of 1960, the Justice Department filed suit against thirty-six landlords.[29] In December,

---

[29] *United States v.* Atkeison, W.D. Tenn., No. 4131

19

the Department added an additional forty-five landowners, twenty-four merchants, and one financial institution to the suit, charging all the parties with civil rights violations. In 1962, a District Court Judge permanently enjoined the landowners from evicting Black residents. By the end of the year, most of the adults in Tent City had registered to vote and the encampments were taken down. The battle over voting rights in Fayette and Haywood Counties was one of the earliest struggles on the very front end of a new freedom movement. The struggle was a powerful reminder both about the indominable will of determined Black citizens and the collective determination of white society to defend the racial status quo by any means necessary.[30]

While Black voters in Fayette and Haywood Counties faced virulent intimidation and suppression in their efforts to register and vote, Black voters in Memphis navigated the dynamic forces of suppression and discrimination as they built up a slate of political candidates for the 1959 elections. For decades, Black civic leaders and activists diligently registered Black voters. Robert Church's Lincoln League, a new and vigorous Black Democratic Club, worked alongside a constellation of local civic organizations to register tens of thousands of new voters. By 1959, the community was poised to take aim at a host of elected positions. Benjamin Hooks, Russell Sugarmon, and three other candidates formed the all-Black Volunteer Ticket. Unlike Black political coalitions in other cities, Black residents in Memphis were very wary of White moderates, who expected Black support but could never muster the courage to respond in kind. White politicians feared the implications of aligning themselves too closely with even the most moderate or conservative of Black leaders; the possibility of backlash and retaliation was simply too high.[31]

---

[30] Couto, *Lifting the Veil,* 189-269; Wynn, *Ibid;* Green, *Ibid;* Robert Hamburger, *Our Portion of Hell: Fayette County, Tennessee – An Oral History of the Struggle for Civil Rights* (Jackson: Univ. Press of Mississippi, 2022); Richard Couto, *Ain't Gonna Let Nobody Turn Me Around: The Pursuit of Racial Justice in the Rural South* (Philadelphia: Temple University Press, 1991).
[31] Sharon Wright*, Race, Power, and Political Emergence in Memphis* (Garland Publishing, 2000), 45; J. Morgan Kousser, *Colorblind Injustice: Minority Voting Rights and the Undoing of the Second Reconstruction* (Univ. of North Carolina Press, 1999), 149-151. As Kousser states, "The racial climate of West Memphis was so torrid during

20

The Volunteer Ticket reflected the determination by Black leaders that bloc voting and an independent political apparatus were the best was to acquire political power in the city. A "Freedom Rally", held at the historic Mason Temple Church, drew five thousand Black Memphians, who listened intently while Mahalia Jackson sang and cheered loudly when Martin Luther King, Jr. declared "I am delighted beyond word to see such magnificent unity. The rally was electrifying, and Black Memphians across the city were equally enthusiastic." [32]

By 1959, 55,000 out of the city's 187,000 registered voters were Black, representing almost a third of the electorate. The city's white leadership responded to this display of Black political autonomy by bringing the full weight of the state legislature to bear on changing the rules of the game. Of all the Black candidates, whites in power were most worried about Sugarmon, who was running for Public Works Commissioner. When Sugarmon entered the race in June as an independent, he became the seventh candidate for the position. Alarm bells went off immediately. Reporters from both major newspapers ran stories discussing the impending disaster if all the white candidates stayed in the race and split the white vote. For the first time in the twentieth century, the white political establishment in Memphis feared – correctly – that a Black candidate could win a citywide election. At that point in the year, Memphis voters had the option of employing the "single shot" voting method. Instead of selecting your top four preferences voters had the ability to simply vote for one candidate, a "single shot." This electoral feature meant that, if Black Memphians all voted for Sugarmon, their single shot, while whites voted a host of candidates, he could win. M.A. Hinds, Shelby County Sheriff, ominously intoned at a gathering in the Mississippi Delta, "Negro voters in Memphis may soon be able to elect a Negro as city commissioner through

---

the late 1950s that any suggestion of softness on segregation, any hint of sympathy for black rights, was considered devastating to a politician."

[32] Laurie Green, *Battling the Plantation Mentality: Memphis and the Black Freedom Struggle* (University of North Carolina Press, 2007)*, 216-217.

'single shot' voting." As more white Memphians began paying attention to the race, all the candidates – and especially Sugarmon – began receiving death threats.[33]

The Shelby County delegation wasted little time in composing a series of bills designed specifically to diminish the possibility of Black electoral victory. In March, the Tennessee State Legislature passed legislation barring the single shot rule. Legislators also changed the structure of the election. Usually, the top candidates who came in first through fourth in the voting won a city commission post on public works, fire and police, finances and institutions, or public service. The Legislature changed the law to require that candidates now had to run for *specific* positions. With the elimination of the single shot rule, and the plurality method, Sugarmon's chances for victory – along with all the other Black candidates – were severely diminished. Prior to the Legislature changing the law, Mayoral candidate Henry Loeb (the eventual winner of the mayor's race) asked several of the white candidates to drop out of the race to consolidate the white vote behind fewer candidates. He also asked the City Attorney to study the prospects of creating a run-off election in the event Sugarmon was one of the top vote-getters. When asked if he would publicly endorse any candidate for public works commissioner, Loeb replied "if necessary to prevent the election of a Negro."[34]

On election night, none of the Black candidates won their races. In the race for public commissioner, Sugarmon won over 35,000 votes. Had the rules not been changed, he would have become the first Black candidate elected to citywide office since 1879. A local Black radio announcer reflected that the fear of a Black man sitting in a seat of political power brought the white community together like never before "to strike a blow against the attempts of Negroes to

---

[33] Kousser, *Colorblind Injustice,* 150.
[34] Kousser*, Colorblind Injustice,* 155.

22

rise in Memphis."[35] But, as J. Morgan Kousser reminds us, "[t]he white panic at the prospect of Sugarmon's election…is the strongest indication of the white racism that pervaded Memphis in the 1950s and 60s and conditioned every public action, particularly every effort to change electoral laws."[36] In the face of possible Black political success, white political leaders in Memphis in 1959 responded in the only way they knew how – by accessing legislative power for the specific purpose of neutralizing Black political power in order to maintain white political supremacy.[37]

Black communities across the state accelerated their efforts to build political power throughout the twentieth century. The civil rights movement quickened this effort as Black Tennessean began to assert their rights more boldly under the law and demand that those rights be recognized. In response, White political leaders across the state employed suppressive tactics specifically designed to dilute or eliminate the electoral power of Black voters, a key strategy in the escalating fight to maintain the racial hierarchy upon which the state was founded. The State Legislature could always be counted as a reliable ally when it came to the suppression of Black voters. One of the state's oldest weapons for suppression was legislative malapportionment. Under a statute passed by the Legislature in 1901, districts were shielded from having to reapportion their legislative districts. Even after massive and sweeping demographic shifts and population expansion – all flowing toward the urban centers of the state – legislative lines remained fixed from a moment in time when over 80% citizens in the state resided in rural areas.[38] With the continued protection of these boundaries, rural, white districts retained an overwhelming grip on state legislative power. Urban centers such as Memphis, Nashville, and Chattanooga were

---

[35] Bobby L. Lovett, *The Civil Rights Movement in Tennessee* (Univ. Press of Mississippi, 2005), 263.
[36] Kousser, *Colorblind Injustice,* 155.
[37] Wayne G. Dowdy, *Crusades for Freedom: Memphis and the Political Transformation of the American South* (Univ. Press of Mississippi, 2010), 66-75.
[38] "Understanding Population Shifts in Tennessee", https://utextensionced.tennessee.edu/understanding-population-shifts-in-tennessee-a-100-year-analysis/ Accessed 6/4/26.

thoroughly underrepresented legislatively. By 1960, one third of the state's population had the electoral power to elect two-thirds of the state's representatives.[39]

This element of Tennessee law worked as a top tier instrument of voter suppression in the state and had a direct impact on the evolution of urban political power in general and Black political power specifically. Even as Black voter registration surged in cities like Nashville and Memphis, their overall electoral capacity remained stunted due to the legal status quo. This status quo also had the effect of insulating the rural, segregationist voting bloc from any demands emanating from urban, more politically progressive places. Charles Baker, a politician in Shelby County, challenged this ancient tradition by filing suit against the State of Tennessee. In *Baker v. Carr*, Baker claimed that, by deliberately refusing to reapportion legislative seats, the state was violating his rights under the Fourteenth Amendment.[40] In previous instances, the Supreme Court refused to intervene in redistricting cases, characterizing them as non-justiciable political questions beyond the scope of the Court, under the precedent set by *Colegrove v. Green*, 328 U.S. 549 (1946). However, in the *Baker* case, the Court found, by a 6-2 majority, that constitutional challenges to malapportionment were, in fact, justiciable. This was a crucial decision, one of several cases where the Court asserted that it had the authority to protect citizens against state-sanctioned voter suppression. This case codified the concept of "one person, one vote", and fundamentally reshaped the electoral terrain in states where malapportionment ran rampant. While this represented a significant victory in the ongoing battle for electoral representation, the political headwinds remained strong in the state.[41]

---

[39] Anderson, *One Person, No Vote,* 100.
[40] *Baker v. Carr,* 369 US 186 (1962); Justia: US Supreme Court Website, https://supreme.justia.com/cases/federal/us/369/186/, accessed 6/4/26.
[41] *Colegrove v. Green*, 328 U.S. 549 (1946); Wright, *Race, Power, and Political Emergence in Memphis*; Lovett, *The Civil Rights Movement in Tennessee*; Goudsouzian and McKinney, *An Unseen Light: Black Struggles for Freedom in Memphis, Tennessee;* Green, *Battling the Plantation Mentality;* Marcus Pohlmann and Michael Kirby, *Racial Politics at the Crossroads: Memphis Elects Dr. W.W. Herenton* (Univ. of Tennessee Press, 1996).

24

The patterns and practices of voter suppression forged in the state's past continued to shape electoral dynamics over the past few decades. The rhetoric of voter suppression also continues to echo down to the current moment. Initiatives passed by the state or county-level officials for the purpose of "clearing", "cleaning" or in some way streamlining voter rolls shares the same language as suppression efforts from the 19th and early 20th centuries. The effort to remove or reduce Black voters is clothed in the language of reasoned moderation.[42]

In the 1970s, the evolution of the voting rights struggle was marked not by a straight line of progress, but by the dynamic struggle between advocates of racial justice and constituencies determined to keep African Americans secluded to the margins of the electoral process. In the 1950s and 1960s, Fayette and Haywood Counties challenged the white monopoly on local politics and brought Black voters into the democratic process, an effort mightily assisted by provisions in the Civil Rights Act of 1957. In 1970, Congress amended the Voting Rights Act and extended the ban on literacy tests, banning the use of this tool of explicit racial exclusion.[43] In *Dunn v. Blumstein (1972),* the Supreme Court ruled that Tennessee's voter residency requirement that a resident had to live in the state for a year and in the county for three months before registering to vote violated the Equal Protection Clause of the 14th Amendment. The ruling compelled Tennessee, and subsequently other states in the nation, to adopt shorter, more reasonable residency laws, and opened the ballot to new residents and high-mobility citizens.[44]

Beginning in the 1970s and 80s, the epicenter of electoral struggles in the state shifted primarily to the local level, where Black communities still grappled with at-large voting systems

[42] William Chafe, *Civilities and Civil Rights: Greensboro, North Carolina, and the Black Struggle for Freedom* (Oxford University Press, 1980).

[43] Steven Lawson, *In Pursuit of Power: Southern Blacks and Electoral Politics, 1965-1982* (Columbia university Press, 1985); "Legacy of the Voting Rights Act: Expansions in the 1970s", Reagan Presidential Library, https://www.reaganlibrary.gov/legacy-voting-rights-act-expansions-1970s. Accessed 6/626.

[44] *Dunn v. Blumstein, 405 U.S. 330 (1972);* "Dunn v. Blumstein." Oyez. Accessed June 6, 2026. https://www.oyez.org/cases/1971/70-13.

designed exclusively to dilute Black vote power. Even with rapidly growing numbers of Black registered voters in the state's major cities, at-large elections remained a powerful tool in maintaining white majorities in city and countywide elections. In Chattanooga, a five-member Board of Commissioners dominated city politics. Election to the Board was on an at-large basis. Since white voters voted as a cohesive racial bloc, Black candidates for office had virtually no chance of winning election. In 1911, the city approved a new charter which provided for five City Commissioners elected at-large. In an explicit attempt to limit the ability of Blacks to vote, the charter also made it illegal for groups to form organizations to pay individual's poll taxes. This portion of the act had a deleterious effect on Black voters' ability to financially support other voters by paying their poll tax. These changes in the city charter had their intended effect: no Black person was elected to the City Commission until 1971. Crucially, the city had also expanded dramatically in population in the late 1960s and early 1970s. By 1974, the population of the city reached over 165,000, a feat achieved by annexing surround areas that were primarily occupied by whites. Plaintiffs noted that 96% of the city's new citizens were white.[45]

In 1964, 1970, and 1984, the residents of Chattanooga and Hamilton County failed to pass referenda on whether or not the city and county would be jointly governed under a metropolitan charter.[46] Having exhausted all of their electoral options to change the racially discriminatory charter, Black activists took to the courts. In November 1987, twelve Black voters filed a suit in federal court, claiming that at-large elections and absentee-owner voting privileges diluted Black political power and violated the Voting Rights Act and the U.S. Constitution. After years of discovery, the lawsuit went to trial in 1989. The judge found that the Commission deliberately

---

[45] *Brown v. The Board of Commissioners of the City of Chattanooga*, 722 F. Supp. 380 (E.D. Tenn. 1989); Wade Rollins, Dick Copper, "The Color of Ballots". *Facing South*, December 1, 1989. https://www.facingsouth.org/1989/12/color-ballots. Accessed 6/6/26
[46] *Brown v. The Board of Commissioners of the City of Chattanooga*, 722 F. Supp. 380 (E.D. Tenn. 1989).

sought to disenfranchise Black voters and ordered a new form of government be constructed. As a result of the ruling, Chattanooga was placed under Section 3(c) supervision.[47]

In Memphis, at-large voting and the run-off system (where the top two vote earners ran for office *again)* effectively barred Black candidates from victory. Liberal annexation policies also bolstered the white vote; from 1967 to 1990, the city annexed surrounding unincorporated areas that dramatically increased the white voter base.[48] The 1982 mayoral elections powerfully illustrate the impact of these policies on Black electoral strength. That year, Mayor Wyeth Chandler resigned to take a judgeship. Per the city charter, J.O. Patterson, the chair of the City Council, was appointed mayor. A prominent Black pastor, and lawyer, Patterson served as interim mayor and ran for election to a full term in 1983. In the general election, Patterson defeated Richard Hackett, garnering 41% of the vote to Hackett's 29%. However, with the run-off system in place, Patterson had to run again against Hackett. Hackett won the runoff election and the racial polarization of the city's electorate virtually guaranteed his victory.[49]

In February 1991, the Justice Department filed suit against the city of Memphis under the Voting Rights Act. The Department claimed that the at-large and runoff schemes employed by the city diluted the Black vote in Memphis and precluded the election of Blacks to most of the city's elected positions. Specifically, the suit claimed that Memphis's white majority voted as a bloc to consistently defeat Black candidates, and declared that the combination of the electoral system and

---

[47] Rollins, Copper, "The Color of Ballots". https://www.facingsouth.org/1989/12/color-ballots. Accessed 6/6/26; Travis Crum, "The Voting Right's Act Secret Weapon: Pocket Trigger Litigation and Dynamic Preclearance", *The Yale Law Journal*, 119: 1992, 1992-2010.

[48] Annexation Ordinance History. Shelby County: https://www.shelbycountytn.gov/DocumentCenter/View/21645/Annexation-Ordinances-history?bidId. Accessed 6/6/26; Pohlmann and Kirby, *Racial Politics at the Crossroads,* 113.

[49] Wright, *Race, Power, and Political Emergence in Memphis,* 104.

annexation ensured the success of these devices by constant expansion of the white electorate.[50] In that year's mayoral election, Willie Herenton, the African American Superintendent of Memphis City Schools, entered the race against the incumbent Richard Hackett. The conventional wisdom was that, due to the current election rules, Hackett would ultimately win the election, even if it went to runoff. However, to the surprise of many, federal district judge Jerome Turner issued a preliminary injunction against runoffs, effectively removing that option from the mayor's election in October. In October of 1991, Willie Herenton became Memphis's first elected Black mayor, winning by 172 votes out of over 245,000 votes cast. Herenton's narrow victory was only possible because a district court judge affirmed the principles set forth in the Voting Rights Act.[51]

Around the nation, redistricting efforts in the wake of the 1990 Census resulted in one of the largest increases in minority representation since the passage of the Voting Rights Act. As in years past, the growing presence of minorities and the concomitant expansion of non-white political influence rekindled a contentious struggle for power in state legislatures, particularly in the South. The debates swirling around the nation about minority voter representation tended to obscure the fact that Black people remained severely underrepresented in both Congress and in legislatures around the nation. Despite being 11.1% of the overall voting age population, African Americans still only comprised 4.9% of members of Congress and 5.4% of state legislators.[52]

---

[50] Pohlmann and Kirby, *Racial Politics at the Crossroads,* 114; *United States v. City of Memphis*, Case No. 2:91-cv-02139 (W.D. Tenn.); Otis Sanford, *From Boss Crump to King Willie: How Race Changed Memphis Politics* (Univ. of Tennessee Press, 2017), 203-242.
[51] Christophe Silver and John Moeser, *The Separate City: Black Communities in the Urban South, 1940-1968* (Univ. Press of Kentucky), 173.
[52] Frank R. Parker, *The Constitutionality of Racial Redistricting: A Critique of Shaw v. Reno*, 3 U.D.C. L. REV. 1 (1995).
Available at: https://digitalcommons.law.udc.edu/udclr/vol3/iss1/4; Brenda Wright, "Minority Vote Dilution is Still Illegal", *Southern Changes: The Journal of the Southern Regional Council, 1978-2003,* Vol. 22, No. 4, 2000 pp. 7-10.

In 1992, the Tennessee General Assembly passed legislation reapportioning both houses of its legislative body. Voting rights activists in rural West Tennessee filed suit. *Rural West Tennessee African American Affairs Council v. Sundquist* alleged that the new apportionment plan violated Section Two of the Voting Rights Act and the 13th, 14th, and 15th Amendments to the Constitution. African Americans living in Rural West Tennessee were quite familiar with voter discrimination.[53] They had been fighting for full electoral inclusion since the dawn of Reconstruction, through the era of segregation, and the civil rights movement.[54] In September 1993, a three-judge panel ruled the House Plan unconstitutional because it violated the "One Person, One Vote" doctrine set forth by *Baker v. Carr.* Two months later, the court ruled that the Senate Plan violated Section 2 of the Voting Rights Act by "affording African American voters in west Tennessee less opportunity than other members of the electorate to participate in the political process and the elect representatives of their choice."[55]

In hopes of making a judicial course correction, the General Assembly adopted a new House plan during the appeal in 1994. Chapter 536 of the Public Acts of 1994 created a three-part reapportionment plan for the state's 99 house districts. After the Court dismissed the plaintiff's case, the Council amended its complaint and challenged the House Plan on the sole ground of violating Section 2 of the Voting Rights Act. In 1998, the District Court ruled that the 1994 House Plan violated the Voting Rights Act. Plaintiffs in the case pointed to the question of proportionality. In the six counties counted in the case, African Americans comprised 31% of the voting age population but noted that none of the districts in the area contained a majority of Black voters. The court went on to acknowledge that, "in four of the five districts minority members make up 25-

---

[53] The counties implicated in the plan were: Madison, Haywood, Hardeman, Tipton, Fayette, and Lauderdale.
[54] New York Times. "How Minority Districts Fueled the G.O.P.'s Southern Ascendancy in Congress," May 10, 2026.
[55] *Rural West Tennessee African American Affairs Council v. Sundquist*, 209 F.3d 835, 837 (6th Cir. 2000), citing *Rural West Tennessee African American Affairs Council v. McWherter*, 836 F.Supp. 453, 456 (W.D. Tenn. 1993).

29

55% of the population and hence could meaningfully affect election outcomes in those four districts, but concluded that in the absence of a single majority black district, this fact had little probative significance."[56] In April of 2000, the state appealed to the Supreme Court, requesting a stay. Justice John Paul Stevens rejected the request.[57]

The ruling in this case reaffirmed the necessity for a watchful judiciary. It also confirmed the continued history of voter suppression in West Tennessee.[58] The discriminatory conditions observed by the court in the early 1990s were the product of law and history. The systematic dilution of Black voter power had been woven into the state's DNA. Anchored by the constitutional avoidance sanctified by the Legislature in 1901, Tennessee continued – with dogged determination – to bake voter suppression into its reapportionment process. However, as in years past, Black activists and their allies looked to the courts for remedy. The ruling also helped further focus arguments regarding racial bloc voting. The court maintained that "that neither over-proportionality in one area of the State nor substantial proportionality in the State as a whole should ordinarily be used to offset a problem of vote dilution in one discrete area of the state." The message was clear from the U.S. Court of Appeals for the Sixth Circuit: the presence of majority-minority districts in urban centers did not absolve the state of its obligation to uphold equal representation in another part of the state. In *Cousin v. McWherter* the court made a similar finding, acknowledging a history of voter discrimination in Hamilton County.[59]

Since then, Tennessee has implemented a host of laws that placed an undue burden on minority voters. In 2011, the state passed a law requiring presentation of a photo ID to vote. While

---

[56] *Rural West Tennessee African American Affairs Council v. Sundquist*, 209 F.3d 835, 842 (6th Cir. 2000).
[57] *Sundquist v. Rural West Tennessee African American Affairs Council*, 531 U.S. 944 (2000); The Las Vegas Sentinel-Voice. "Justice lets Black Tennessee district stand." April 13, 2000.
[58] *Rural West Tenn. African-American Affairs Council v. Sundquist*, 209 F.3d 835, 843 n. 1 (6th Cir. 2000).
[59] *Rural West Tennessee African American Affairs Council v. Sundquist*, 209 F.3d 835 (6th Cir. 2000); Kristen Clarke, "Voting Rights & City-County Consolidations."43 *Houston Law Review* 621; *Cousin v. McWherter,* 46 F.3d 568, 571 n.3 (6th Cir. 1995).

the Secretary of State for Tennessee claimed that the law was implemented to ensure the accuracy of the voter rolls, critics expressed other, larger concerns, such as an over-reliance on outdated databases to make crucial decision regarding a voter's eligibility and the higher probability of highly mobile voters (who are disproportionately poor) being accidentally dropped from the rolls. The American Civil Liberties Union observed that, under the new law, hundreds of thousands of voters had been purged from the rolls for inactivity, "a practice the Sixth Circuit Court of Appeals has ruled violates the National Voter Registration Act."[60] When the state passed the act, voting rights advocates pointed out that the state had hundreds of thousands of voters without the necessary ID to vote under the new law, and that number included 230,000 senior citizens, many of whom possessed state-issued driver's licenses without photographs. Activists also pointed out that, as of July 2012, the state's "intense campaign" to educate voters and provide free, state-issued IDs had resulted in just under 21,000 free IDs for election purposes.[61]

City officials in Memphis responded proactively to the issue of disenfranchisement caused by the state's voter ID law by instructing the Memphis Public Library to begin issuing library cards with photos. The initiative came under attack on the day of its announcement. State officials argued that, since the library was a city entity and not a state entity, it did not have the authority to issue IDs that could be used for election identification. Memphis Mayor A.C. Wharton argued that the city library system should count as a state institution under the Voter ID law. According to Wharton, "the library system is the very embodiment of a state institution."[62]  The State Elections

[60] "ACLU-TN Voting Rights Toolkit". https://www.aclu-tn.org/app/uploads/2023/09/tn-voting-rights-toolkit-final.pdf?utm_source=chatgpt.com. Accessed 6/6/26.

[61] Chris Kromm, "Tennessee reveals shortfalls in efforts to remove barriers created by voter ID laws", *Facing South*. 3/15/13.  https://www.facingsouth.org/2013/03/tennessee-reveals-shortfalls-in-efforts-to-remove-.html. Accessed 6/6/26. Chris Kromm, "Tennessee program to provide photo IDs missing most voters who need it", *Facing South*. 7/12/12. https://www.facingsouth.org/2012/07/tennessee-program-to-provide-photo-ids-missing-most-voters-who-need-it.html. Accessed 6/6//26.

[62] Bob Warburton, "Judge: Memphis Library Cards Aren't Voter ID", *Library Journal*, 8/6/12. https://www.libraryjournal.com/story/judge-memphis-library-cards-arent-voter-id. Accessed 6/7/26.

Coordinator ordered voting officials in Shelby County not to accept Memphis library cards as a valid form of identification. Wharton responded to the Elections Coordinator with a 33-page legal opinion from the city attorney that had been written earlier in the year in preparation for litigation. Wharton and other voter advocates had long claimed that the state's voter ID law placed an undue burden on elderly, Black citizens. Wharton issued a public call to anyone who had experienced difficulties trying to vote, encouraging them to come forward and explore legal recourse. One elderly woman came forward and identified herself as a plaintiff. Her library ID was her only form of identification. She tried, unsuccessfully, to vote at two separate voting precincts and had been turned away, in clear violation of the law. The city's response to the voter ID law was innovative, proactive, and gained the support of the Tennessee ACLU, the Shelby County Democratic Party, and the Memphis Branch of the NAACP. The residents and the city filed a declaratory judgement action arguing that the photographic identification requirement violated constitutional protections, and that the "city qualified as an entity of the State authorized to issue valid photographic identification cards through its public library." While the court upheld the Voter ID law, it also declared that the cards issued by the library complied with the statute. After the ruling, the State Legislature changed the law to specifically exclude identification issued by municipalities or their libraries from qualifying as valid forms of ID for elections.[63]

In recent years, the state has continued its assault on the full, constitutional expression of voting rights. Rather than finding ways to increase participation and turnout, Tennessee continually failed to pass a provision in the Voter ID law that enabled out of state students to use their college

---

[63] *City of Memphis v. Hargett;*" "Judge: Memphis Library Cards Aren't Voter ID", https://www.libraryjournal.com/story/judge-memphis-library-cards-arent-voter-id. Accessed 6/7/26; "ACLU-TN Disappointed with Stat Appeals Court Ruling Upholding Photo ID Law", https://www.aclu.org/press-releases/aclu-tn-disappointed-state-appeals-court-ruling-upholding-photo-id-law. Accessed 6/7/26; "Memphis Sues Tennessee Over Voter ID Law", https://www.courthousenews.com/memphis-sues-tennesseeover-voter-id-law/. Accessed 6/7/26.

identification to vote. Students in Nashville took the state to court to gain access to a right that had been affirmed in previous cases. While the state barred students from using their student IDs to vote, state law allows for concealed-carry permits to count as a valid ID. According to the Brennan Center, "this legislative choice disproportionately harms African Americans, who are under-represented among concealed-carry handgun permit holders and over-represented among students. For instance, African Americans make up 16.9% of the public university student population, but received less than 7.7% of the state's concealed-carry permits last year."[64]

In 2019, lawmakers passed a bill essentially criminalizing voter registration organizations in the state, creating another set of obstacles to vote in a state with abysmally low voting rates. Ironically, the bill became law in response to a significant increase in voter registrations before the 2018 midterm elections. In 2018, the Tennessee Black Voter Project led a coalition of organizations in accumulating 91,000 applications.[65] In an act of legal intimidation, the new law created civil and criminal penalties to suppress the success of major voter registration groups. The submission of an incomplete application carried the potential for legal action. To make matters worse, the bill was unclear on who, precisely, would be subject to punishment for the submission of incomplete, or "deficient" forms. While the bill mandated state sponsored training for voter registration groups, it did not lay out any details about the provision of the mandatory training. Voter registration

---

[64] *Nashville Student Organizing Committee et al. v. Hargett et al*, 123 F. Supp.3d 967 (M.D. Tenn. 2015); "Students Claim Tenn. Voter ID Law Is Unfair." Courthouse News Service, March 5, 2015, Students Claim Tenn. Voter ID Law Is Unfair | Courthouse News Service; Lawrence Norden, Statement from Congressional Forum: "Excluded from Democracy: The Impact of Recent State Voting Changes." https://www.brennancenter.org/our-work/research-reports/statement-congressional-forum-excluded-democracy. Accessed 6/6/26.
[65] Matt Vasilogambros, "Tennessee Made It Harder to Register Voters. Activists Consider What's Next". *Stateline*. *https://stateline.org/2019/08/14/tennessee-made-it-harder-to-register-voters-activists-consider-whats-next/*. Accessed 6/6/26.

groups took the state to court, and in 2020 the state repealed the more deleterious components of the bill.[66]

The Civil Rights Movement ushered in an unprecedented era of voting rights expansion for African Americans. However, on the heels of that expansion, states like Tennessee began disenfranchising convicted felons at a growing rate.[67] By 2016, 6.1 million people in the nation were disenfranchised due to a felony conviction. Tennessee led the nation in the rate which it purged convicted citizens from the voter rolls. In 2022, the state excluded over 470,000 Tennessee voting age residents, a number that represented 9.3% of the state's voting age population. Of that dismal number, over 68,000 citizens were on probation or parole, and over 370,000 had completed their sentences. Between 2018 and 2023, only 3,350 people with felony convictions had successfully restored their rights, a paltry 1% of people who had completed their sentence.[68] Over one in five Black voting age residents were unable to vote due to their criminal records. Tennessee law facilitated a rate of disfranchisement for Black people that was four times the national average. Although Black Tennesseans only make up 17% of the state's population, they are 43% of those disenfranchised. The historic and discriminatory overrepresentation of Black people in the

---

[66] "Tennessee Removes Anti-Voter Registration Provisions Following Federal Legal Challenge", ACLU, April 2, 2020, Tennessee Removes Anti-Voter Registration Provisions Following Federal Legal Challenge | American Civil Liberties Union; "Civil and Voting Rights Organizations Oppose Tennessee's Proposed Restrictions to Voter Registration Drives". Lawyers' Committee for Civil Rights Under Law. April 15, 2019, Civil and Voting Rights Organizations Oppose Tennessee's Proposed Restrictions to Voter Registration Drives | Lawyers' Committee for Civil Rights Under Law

[67] Michelle Alexander, *The New Jim Crow: Mass Incarceration in the Age of Colorblindness* (The New Press, 2020).

[68] Dinesh Napal, Kristen Budd, Emma Stammen, "Tennessee Should Restore Voting Rights to Nearly 400,00 Citizens", The Sentencing Project. 3/31/25. https://www.sentencingproject.org/fact-sheet/tennessee-should-restore-voting-rights-to-nearly-400000-citizens/. Accessed 6/7/26; Hannah, Grabenstein, "Tennessee makes it hard for ex-offenders to regain voting rights. This man did it anyway." MLK50: Justice Through Journalism. 10/30/20. https://mlk50.com/2020/10/30/ex-offender-fights-tennessees-tough-path-to-restore-voting-rights-before-election-day/. Accessed 6/7/26.

criminal justice system lays the foundation for overrepresentation in voter disfranchisement in the state and in the nation.[69]

The state's effort to restore the voting rights of citizens who have completed their sentences are inadequate and have a disproportionate impact on Black citizens. While other states have made it easier for system-impacted residents to vote, Tennessee has made it more difficult—so difficult that activists working on the issue liken the restoration process to voter suppression. Court fines and fees, coupled with little to no assistance from state officials tasked with helping people fill out the appropriate forms, all combine to keep eligible voters off the rolls.[70] In 2020, the Tennessee NAACP filed suit against the state, claiming that state officials failed to adequately administer the process whereby citizens can get their mandatory Certificates of Restoration (COR) completed and have their right to vote reinstated. Plaintiffs in the suit challenged the state's "unequal, inaccessible, opaque, and error-ridden implementation of the statutes granting restoration of voting rights to citizens who lost the right to vote because of a felony conviction." Plaintiffs also noted that Rutherford County charged a $25 fee to issue a COR in order to register to vote. The suit claimed that this charge amounted to an illegal poll tax. In addition to the poll tax Rutherford County had instated, the suit also claimed that the voter restoration process violated the Due Process Clause of the 14th Amendment, the Equal Protection Clause of the 14th Amendment, and the National Voter

---

[69] The Sentencing Project, "Tennessee Denies Voting Rights to Over 470,000 Citizens", https://www.sentencingproject.org/app/uploads/2023/01/Tennessee-Voting-Rights-for-People-with-Felony-Convictions.pdf. Accessed 6/7/26; Bianca Fortis, "How Tennessee disenfranchised 21% of its Black Citizens." *MLK50: Justice Through Journalism*. https://mlk50.com/2022/11/08/how-tennessee-disenfranchised-21-of-its-black-citizens/. Accessed 6/7/26.
[70] Nicole Lewis, "Tennessee's Voter Restoration Gauntlet", *The Marshall Project*. 9/19/19. https://www.themarshallproject.org/2019/09/19/tennessee-s-voter-restoration-gauntlet. Accessed 6/7/26; Jamie McGee, "Restoring voting rights after a felony is rare in Tennessee. This year, the process got harder." Tennessee Lookout, 12/7/23. https://tennesseelookout.com/2023/12/07/restoring-voting-rights-after-a-felony-is-rare-in-tennessee-this-year-the-process-got-harder/. Accessed 6/7/26.

Registration Act. Sadly, while the leading the nation in disfranchising its system involved citizens, state officials dramatically underperform when it comes to voter restoration.[71]

In 2025, voting rights activists in Fayette County once again took to the courts to press for greater freedom. The Legal Defense Fund filed suit against Fayette County Commissioners for adopting a map that diluted Black electoral power.[72] Ignoring the "explicit advice" of its own redistricting committee and legal counsel, the commission adopted a plan with no majority-minority districts. Under the new map, Black voters – who comprised more than a quarter of Fayette County's population – had no representation on the nineteen-member county commission. Black activists also alleged that the 2021 map was based on a previous redistricting cycle that also diminished Black electoral power.[73] The Department of Justice also filed suit, claiming that Fayette County violated the Voting Rights Act.[74] Both suits referenced Fayette County's long history of voter exclusion and discrimination. In response to the two lawsuits, Fayette County commissioners unanimously passed a new electoral map in 2025 that contained three majority-minority single member districts.[75]

**Conclusion**

---

[71] Case Summary of *NAACP v. Lee*, Civil Rights Litig. Clearinghouse, https://clearinghouse.net/case/18230/ (last updated 1/3/2025). Accessed 6/7/26; A year after the suit was filed, Rutherford County removed the fee from the restoration process. Campaign Legal Center, "Rutherford County, TN Will End $25 Poll Tax", https://campaignlegal.org/press-releases/rutherford-county-tn-will-end-25-poll-tax. Accessed 6/7/26. This case is still ongoing.

[72] *NAACP Fayette-Somerville Branch v. Fayette Cnty., Tenn.*, No. 2:25-cv-02223 (W.D. Tenn. 2025).

[73] Cassandra Stephenson, "Lawsuit: Fayette County diluted Black voting power, violated Voting Rights Act in 2021." *Tennessee Lookout*. 1/16/25. https://tennesseelookout.com/2025/01/16/lawsuit-fayette-co-diluted-black-voting-power-violated-voting-rights-act-in-2021-redistricting/. Accessed 6/7/26.

[74] *U.S. v. Fayette Cnty., Tenn.*, No. 2:25-cv-02047 (W.D. Tenn. 2025).

[75] LDF Press Statement, "LDF declares victory in successfully advocating for the County Commission in Fayette County, Tennessee to draw a New, Fairer Electoral Map." 6/4/26. https://www.naacpldf.org/press-release/ldf-declares-victory-in-successfully-advocating-for-the-county-commission-in-fayette-county-tennessee-to-draw-a-new-fairer-electoral-map/. Accessed 6/7/26.

Racially motivated voter suppression has been and continues to be a regrettable fact of life for African Americans in the Volunteer State. From the first days of Reconstruction down to the day after the Supreme Court's ruling in the *Callais* case, voter suppression has played a central role in the state's political evolution. The litany of devices deployed by the state is clear: poll taxes, literacy tests, white primaries, to say nothing of violence, intimidation, and murder. All of these have been brought to bear on the uncertain odyssey toward racial justice that has played out in the state. In each of these instances, African Americans have been the primary targets of this suppression.

As African Americans gained more political power, particularly in the western portion of the state, White leaders had to rely less on segregation era intimidation tactics to stop the forward march of Black progress. Instead, they amplified and modernized an old tactic, legislative manipulation. When Russell Sugarmon and other members of the Volunteer Ticket came close to winning citywide political positions, the Shelby County delegation and state legislature changed the election rules, ensuring no Black candidate could win. When Black citizens in Nashville approached a plurality in some districts, White leaders merged the county and city, a move designed specifically to blunt Black political power. Voter ID laws continue to stifle voter registration, particularly in poor, Black, and immigrant communities. In 2026, White leaders are working to remove Black representation from the state's congressional delegation by breaking up the overwhelmingly Black 9th Congressional District. All told, the patterns and practices of suppression, forged in the state's past, reverberate to the present.

**Note**

Pursuant to 28 U.S.C. § 1746, I, Charles W. McKinney, Jr., declare under penalty of perjury that the foregoing is true and correct.

Date: <u>June 8, 2026</u>

Charles W. McKinney, Jr., Ph.D.

Section 3.  CV

**Charles Wesley McKinney, Jr., Ph.D.**
Professor of History
Rhodes College
2000 N. Parkway
Memphis, TN 38112
mckinneyc@rhodes.edu

# Education

**Duke University**
  *Ph.D., United States History, 2003*
  Dissertation:  "'Our people began to press for greater freedom': The Black Freedom Struggle in Wilson, North Carolina, 1945-1970"

  *Committee:* William Chafe (Chair); Raymond Gavins; Charles Payne; William Turner.

  *Graduate Certificate, African and African American Studies*, 2003

  *A.M., United States History, 1993*
  Master's Thesis: "Fighting the 'Violence' of Poverty: The Creation of the Foundation for Community Development"

**Morehouse College**
  *B.A.,* cum laude *with Honors in History and English, 1989*

# Academic Appointments

## Rhodes College, Department of History
  Professor, 2025 – Present
  Associate Professor, 2011 – 2025
  Assistant Professor, 2005 – 2011

*Neville Frierson Bryan Chair, Africana Studies, 2014 – 2023*
*Director, Rhodes Institute for Regional Studies, 2012 – Present*

# Courses Taught

## Rhodes College

<u>History</u>
*African American History*
*American History/American Music*
*The African American Intellectual Tradition*
*Behind the Veil: African American Life in the Jim Crow South*
*Black Women's Activism*
*Civil Rights in Memphis*

*The Civil Rights Movement*
*History, Literature and the African American Experience*
*Martin Luther King, Jr. in Historical Context*
*The Meaning of Freedom: African American Activism, 1830-1950*
*Recent History of the United States (Post – 1945)*
*Slavery in the United States*
*Teaching the Civil Rights Movement*
*U.S. History in the 20th Century*

<u>Africana Studies</u>
*Africana Theory*
*Theory and Methods in Africana Studies*
*The Black Freedom Struggle*
*Introduction to Africana Studies*
*Black Madness/Mad Blackness: The Psychic Life of Race*
*Theory and Methods in Africana Studies*

## Duke University

*Introduction to African American Studies*

*African American History, 1619-Present*
*The African American Presence in American Film*

## Guilford College

*Civil Rights in North Carolina: A History*

# Publications

## Books

*From Rights to Lives: The Evolution of the Black Freedom Struggle,* Co-edited with Françoise Hamlin (Nashville: Vanderbilt University Press, 2024)

*An Unseen Light: Black Struggles for Freedom in Memphis, Tennessee*, Co-edited with Aram Goudsouzian (Lexington: University Press of Kentucky, 2018)

*Greater Freedom: The Evolution of the Civil Rights Struggle in Wilson, North Carolina* (Lanham, MD: University Press of America, 2010)

## Peer-Reviewed Articles and Book Chapters

Introduction to the new edition of Nicholas Von Hoffman, *Mississippi Notebook* (Jackson: University Press of Mississippi, 2025), IX-XXV

Charles McKinney and Francoise Hamlin, "From Rights to Lives: History Matters", in *From Rights to Lives: The Evolution of the Black Freedom Struggle,* Co-edited with Françoise Hamlin (Nashville: Vanderbilt University Press, 2024), 1-16.

Charles McKinney and Francoise Hamlin, "Postscript: 'Miraculous, Magnificent, and Messy': Rights, Lives, and the Movement in Real Time", in *From Rights to Lives,* 239-255.

"Complicating Martin Luther King, Jr.: Teaching the Life and Legacy of the Movement's Most Iconic Figure", in Hasan Jeffries, ed., *Understanding and Teaching the Civil Rights Movement* (Madison: University of Wisconsin Press, 2019), 113-130

"Riot", in Erica Edwards, Roderick Ferguson, Jeffrey Ogbar, eds., *Keywords in African American Studies* (New York University Press, 2018) 179-183.

"Beyond Dreams and Mountains: Martin King's Challenge to the Arc of History," *The University of Memphis Law Review* (Vol. 49, no. 1, Fall, 2018), 263 – 284

Charles McKinney and Aram Goudsouzian, "Introduction", *An Unseen Light: Black Struggles for Freedom in Memphis, Tennessee* (Lexington: University Press of Kentucky, 2018), 1-11.
"Coda", in *An Unseen Light*, 393-399.

"Multiple Fronts: The Struggle for Black Educational and Political Equality in Wilson, North Carolina, 1941-1953." *The North Carolina Historical Review* (January 2011)
- (Winner, R.W.D. Connor Award, Given by the Historical Society of North Carolina for Outstanding Article in the *North Carolina Historical Review*)

"Finding Fannie Corbett: Black Women and the Transformation of Civil Rights Narratives in Wilson, North Carolina" in *Civil Rights History from the Ground Up: Local Struggles, A National Movement,* edited by Emilye Crosby (University of Georgia Press, 2011).

"Democratic Intent?  The Perils and Promise of Constitutional Reform in the New South." *Charleston Law Review,* vol. 3, no. 2 (Summer 2009)

Charles McKinney and Rhonda Jones, "Jim Crowed – Democracy Betrayed: African Americans in the Jim Crow South," in Alton Hornsby, ed., *A Companion to African American History* (London: Blackwell, 2005), 271-282

## Book Reviews

Brian Suttell, *Campus to Counter: Civil Rights Activism in Raleigh and Durham, North Carolina, 1960–1963, Journal of American History* (December 2024)

"The Divine City: On J.T. Roane's *Dark Agoras"*, *Los Angeles Review of Books*, June 2023: https://lareviewofbooks.org/article/the-divine-city-on-j-t-roanes-dark-agoras/

*Beyond Integration: The Black Freedom Struggle in Escambia County, Florida, 1960 – 1980*. By J. Michael Butler. (Chapel Hill: University of North Carolina Press, 2016) in *the Journal of American History* (September 2017)

*Ain't Scared of Your Jail: Arrest, Imprisonment, and the Civil Rights Movement*. By Zoe A. Colley. (Gainesville: University Press of Florida, 2013) in *Louisiana History* (Fall 2015)

*The Nicest Kids in Town: American Bandstand, Rock 'n' Roll, and the Struggle for Civil Rights in 1950s Philadelphia.* By Matthew F. Delmont. (Berkeley: University of California Press, 2012) in *The Journal of American History* (December 2013)

*Becoming King: Martin Luther King, Jr. and the Making of a National Leader* (Lexington: University Press of Kentucky, 2008) in *Louisiana History* (Winter 2010)

*Maxine Smith's Unwilling Pupils: Lessons Learned in Memphis's Civil Rights Classroom* by Sherry Hoppe and Bruce Speck (Knoxville: University of Tennessee Press, 2007) in *The Journal of Southern History* (February 2009)

*A Little Taste of Freedom: The Black Freedom Struggle in Claiborne County, Mississippi* by Emilye Crosby, in *The Register of the Kentucky Historical Society* (Spring 2006)


## Online articles and Other Publications

Françoise Hamlin and Charles McKinney, "History Matters Now More Than Ever", Response essay written for *From Rights To Lives* Book Roundtable, *Black Perspectives*, July 2025: https://www.aaihs.org/history-matters-now-more-than-ever/

"Potentializing Violence", in Leigh Raiford, Ariella, Aïsha Azoulay, Wendy Ewald, Susan Meiselas, Laura Wexler, *Collaboration: A Potential History Of Photography* (London: Thames and Hudson, 2023), 107

"Why protest? Recent killings resonate powerfully with black Memphians." Opinion piece co-written with Aram Goudsouzian, *The Daily Memphian*, June 2020: https://dailymemphian.com/article/14504/why-memphis-protesting-death-george-floyd-martin-luther-king-legacy
"Grim New Chapter in Black History" *Memphis Commercial Appeal,* 7 March 2020

"What King knew for sure: Youth must be partners in social transformation", MLK50: Justice Through Journalism, January 2019: https://mlk50.com/what-king-knew-for-sure-youth-must-be-partners-in-social-transformation-bbdf2ba43b0e

"An Unseen Light", Memphis *Commercial Appeal:* https://www.commercialappeal.com/story/opinion/contributors/2018/03/23/unseen-light-new-book-chronicles-black-struggles-freedom-and-equality-memphis/444718002/ (March 2018)

"Using 'Public Safety' Claims to Curtail Our Rights", Memphis *Commercial Appeal*, December 2017 https://www.commercialappeal.com/story/opinion/contributors/2017/12/04/using-public-safety-claims-curtail-our-rights/919444001/

"Now that the flag is down, can we talk about race in America?" *Wall Street Journal MarketWatch*: http://www.marketwatch.com/story/now-that-the-flag-is-down-can-we-talk-about-race-in-america-2015-07-21 (July 2015)

"Black GOP Can Learn from Old American South," *USA Today*: http://www.usatoday.com/story/opinion/2014/03/15/black-republicans-gop-history-south-civil-rights-column/6079991/ (March 2014)


## Selected Interviews and Articles About My Research and Teaching

Interview, "Critical Race Theory", *Imagine An America: The National Civil Rights Museum Podcast,* June 2024*: https://podcasts.apple.com/us/podcast/iii-critical-race-theory-with-charles-mckinney/id1749591663?i=1000659147260*

Interview, *The Black Studies Podcast*, May 2024: https://open.spotify.com/episode/7C8xGJ9gwS1F7nMRptA6aT?si=395c893453ee4a32&nd=1&dlsi=4975eb9be7494b4a

Interview for *From Rights To Lives: The Evolution of the Black Freedom Struggle,* New Books In African American Studies Podcast, March 2024: https://newbooksnetwork.com/from-rights-to-lives

"Conversations in Atlantic Theory", Podcast that explores the Cultural, Political and Philosophical conditions of the Atlantic World: Discussion of *An Unseen Light* with Aram Goudsouzian, February 2022: https://atlantictheory.org/e8/?fbclid=IwAR0qlceuw98KEpZiFaB2FaMEcLzdnMktLuSZubiEa84ReqQ1ebjUp7t3wm0

"Whose History?" The Hotel Bar Sessions Podcast, November 2021: https://hotelbarpodcast.com/podcast/episode-31-whose-history/

"Has Justice Been done to George Floyd?" The Minefield – ABC (Australia) National Radio, June 2021: https://www.abc.net.au/radionational/programs/theminefield/charles-mckinney/13427130

"The Bad Faith War on Critical Race Theory", Straight White American Jesus Podcast, May 2021: https://podcasts.apple.com/lu/podcast/the-bad-faith-war-on-critical-race-theory/id1441649707?i=1000522916543

"For Memphis professors, the Capitol riots added a horrific chapter to Black history", *Memphis Commercial Appeal*, March, 2021: https://www.commercialappeal.com/story/news/columnists/tonyaa-weathersbee/2021/03/05/mob-violence-led-jan-6-capitol-insurrection-spawned-teachable-moments-memphis/6910537002/

"Why We Remember: Black History is America's Story – Terrible and Triumphant", MLK50, February, 2021: https://mlk50.com/2021/02/01/why-we-remember-black-history-is-americas-story-terrible-and-triumphant/

"Teaching the Movement's Most Iconic Figure", Teaching Hard History Podcast, November 2020: https://www.learningforjustice.org/podcasts/teaching-hard-history/civil-rights-movement/teaching-the-movements-most-iconic-figure

"George Floyd and the Black Lives Matter Protests", Good Morning Scotland/BBC Interview, June 2020

"George Floyd's Death and its Aftermath", China Central Television, Interview, June 2020

Panelist, "Building Opportunity For All", Discussion hosted by *Atlantic Monthly Magazine*, National Civil Rights Museum, April 2019: https://www.youtube.com/watch?v=e1jYT-JbyVs

"Don't Know Much About History: Is it time to change Public School Curriculums?", *Where We Live*, WNPR, March 2019: https://www.wnpr.org/post/dont-know-much-about-history-it-time-change-public-school-curriculums

Interview for *An Unseen Light*, New Books in African American History Podcast, December 2018: https://www.stitcher.com/podcast/new-books-network/new-books-in-african-american-studies/e/57542362

*"An Unseen Light:* On the History of Black Memphis", *Black Perspectives*, October 2018: https://www.aaihs.org/an-unseen-light-on-the-history-of-black-memphis/

"Martin Luther King's Legacy: Fifty Years Later", *The Takeaway*, WNYC Studios, April 2018: https://www.wnycstudios.org/story/the-takeaway-2018-04-04/

"Martin Luther King and the Grassroots Struggle in Memphis," *Black Perspectives,* April 2018: https://www.aaihs.org/martin-luther-king-jr-and-the-grassroots-struggle-in-memphis/

"MLK's Final Message, Fifty Years after His Death", *On Point,* WBUR Studios, April 2018: http://www.wbur.org/onpoint/2018/04/04/martin-luther-king-assassination-50-years

The Permanent Record Podcast, Just City, April 2018: http://www.theoamnetwork.com/tprpod/2018/4/16/episode-23-dr-charles-mckinney

Public Radio East, Interview Regarding *Greater Freedom*, 2011:

http://www.publicbroadcasting.net/pre/news.newsmain/article/0/0/1745715/Arts..and..Culture/Greater.Freedom.The.Evolution.of.the.Civil.Rights.Struggle.in.Wilson..North.Carolina.-.Charles.W..McKinney..Jr

New Books in History Website, Interview Regarding *Greater Freedom*, 2011: http://newbooksinhistory.com/2011/09/16/charles-mckinney-jr-greater-freedom-the-evolution-of-the-civil-rights-struggle-in-wilson-north-carolina-upa-2010/

## Selected Television Interviews/Lectures

George Floyd protests prompt question: "What should we be doing to transform neighborhoods and communities?" ABC News 24 Interview, June 2020: https://www.localmemphis.com/article/news/local/protests/george-floyd-protests-prompt-question-what-should-we-be-doing-to-transform-the-neighborhoods-and-the-communities/522-9729acf0-fbf3-43ce-9869-f20cbfcb541e

'This is what people do when they have not been heard': A local professor weighs in on the cause of riots." Fox 13 Memphis News Interview, May 2020: https://www.fox13memphis.com/news/local/what-causes-riots/EA4MDEP3WFHFBNIEQPLUZICG7I/

CNN Interview, "Donald Trump and John Lewis", January 2017: https://www.youtube.com/watch?v=d22_ZfLf0V8

Featured on "Lectures in History," American History TV, CSPAN-3, November 2016: https://www.c-span.org/video/?417459-2/world-war-ii-civil-rights

CNN Interview, "Same-Sex Marriage Laws", November 2012: https://www.youtube.com/watch?v=CiB7WwfGIpU

## Work in Progress

*The Political Worlds of George Washington Lee*

*Martin Luther King, Jr., and the Black Liberal Arts Tradition* (Symposium and Edited Volume of the Proceedings, to be published in the Morehouse College King Collection Series on Civil and Human Rights, University of Georgia Press, 2027)

## Selected Invited Talks

"A Rising Imbalance: Civil Rights and the Demise of Black Republicanism in the 1960s", University of Buffalo, February 2025

"Building Black Wealth", Catalyst for Change Distinguished Speaker Series, National Civil Rights Museum, April 2023

"Black Women's Local, National, and International Organizing and Activism", Association of Black Women Historians National Conference, December 2022

"Black Studies: Origins and Obligations", The Patience Essah Lecture in Africana Studies, Auburn University, October 2022

"Confronting the Master Narrative of the Civil Rights Movement", Gilder Lehrman Institute Presentation, July 2022 "Unfulfilled Dreams and Other Tragedies: Reckoning with the Unfinished Work of the Civil Rights Movement", Missouri State University, February 2022

"The Beautiful Struggle: What King can teach us about the 'fierce urgency of now.'" King Day Lecture, University of Texas – San Antonio, January 2022

"Killing King Again: Race, Power, and the Cost of Unfulfilled Dreams", King Day Lecture, University of Florida, January 2022

"The Political Worlds of George Washington Lee: Power, Politics, and the End of Segregation," Anna J. Cooper Workshop in Black History, University of Maryland, February 2021

"Race, History, and Democracy: A Discussion", Conversation with Aram Goudsouzian, University of Memphis Advocate for Democracy Series, February 2021

"The Legacy of Martin Luther King, Jr." Panel Discussion, Hosted by the United States Embassy, Qatar, February 2021

"Martin Tried To Tell Us: Confronting King as the Nation Chooses Chaos Over Community", Duquesne University, January 2021

"The King We Don't Know", Arizona State University, January 2021

"A Rising Imbalance: George Washington Lee, Civil Rights Ascendancy and the Demise of Black Republicanism in Memphis, Tennessee", Remaking Political History Conference, Purdue University, June 2019

"An Imperfect Union: Pursuing the Constitution in an Age of Alienation", Constitution Day Lecture, Delta State University, September 2018

"The Dangerous Nature of Education", Rhodes College Opening Convocation (Speech given by the winner of the Clarence Day Award for Teaching) August 2018

"Creative Extremists: King's Call to Action" Black History Month Lecture, Lemoyne-Owen College, February 2018

"You Can't Get Around the Work: Race, Rights and the Perpetual Pursuit of Educational Justice", Keynote Speech, National Council on Black American Affairs, October 2017

"Can You Hear Me Now? Affirmative Disruption and the Perpetual Pursuit of Black Humanity", Ohio University – Athens, October 2016

"Fighting to Breathe: Race, History the Perpetual Battle for Black Life", University of Cincinnati – Blue Ash College, February 2016

"Chasing Dreams: African Americans and the Perpetual Pursuit of Voting Rights," Birmingham Civil Rights Institute, April 2015

"Talking in a Language Everyone Can Easily Understand: Insurgency, Invisibility, and the Perpetual Battle for Black Life," Annual Alton Hornsby Lecture, Morehouse College, April 2015

"The Struggle is Eternal: Race, Memory and the Continual Challenge of Black Humanity," *Winning the Race Conference*, Delta State University, March 2015

"Seeing the Unseen: Grappling with Race, History and the 'fierce urgency of now,'" The Annual Kennedy Lecture, Ohio University – Chillicothe, February 2015
"The Perpetual Pursuit of Greater Freedom", Barton College, September 2013

"(Re)building From the Ground Up: Local Studies and the Revolution in Civil Rights Scholarship", Penn State University, April 2012

"Educating King: Civil Rights, the Liberal Arts and the Education That Changed A Nation", King Day Lecture, Hastings College, January 2012

"Greater Freedom: The Civil Rights Struggle In Eastern North Carolina", Lecture, Albany Civil Rights Institute, Albany, Georgia, June 2011

"Race, Rights and Redemption: Lessons from North Carolina's Freedom Struggle", Lecture, Rhodes College, February 2011

"Ain't Gonna Let Nobody Turn Me Around: the Civil Rights Movement's Significance." Opening Lecture, Eleventh Annual Civil Rights Conference, University of Tennessee – Martin, February 2011

"The Crawl of an Arthritic Turtle: Race, Progress and Freedom in North Carolina." Southern Studies Brown Bag Lunch and Lecture Series, University of Mississippi, November 2010

"Black Power: The Evolution." Medgar Evers/Ella Baker Civil Rights Lecture Series, Jackson State University, April 2010

"Constitutional Reform in the New South." Keynote Address, Charleston College of Law Inaugural Symposium, January 2009

"Rethinking working class activism in the Civil Rights Era." Samuel Shannon Distinguished Lecture, Tennessee State University, March 2008


## Selected Academic Presentations

"From Rights To Lives: The Evolution of the Black Freedom Struggle", Organization of American Historians Conference, Chicago, IL, April 2025

"From Rights To Lives: The Evolving Black Freedom Struggle", American Historical Association Conference, New York, NY January 2025

"The Language of Liberation: George Washington Lee and the construction of a civil rights narrative in Memphis, Tennessee," College Language Association Conference, Memphis, TN, April 2024

"Dr. King and Economic Justice", Project Humanities Lecture, Arizona State University, January 2024

"To Study A State To Know A Nation: North Carolina and the United States", Final Plenary Session, Southern Historical Association, Charlotte, NC, November 2023

"The Political Worlds of George Washington Lee", Nashville Conference on African American History and Culture, February 2023

George Lee and the Politics of Black Representation", Association for the Study of African American Life and History Conference, September 2022

"Confronting the Master Narrative of the Civil Rights Movement", Gilder Lehrman Institute Presentation, July 2022

"The History and Philosophy of Black Lives Matter", Panelist, University of Memphis Department of Philosophy, October 2020

"Teaching Movement History", Presentation to Prof. Hasan Jeffries' Civil Rights History Course, The Ohio State University, April 2020

Panel Discussion: "1619: Commemoration and the (After) Lives of Slavery" (Gordon Bigelow; Kijan Bloomfield; Trimiko Melancon; Charles McKinney), Rhodes College October 2019

"The Central Lesson: Teaching the Movement in a Time of Universal Deceit", Opening Lecture, We Who Believe in Freedom: A Symposium on Teaching The Civil Rights Movement, June 2018

"Memphis Moving Forward: Confronting Poverty", Panel Discussion, MLK50 Symposium, April 2018
(Panel can be viewed at: https://www.youtube.com/watch?v=fdyOljVoiG4&feature=youtu.be)

"Institution Building: The Age of Jim Crow"
"Continuity of Struggle: The Age of Jim Crow"
Two Invited Lectures, National Endowment for the Humanities Summer Institute for College and University Teachers, Jackson State University, June 2017

"Understanding and Teaching the Civil Rights Movement: An Exploration in Civil Rights Pedagogy", American Historical Association Conference, January 2017

"Reconstruction's Protean Post-Civil Rights Legacy", Paper Presented at "Memories of a Massacre: Memphis in 1866, a Symposium Exploring Slavery, Emancipation, and Reconstruction." May 2016

"Region, Race and Memory: Inheriting the Civil War", Fort Pillow State Historic Park, April 2014

"'It is a mistake for the Party to…write off the Negro': Civil Rights and the Pursuit of Power at the Republican National Convention, 1964", Association for the Study of African American Life and History Conference, October 2013

"Greater Freedom: The Civil Rights Struggle In Eastern North Carolina", Lecture, Albany Civil Rights Institute, Albany, Georgia, June 2011

"Race, Rights and Redemption: Lessons from North Carolina's Freedom Struggle", Lecture, Rhodes College, February 2011

"The Crawl of an Arthritic Turtle: Race, Progress and Freedom in North Carolina." Southern Studies Brown Bag Lunch and Lecture Series, University of Mississippi, November 2010

"Fighting Over the Future of the Past: History, Memory and Contemporary Black Politics." Association for the Study of African American Life and History Conference, Cincinnati, Ohio, October 2009

Chair and Commentator, "Communities of Resistance Down East: Oral Histories of Working-Class Struggle in Eastern North Carolina." Oral History Association Meeting, Oakland, California, October 2007

"Building History from the Ground Up: The Continued Relevance of Local Studies." The Twenty-Fourth Annual Fannie Lou Hamer Memorial Symposium Lecture Series, The Hamer Institute, Jackson State University, October 2007 (Invited participant)

Panel Chair, "Race, Religion and Theology in the Public Square." American Academy of Religion Conference, Nashville, Tennessee, March 2007

"Writing History, Building Freedom: How Black History Can Transform America – If We Let It." Keynote Speech, Black History Month Program, Morehouse College, Atlanta, Georgia, February 2007
"Cracking Open the Black Box: Martin Luther King, Jr., the Media and the Continuing Challenge to Black Leadership." National Media Reform Conference, January 2007

"'We would be stronger if we came together': Building a Working-Class Freedom Movement in the Rural South, 1968 – 1970." Southern Historical Association Conference, Birmingham, Alabama, November 2006

"'That Ain't how I remember it!': Oral History, Memory and the Transformation of Civil Rights Narratives in Wilson, North Carolina." Oral History Association Conference, Little Rock, Arkansas, October 2006

"'A Little too much for a self-respecting white man to swallow': Black insurgency and white management in Wilson, North Carolina, 1955-1965." Organization of American Historians Conference, Washington, DC, June 2006

"Memphis, Tennessee and the Confluence of Labor and Civil Rights: The Sanitation Workers Strike." Landmarks of American Democracy Seminar of the National Endowment for the Humanities, July 2005

"'Somewhere down the line, we decided to organize': Fannie Corbett and the creation of a working class Freedom movement in Wilson, North Carolina, 1968-1970." Thinking Through Action Conference, Vancouver, British Columbia, Canada. June 2005

"'The brothers on the corner got my back': Self-Defense and the creation of non-violent spaces in Wilson, North Carolina, 1963-1970." American Historical Association Conference, Seattle, WA. January 2005 (paper accepted)

"'They lynched a Negro in Hoover Time': Race, Violence and the Limits of Civic Inclusion in Wilson, North Carolina, 1930-1964." American Studies Association Conference, Hartford, Conn. October 2003

## Selected Public/Community Presentations

"Civil Rights: Movement or Cycle?", Hattiloo Theater Black History Month Lecture, February 2025
"Hidden Histories of Memphis", City Year Memphis, July 2024

"Rethinking Black History: Beyond Dates and Figures", St. Stephens Church of God in Christ Cathedral, San Diego, CA, February 2024

"Jazz and Justice", North Cross School, Roanoke, Virginia, February 2024

"The Legacy of Martin Luther King, Jr." Panel Discussion, Hosted by the United States Embassy, Qatar, February 2021

"Wear It: Our Crown Has Already Been Bought and Paid For", Keynote Lecture for the Black Millennial Political Convention, Lemoyne-Owen College, March 2020

"The Many Faces of Educational Reform", Keynote Lecture, Charter School Growth Fund National Conference, October 2019

"Wait, wait! I know that! What we can learn from Black History Month", Kate Bond Elementary, February 2019

"Memphis Moving Forward: Confronting Poverty", Panel Discussion, MLK50 Symposium, April 2018
(Panel can be viewed at: https://www.youtube.com/watch?v=fdyOljVoiG4&feature=youtu.be)

"Twenty-First Century Activism", Panel Discussion, MLK50 Symposium, University of Memphis Law School, April 2018 (Panel can be viewed at: https://www.youtube.com/watch?v=acwNBcdi8EI)

"The Silence of our Friends: MLK's Legacy and the Costs of Community", Calvary Episcopal Church, February 2018

"You Can't Get Around the Work: Race, Rights and the Perpetual Pursuit of Educational Justice", Keynote Speech, National Council on Black American Affairs, October 2017

"Education Reform in Real Time", The Memphis Lift Community Organization, September 2017

48

Panelist, "Telling Histories: Storytelling and Civil Rights", Art Symposium on Photo Collection "Road through Midnight", Tennessee State Museum, Nashville, TN, February 2015

## Honors/Prizes/Awards/Grants

Director, Neighborhood Narratives Initiative, funded by Mellon Foundation Grant for developing the *Institute for Race and Social Transformation*, Rhodes College. Grant award: 800k for three years, 2023-2026

Mellon Faculty Innovation and Collaboration Fellowship: Health Equity, Human Flourishing, and Well-Being, Rhodes College, "Freedom Dreams: Building a Music, Justice and Voice Curriculum with the Memphis Music Initiative", 2020-2021

Mellon Faculty Innovation and Collaboration Fellowship: Liberal Arts and Social Justice in the 21st Century, Rhodes College, "The Meaning of Freedom: Teaching the Civil Rights Movement", 2019-2020

Rhodes College Clarence Day Award for Outstanding Teaching, (The College's Highest Teaching Award) May 2018

Hill Grant for Curricular Development, Africana Studies, 2015-16. (Grant to create two new courses in Africana Studies for Fall of 2018)

Hill Grant for Curricular Development, Co-Recipient, Fall 2015 (New Course in African American Music)
CODA (Center for Outreach and Development of the Arts) Faculty Staff Grant, Fall 2014

Participant, Advanced Oral History Summer Institute, Regional Oral History Office, University of California, Berkley, Summer 2012

Mellon Foundation Faculty Career Enhancement Grant, June 2012

R.W.D. Connor Award, Given by the Historical Society of North Carolina for Outstanding Article in the *North Carolina Historical Review*, 2011

Rhodes Student Government Outstanding Faculty Member Award, April 2007

Spirit Award, Black Student Association, April 2006

## Campus and Community Service

Board Member, Workers Interfaith Network, 2025 – Present
Steering Committee Chair, Memphis for All (https://www.memphisforall.com/), 2022 – Present
Board Member, Memphis Music Initiative, 2020 – Present
Member, Community Initiatives Committee, Community Foundation of Greater Memphis, 2023 – Present
Shelby County Historical Commission (Elected by Shelby County Commission), 2022-2026
Campus Safety Task Force, October 2022
Primary Organizer, Rhodes #ScholarStrike, September 2020
Keynote Speaker, "The Last Lecture", Rhodes College, April 2020
Director, Africana Studies Program (2012 – 2024)
Faculty Trustee, Board of Trustees (2019 – 2021)
Faculty Advisor, Black Student Association (2019 – Present)
Member, Faculty Task Force on Diversity and Retention (2019 – Present)
Member, Mellon Foundation African Diaspora Exchange Program (2019 – Present)
Member, Faculty Governance Committee, (2015-2017)
Member, President's Commission on Campus Climate, (Spring 2015)

Principal Conference Organizer, "From Civil War to Civil Rights: Race, Region and the Making of Public Memory", (Spring 2014)
Member, Admissions Policy Committee, Humanities Representative (2009-2012)
Urban Studies Program Committee (2005-2009)

## Service to the Profession

**Manuscript Review**

**Academic Presses**
University of Arkansas Press
University of Georgia Press
University of North Carolina Press
University Press of Florida
University Press of Kentucky
University Press of Mississippi
Palgrave Macmillan

**Journals**
*Journal of African American History*
*Journal of Southern History*
*Journal of Urban History*
*North Carolina Historical Review*
*Oral History Review*

## Professional Appointments

Editorial Board, *Journal of African American History*, 2023-2026

Lead Scholar, Gilder Lehrman Institute of American History Summer Seminar in Civil Rights. 2016-2019, 2023

Advisory Board, Politics and Culture in the Twentieth Century South Series, University of Georgia Press, 2023 – Present

Executive Council, Southern Historical Association, (Elected Member), 2021-2023

Juror, Stone Book Award, Museum of African American History, (Boston), 2021 – Present

Inaugural Scholar-In-Residence, National Civil Rights Museum, 2018-2019

Juror, Benjamin L. Hooks Book Award Committee, University of Memphis, 2018 - 2024

Committee Member, Organization of American Historians' *Liberty Legacy Foundation Award Committee*, Award given annually for the best book by a historian on the civil rights struggle from the beginnings of the nation to the present, 2021-2023

## Program/Department Reviews

Consultant, Africana Studies Major Proposal Initiative, Grinnell College, 2022

External Review Team, Connecticut College History Department, 2017

External Proposal Reviewer, The College of New Jersey, December 2014. Reviewed the College's proposal to establish a Bachelor of Arts Degree in African American Studies. (Major approved in January of 2016)

## Consulting

Content Area Scholar, National Civil Rights Museum, 2024

Historical Consultant, Orpheum Theater, Memphis, TN, 2022 – 2023. Wrote historical panel text for *The Balcony Project* (panels can be accessed at https://orpheum-memphis.com/about-us/the-balcony-project/)

Curriculum Consultant, Memphis Music Initiative, 2020-2021

Interpretive Plan Development and Advising Scholar, National Civil Rights Museum Redesign Team, 2009 – 2010

## Professional Memberships

American Historical Association
American Studies Association
Association for the Study of African American Life and History
National Council for Black Studies
Oral History Association
Organization of American Historians
Southern Historical Association