**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

Case No. 3:26-cv-00638

**IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE NASHVILLE DIVISION**

| | | |
|---|---|---|
| TENNESSEE STATE CONFERENCE OF THE NAACP, et al., | ) | |
| Plaintiffs, | ) | ORDER AND OPINION |
| v. | ) | |
| TRE HARGETT, et al., | ) | |
| Defendants. | ) | |

**BEFORE: NALBANDIAN, Circuit Judge, CAMPBELL, Chief District Judge, and STIVERS, District Judge.**

**PER CURIAM.**

In May 2026, the Tennessee legislature adopted a new congressional map. It split Memphis and Shelby County across three districts. During the special session convened to redraw the maps, Republicans in the Tennessee legislature emphasized the political purpose of the new map. The map's sponsors wanted to send an entirely Republican delegation to Congress. Plaintiffs allege that was pretext. On Plaintiffs' account, the real motivation for the 9-0 map was to dilute the voting power of the Black population in Memphis. Because the complaint fails to allege facts that plausibly support that view, we grant the defendant's motion to dismiss.

I.

On April 29, 2026, the Supreme Court decided *Louisiana v. Callais*, 146 S.Ct. 1131 (2026). That case limited the ways a congressional map could be litigated under Section 2 of the Voting

Rights Act. *Id.* at 1159–61. Now, Section 2 imposes liability only when there is a strong inference that a map was the product of intentional racial discrimination. *Id.* at 1156. Disparate impact alone is not enough for a Section 2 claim. *Id.* As now understood, nothing about Section 2 limits "States' prerogative to draw districts based on nonracial factors." *Id.* That decision set off the chain of events leading to today.

The same day *Callais* was decided, U.S. Senator Marsha Blackburn of Tennessee called for the state legislature to "reconvene to redistrict another Republican seat in Memphis." R.30 at ¶75; R.44 at PageID 726. On May 1, Governor Lee issued a proclamation to facilitate the 2026 election. On May 5, the Generally Assembly convened. On the first day, the Republicans advanced legislation to repeal the state's ban on late-decade redistricting. Over the next several days, the map's sponsors stated the political and litigation justifications for the map. By the end of the Extraordinary Session, the Tennessee legislature redrew the districts such that Memphis and Shelby County were spread across three districts. On May 7, the legislature voted that map into law.

On May 13, Plaintiffs—several civil rights advocacy groups and Black Tennessee voters—filed this lawsuit. The Defendants are several state elections officials and the state election commission. Plaintiffs bring one claim: that the 2026 map splitting Shelby County across three separate districts was impermissibly motivated by race, in violation of the Fourteenth and Fifteenth Amendments to the Constitution. The Complaint alleges that the 2026 map was intentionally adopted to disadvantage Black voters and dilute Black votes in Tennessee. This is called a vote-dilution claim. To remedy this supposed violation, Plaintiffs ask this court to declare the May 2026 map unconstitutional and issue an injunction barring any election from taking place using the new map.

II.

When the constitutionality of a state's congressional map is challenged, the Circuit's Chief Judge assembles a three-judge district court to decide the claims. 28 U.S.C. § 2284. Here, the Chief Judge convened this court to evaluate Plaintiffs' allegations that Tennessee's new map violates the Constitution.

A.

Under Rule 12, we dismiss a complaint when its "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), or when "an obvious alternative explanation" would establish no wrongdoing, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007).

Because the complaint accuses the legislature of racial motives, the presumption of good faith applies. *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 10–11 (2024). That presumption applies at the pleading stage. *Tennessee State Conf. of NAACP v. Lee*, 746 F. Supp. 3d 473, 494 (M.D. Tenn. 2024) (per curiam); *Miller v. Johnson*, 515 U.S. 900, 916–17 (1995) ("[C]ourts must also recognize these principles . . . when assessing under the Federal Rules of Civil Procedure the adequacy of a plaintiff's showing at the various stages of litigation."); *see Alexander*, 602 U.S. at 10 ("The presumption of good faith furthers . . . constitutional interests."). So, "when all the relevant evidence in the" complaint is "taken into account," *Abbott v. Perez*, 585 U.S. 579, 607 (2018), and the complaint "makes clear that race and politics are highly correlated, it must allege facts that plausibly disentangle race from politics," *Lee*, 746 F. Supp. 3d at 494 (citation modified). That means Plaintiffs must "rul[e] out the competing explanation that political considerations dominated the legislature's redistricting efforts. If either politics or race could explain a district's contours, the plaintiff has not cleared its bar." *Alexander*, 602 U.S. at 9–10.

Practically, this means that if the map here could be explained by either politics or race, Plaintiffs must plead facts that make it plausible race was a substantial motivator and politics alone can't explain the outcome. *See Hunter v. Underwood*, 471 U.S. 222, 228 (1985); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). Thus, "[a] plaintiff pressing a vote-dilution claim . . . must show that the State 'enacted a particular voting scheme as a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities." *Alexander*, 602 U.S. at 38 (quoting *Miller*, 515 U.S. at 911). Plaintiffs must also demonstrate a discriminatory effect. *Id*. at 39.

So, to determine whether this complaint survives the motion to dismiss, we ask: Has the complaint plausibly overcome the presumption of good faith and shown the legislature was not entirely politically motivated, but instead was motivated in substantial part to dilute the vote of Black Memphians?

B.

The complaint attempts to make that showing by pleading circumstantial facts. Plaintiffs don't allege direct evidence of an impermissible motive. To the contrary, Plaintiffs admit that Tennessee Republicans unabashedly trumpeted the political motivations behind the map. So the validity of the whole complaint hinges on Plaintiffs plausibly showing that these political justifications were pretext.

Attempting to demonstrate that pretext, Plaintiffs make a number of allegations that fall into roughly three categories: (1) the special redistricting process, (2) the 2026 map's impact, and (3) historical and contemporary discrimination in Tennessee. As we'll explain, these allegations don't overcome the presumption and therefore don't state a plausible claim.

First, Plaintiffs catalogue the circumstances of the redistricting process. The complaint points to the unprecedented mid-cycle redistricting, R.30 at ¶¶79, 80, the fast-paced, 48-hour redistricting session, *Id.* at ¶77, and "uninformative" statements made by lawmakers during the session, *Id.* at ¶¶94–97, 104–19, 113–14. Plaintiffs claim these procedural anomalies give rise to a plausible claim of discriminatory motive. But anomalous is not synonymous with animus. Sure, the Republican-majority decided to redistrict right after the Supreme Court decided *Callais*. *Id*. at ¶¶ 75, 109. But as we stated in a previous order regarding Tennessee's new map, "the short gap between the Supreme Court's *Callais* decision and Tennessee's primary elections appeared to give the state a brief window to pass a map that favored Republicans." *Sherman v. Hargett*, No. 3:26-cv-00616, at *9 (M.D. Tenn. July 23, 2026). This racially neutral, "obvious alternative explanation" accounts for the legislature's actions. *Twombly*, 550 U.S. at 567.

Plaintiffs also allege that Tennessee relied "only" on 2020 census data to draw the map. That data includes race, but not political information. According to Plaintiffs, that means the maps drafters must have used race as a proxy for political affiliation. And *Alexander* tells us that this is one way plaintiffs can "establish racial predominance." 602 U.S. at 8 n.1. But the allegations in the complaint don't show that race was used in the redistricting process at all, let alone as a proxy. Plaintiffs point repeatedly to an exchange between Senator Zachary and Senator Clemmons. In that exchange, Senator Clemmons asked Senator Zachary—a supporter of the new maps—if the census was the "sole basis for drawing" the new map. R.30 at ¶113. Senator Zachary responded, "Yes, it is my understanding the census was used to draft the map you have in front of you—based on the population." R.30 at ¶ 113. That ambiguous answer is subject to multiple interpretations. Plaintiffs fault Senator Zachary for not explaining himself further. But the presumption of good faith cautions against reading ambiguity against the legislature here. *See Lee*, 746 F. Supp. 3d at

490. And the Complaint doesn't allege anything that can plausibly overcome that presumption and show that the legislature used racial data in making the map.

Instead, the "obvious alternative explanation" is exactly what the legislators said it was. *Twombly*, 550 U.S. at 567. The map was based on "population and politics." R.30 at ¶157. Sure, the census data includes racial as well as population information. But the mere fact that the census data includes race is not enough to demonstrate that the racial data was used, especially when we presume the legislature acted in good faith. Furthermore, Plaintiffs acknowledge that the map's drafters stated they "filtered out" the race information from the census data. R.50 at PageID 830.[1] Viewing the complaint as a whole, there's not enough evidence to plausibly suggest the legislature lied about filtering out race data—which we would have to conclude for Plaintiffs' claim to be viable.

Second, the discriminatory effect of the map alleged in the complaint does not plausibly show intentional vote-dilution. Plaintiffs argue that the "May 2026 map . . . will have a specific dilutive effect on Black voters." R.30 at ¶194. And they allege that the legislature was aware of that effect. But neither dilutive effect, nor knowledge of dilutive effect, is enough. That's because political gerrymandering is constitutional "even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact." *Alexander*, 602

---

[1] The legislators' statements about filtering out racial data were not in the complaint. But we may take judicial notice of records, such as a legislative hearing recording, which are referenced in the complaint without converting a motion to dismiss into a motion for summary judgment. *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 466 (6th Cir. 2014); *see Greenberg v. Life Ins. Co. of Virginia,* 177 F.3d 507, 514 (6th Cir. 1999) (holding that when a document is "referred to in the complaint and is central to the plaintiff's claim," the court can consider it on a motion to dismiss without converting the motion into one for summary judgment). This is especially appropriate to rebut what would otherwise be "misleading statements." *Omnicare, Inc. Sec. Litig.*, 769 F.3d at 466.

U.S. at 9. Yes, a dilutive effect can be circumstantial evidence of discrimination. *See Arlington Heights*, 429 U.S. at 266. But is it strong enough to overcome the presumption of good faith? Not here, where the map's effects are "readily explainable on grounds apart from race." *City of Mobile v. Bolden*, 446 U.S. 55, 70 (1980). The complaint acknowledges that the stated purpose of the map was to create a 9-0 Republican delegation to Congress. And the complaint does not allege that the Republican majority could have achieved a 9-0 Republican map without splitting up Memphis. Which makes sense because Plaintiffs themselves plead that race and voting tendencies are highly correlated in the state. R.30 at ¶30. So it follows that a Republican-favored map would divide up Shelby County as the 2026 map does. Therefore, Plaintiffs' evidence of dilutive effect is insufficient to plausibly overcome the presumption of good faith and show the legislature was motivated by race when drafting the map.

Third, Plaintiffs highlight historical evidence of racism in Tennessee's state legislature. Notably, "we cannot accept official actions taken long ago as evidence of current intent." *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987). And isolated contemporary statements don't help the complaint either because the "statements and votes of a handful of legislators on unrelated topics do not plausibly suggest that the whole legislature passed the legislative maps to discriminate against racial minorities." *Lee*, 746 F. Supp. 3d at 506 (citation modified).

Disentangling race from politics does not require—as Plaintiffs note—ruling "out additional motivations." R.65 at PageID 916. But it does require plaintiffs to plausibly allege that the map cannot be solely explained by politics. *Lee*, 746 F. Supp. 3d at 490. At every turn, where the complaint purports to show a legislative decision motivated by race, the decision is readily explainable by politics. Like with any complaint, Plaintiffs must show more than the mere possibility of misconduct. But they fail to do that here.

C.

Plaintiffs try to escape their obligations by distinguishing between the burdens of racial-gerrymandering and vote-dilution claims. Plaintiffs are correct that the two are "analytically distinct." *Alexander*, 602 U.S. at 38. But that difference imposes a *more* demanding burden on the Plaintiffs. Plaintiffs point us to *Alexander* for the proposition that a vote-dilution claim is "analytically distinct" from a racial gerrymandering claim. R.50 at PageID 829 (quoting *Alexander*, 602 U.S. at 38). How are they different? *Alexander* explains that a vote-dilution plaintiff can't win "simply by showing race played a predominant role" like they can in a racial gerrymandering case, where "[t]he racial classification itself is the relevant harm" and the intent behind that classification is irrelevant. *Alexander*, 602 U.S. at 38. Instead, a vote-dilution plaintiff must show that the state implemented a voting scheme with the purpose of minimizing or canceling the "voting potential of racial or ethnic minorities." *Alexander*, 602 U.S. at 39. Plaintiffs must show that Tennessee's maps were implemented with both the "purpose *and* effect" of diluting the Black vote in Tennessee. *Id.* But as we've stated, they haven't done that. So Plaintiffs' reliance on *Alexander* is misplaced.

III.

The Republican-controlled state legislature in Tennessee sought maximum political advantage in a state where race and politics are highly correlated. The result was a map that created nine Republican-advantaged congressional seats as well as fractured Black voting populations. Race and politics are certainly entangled in this context. But we presume legislatures act in good faith when they redistrict. Plaintiffs believe they have overcome that presumption and plausibly alleged that the legislature engaged in a racist conspiracy and public coverup to intentionally dilute the Black vote in Tennessee. But we must "act cautiously before we hurl such accusations at the

political branches." *Lee*, 746 F. Supp. 3d at 504. On the face of this complaint, such accusations are implausible. Politics is an obvious alternative explanation. So the motion to dismiss is **GRANTED**.